## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

AMADA AMERICA, INC., a California
corporation,

        Plaintiff,

        v.

PRECISION AMERICAN METALS, LLC.,
An Illinois Limited Liability Corporation, and
JOHN M. MAZUREK and PAMELA F.
MAZUREK, individually,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No.

```
FILED: March 24, 2008
08cv1706      JH
JUDGE NORGLE
MAGISTRATE JUDGE SCHENKIER
```

### COMPLAINT

Plaintiff, Amada America, Inc. ("Amada"), by its attorneys, Connelly Roberts &

McGivney LLC, for its Complaint against Defendants, Precision American Metals, LLC.,

an Illinois Corporation ("Precision"), John M. Mazurek, an individual, and Pamela F.

Mazurek, an individual (collectively "the Parties"), states as follows:

### Jurisdiction

1.      Amada is a corporation with its headquarters and principle place of

business in the State of California.  Precision is a limited liability corporation with its

headquarters and principle place of business in the State of Illinois.  Upon information

and belief, John and Pamela Mazurek are residents of the State of Illinois.

2.      The amount in controversy, exclusive of interest and costs, is in excess of

the sum specified by 28 U.S.C. §1332.

3.      Defendants have waived any objection to this Court's jurisdiction over this

matter.  Further, Defendants consented to the jurisdiction of this Court for the purpose of

enforcing a Settlement and Release Agreement between the Parties and for the entry of a Confession of Judgment Order as outlined in the following facts.

## Parties

4.      Amada is a corporation specializing in the manufacture and sale of machine tools to the fabrication industry, with its headquarters and principle place of business at 7025 Firestone Blvd., Buena Park, California.

5.      Precision is an Illinois limited liability corporation, with its headquarters and principle place of business at 1050 Kingsland Drive, Batavia, Kane County, Illinois.

6.      John M. Mazurek and Pamela F. Mazurek are residents of the village of St. Charles, Kane County, Illinois.

## Facts

7.      In July of 2006, John M. Mazurek, as President of Precision, executed seven separate Equipment Purchase and Security Agreements ("the Agreements"), for the purpose of procuring a number of specialized machines from Amada.

8.      The Agreements were individually and personally guaranteed by John M. Mazurek and Pamela F. Mazurek.

9.      Defendants subsequently breached the terms of the Agreements by failing to tender payment for the purchased items.

10.      On July 24, 2007, Amada filed a Complaint alleging breach of contract against Precision and the Mazureks, individually, for their failure to tender payment under the terms of the Agreements. (A copy of Amada's Complaint is attached as Exhibit "A").

11.     On December 5, 2007, Defendants and Amada entered into a Settlement and Release Agreement.   This Settlement and Release Agreement was signed by Precision and the Mazureks individually. (A copy of the Settlement and Release Agreement is attached hereto as Exhibit "B").

12.     In the Settlement and Release Agreement, Amada agreed to accept the payment of $1,469,952.96 to satisfy the debt owed by Defendants.   Defendants agreed that they were jointly and severally liable for the full satisfaction of the Settlement and Release Agreement. (¶ 9, Ex. B).

13.     Paragraph 10 of the Settlement and Release Agreement established the following payment structure:

> "The Settlement Payment shall be payable as follows:
>
> a.     On November 28, 2007 Defendants tendered to Amada payment in the amount of $39,820.34 (the "First Installment").  Amada acknowledges receipt of the First Installment;
>
> b.     The remaining amount due under this Settlement Agreement, or $1,430,132.62 shall be paid in monthly installments of $23,835.54 (the "Monthly Installments"), due on the 15th of each month and beginning on December 15, 2007.  The Monthly Installments shall continue until the Settlement Payment is satisfied in full."
> (¶ 10, Ex. B)

14.     Defendants issued a check for the December 2007 installment on December 17, 2007, in the amount of $23,836.54, which was accepted and cashed by Amada.

15.     The Amada Complaint was dismissed with prejudice on January 8, 2008 in accordance with the terms of the Settlement and Release Agreement.

16.     Defendants issued a check for the January 2008 installment on January 28, 2008.  Upon deposit of the check, Amada was informed that there was insufficient

funding for the January installment check. (A copy of the insufficient January 28, 2008 check is attached as Exhibit "C").

17.     Defendants did not tender payment for the February 2008 monthly installment.

18.     Paragraph 12 of the Settlement and Release Agreement states:

"[I]f, for any reason, Defendants fail to make any payment enumerated in this Settlement Agreement within 7 (Seven) days of when such payment(s) become due (the "Event of Default"), Amada may initiate a proceeding against Defendants under this Settlement Agreement, under its common law or statutory rights, or both."
(¶ 12, Ex. B).

19.     In paragraph 12 of the Settlement and Release Agreement, Defendants consented to the entry of a Confession of Judgment Order similar to the Order attached to the Settlement and Release Agreement as Exhibit B. (¶ 12, Ex. B).

20.     Simultaneously with this Complaint, Amada has filed a Motion to Enter the Confession of Judgment Order. (A copy of said Motion is attached hereto as Exhibit "D").

21.     Paragraph 13 of the Settlement Agreement states:

"For purposes of the Confession of Judgment Order, Defendants appoint the law firm of Connelly Roberts & McGivney LLC, or its designee, as attorneys in fact for Defendants to enter the Confession of Judgment Order and for the preparation of any motion required for the entry of such Order. For purposes of this Agreement, Defendants waive any conflict which may arise with Connelly Roberts & McGivney LLC with respect to the entry of the Confession of Judgment Order, in addition to waiving any appeal rights which may arise resulting from the entry of the Confession of Judgment Order. Defendants also waive and forego any affirmative defenses, bars to enforcement, claims of estoppel, or any other matter which could act as a defense to the proceeding relating to the entry of the Confession of Judgment Order and/or any matters relating to the enforcement of any such Confession of Judgment Order, or supplemental proceedings thereon."
(¶ 13, Ex. B).

4

22.    Defendants are liable to Amada for the full Settlement Payment as well as attorney's fees and costs pursuant to paragraph 14 of the Settlement Agreement, which states:

> "Upon an Event of Default, Defendants shall be liable to Amada for the Settlement Payment, in full, plus attorneys' fees and costs, less any amounts paid by Defendants pursuant to this Settlement Agreement. At the time of the entry of the Confession of Judgment Order, Connelly Roberts & McGivney LLC shall provide the Court with an affidavit stating the amounts previously paid by Defendants pursuant to this Agreement and the attorneys' fees incurred by Amada."
> (¶ 14, Ex. B).

23.    Attached is the Affidavit of Cory D. Anderson (the "Affidavit"), an attorney with Connelly Roberts & McGivney LLC, which states the amounts paid to Amada by Defendants, Defendants' outstanding Settlement balance and the attorney's fees and costs incurred by Amada to enforce the Settlement Agreement. (see Exhibit E).

24.    Amada has performed all of its obligations under the Settlement and Release Agreement by dismissing its suit against Defendants.

25.    Defendants breached their obligations pursuant to the Settlement and Release Agreement, and are in default of the same, by:

   a)    Issuing an insufficient check for the January 2008 installment payment, and,

   b)    Failing to tender payment for the February 2008 installment.

26.    Defendants owe Amada $1,406,296.08 under the terms of the Settlement and Release Agreement. (see Exhibits B through E). Moreover, Amada, per the terms of the Settlement and Release Agreement, is entitled to be reimbursed by Defendants for their fees and costs associated with the enforcement of the Settlement and Release Agreement, totaling $7,150.00. (see Exhibits B through E).

WHEREFORE, Plaintiff, Amada America, Inc., respectfully requests that this Court:

1) Enter judgment for Amada America, Inc. and against Precision American Metals, LLC, John M. Mazurek and Pamela F. Mazurek, jointly and severally, in the amount of $1,413,446.08;

2) Or, in the alternative, for any other relief that this Court deems just.

Respectfully Submitted,

Amada America, Inc.,

By: /s/Cory D. Anderson
One of its Attorneys

Matthew P. Connelly
Cory D. Anderson
Connelly Roberts & McGivney LLC
55 W. Monroe St., Suite 1700
Chicago, Illinois 60603
(312)251-9600

RECEIVED

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JUL 2 4 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| AMADA AMERICA, INC., a California corporation, | ) | 08cv1706 |
|  | ) | JUDGE NORGLE |
|  | ) | MAGISTRATE JUDGE SCHENKIER |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | 07 C 4177 |
|  | ) | |
| PRECISION AMERICAN METALS, LLC., An Illinois Limited Liability Corporation, and JOHN M. MAZUREK and PAMELA F. MAZUREK, individually, | ) | JUDGE MORAN |
|  | ) | |
|  | ) | MAGISTRATE JUDGE KEYS |
|  | ) | |
| Defendants. | ) | |

JH

## COMPLAINT

Plaintiff, Amada America, Inc. ("Amada"), by its Attorneys, Connelly Roberts & McGivney, for its Complaint against Defendants, Precision American Metals, LLC., an Illinois Corporation ("Precision"), John M. Mazurek, an individual, and Pamela F. Mazurek, an individual, states as follows:

### Jurisdiction

1.     Plaintiff is a corporation with its headquarters and principle place of business in the State of California. Defendant Precision is a limited liability corporation with its headquarters and principle place of business in the State of Illinois. Upon information and belief, the Defendants John and Pamela Mazurek are residents of the State of Illinois.

2.     Upon information and belief, the amount in controversy, exclusive of interest and costs, is in excess of the sum specified by 28 U.S.C. §1332.

EXHIBIT
A

### Facts

3.      Plaintiff Amada is a corporation specializing in the manufacture and sale of machine tools to the fabrication industry, with its headquarters and principle place of business at 7025 Firestone Blvd. in the city of Buena Park, California.

4.      Defendant Precision is an Illinois limited liability corporation, with its headquarters and principle place of business at 1050 Kingsland Dr., in the village of Batavia, Kane County, Illinois.

5.      Upon information and belief, Defendants John M. Mazurek and Pamela F. Mazurek are residents of the village of St. Charles, Kane County, Illinois.

6.      Sometime on or about July 20-27, 2006, Precision executed seven separate Equipment Purchase and Security Agreements ("the Agreements"), for the purpose of procuring a number of specialized machines from Amada.   The Agreements were numbered and executed as follows:

      a.  Agreement Number 14744, to purchase a Togu III Tool Grinder from Amada for the purchase price of $21,600.00. (A copy of the Agreement is attached hereto as Exhibit A).

      b.  Agreement Number 14546, dated July 20, 2006, to purchase a Spot Welder from Amada for the purchase price of $32,000.00. (A copy of the Agreement is attached hereto as Exhibit B).

      c.  Agreement Number 14738, to purchase an APS Software Package from Amada for the purchase price of $89,880.00. (A copy of the Agreement is attached hereto as Exhibit C).

      d.  Agreement Number 14550, to purchase a Fabrivision Inspection Machine from Amada for the purchase price of $64,700.00. (A copy of the Agreement is attached hereto as Exhibit D).

      e.  Agreement Number 14742, to purchase a Manipulator System from Amada for the purchase price of $122,000.00. (A copy of the Agreement is attached hereto as Exhibit E).

     f.   Agreement Number 14738, to purchase a Turret Punch Press, with Tooling Package and Scrap Conveyor, from Amada for the purchase price of $307,235.00. (A copy of the Agreement is attached hereto as Exhibit F).

     g.   Agreement Number 14741, to purchase a Robotic Press Brake with Tooling Package from Amada for the total purchase price of $605,000.00. (A copy of the Agreement is attached hereto as Exhibit G).

7.    Upon information and belief, these documents were executed by Precision in the village of Batavia, Illinois.

8.    Precision paid down payments of twenty per cent of the purchase price under each Agreement, and agreed to pay the remaining amount of each Agreement in 60 equal monthly installments. (*See* Exhibits A-G).

9.    The Agreements each provide that "any payment…not received by the ninth (9th) day following the date due will be subject to a late charge of five percent (5%) of the amount due as liquidated damages." (See Exhibits A-G, Section A, ¶4).

10.    As a condition of the Agreements, Precision granted Amada security interest in the property purchased under each agreement, and executed UCC Financing Statements with the California Secretary of State, Uniform Commercial Code Division, certifying such. (*See* Exhibits A-G, Section B, ¶1; UCC Financing Statements, 11190731, 11190774, 11190790, 11190766, 11190758, 11190723, and 11190782, attached hereto as Group Exhibit H).

## Count I
### Breach of Contract Against Precision

1-10    Plaintiff repeats and realleges paragraphs 1-8 of this Complaint as paragraphs 1-10 of this Count I, as if fully set forth herein.

11.    Amada has performed all of its obligations under each and every one of the Agreements by delivering the purchased machines and other equipment to Precision.

12.    Precision has legally accepted all goods delivered by Amada, as defined by §2606 of the California Commercial Code, by failing to make an effective rejection after having had a reasonable opportunity to inspect them.

13.    The first installment payment for Agreement number 14744, in the amount of $365.13, was due to Amada on October 1, 2006. (*See* Exhibit "A")

14.    Precision failed to remit this payment, or any other required payment on Agreement number 14744, and consequently late charges were assessed in the amount of $18.26 per month, and interest compounded at a rate of 9.75% per month. (*See* "Payment History", attached hereto as Exhibit I).

15.    To date, because of its failure to remit any payment whatsoever as required by Agreement number 14744, Precision owes Amada approximately $18,919.06. (*See* Exhibit I).

16.    The first installment payment for Agreement number 14546, in the amount of $540.93, was due to Amada on October 1, 2006. (*See* Exhibit "B").

17.    Precision failed to remit this payment, or any other required payment on Agreement number 14546, and consequently late charges were assessed in the amount of $27.05 per month, and interest compounded at a rate of 9.75% per month. (*See* Exhibit I).

18.    To date, because of its failure to remit any payment whatsoever as required by Agreement number 14546, Precision owes Amada approximately $28,028.22. (*See* Exhibit I).

19.   The first installment payment for Agreement number 14738, in the amount of $1,519.33, was due to Amada on May 15, 2007. (*See* Exhibit "C").

20.   Precision failed to remit this payment, or any other required payment on Agreement number 14738, and consequently late charges were assessed in the amount of $75.97 per month, and interest compounded at a rate of 9.75% per month. (*See* Exhibit I).

21.   To date, because of its failure to remit any payment whatsoever as required by Agreement number 14738, Precision owes Amada approximately $73,898.85. (*See* Exhibit I).

22.   The first installment payment for Agreement number 14550, in the amount of $1,132.57, was due to Amada on May 15, 2007. (*See* Exhibit "D").

23.   Precision failed to remit this payment, or any other required payment on Agreement number 14550, and consequently late charges were assessed in the amount of $56.63 per month, and interest compounded at a rate of 9.75% per month. (*See* Exhibit I).

24.   To date, because of its failure to remit any payment whatsoever as required by Agreement number 14550, Precision owes Amada approximately $55,087.03. (*See* Exhibit I).

25.   The first installment payment for Agreement number 14742, in the amount of $2,045.38, was due to Amada on May 15, 2007. (*See* Exhibit "E").

26.   Precision failed to remit this payment, or any other required payment on Agreement number 14742, and consequently late charges were assessed in the amount of $102.27 per month, and interest compounded at a rate of 9.75% per month. (*See* Exhibit I).

27.    To date, because of its failure to remit any payment whatsoever as required by Agreement number 14742, Precision owes Amada approximately $99,485.53. (*See* Exhibit I).

28.    The first installment payment for Agreement number 14740, in the amount of $6,437.38, was due to Amada on May 15, 2007. (*See* Exhibit "F").

29.    Precision failed to remit this payment, or any other required payment on Agreement number 14740, and consequently late charges were assessed in the amount of $321.87 per month, and interest compounded at a rate of 9.75% per month. (*See* Exhibit I).

30.    To date, because of its failure to remit any payment whatsoever as required by Agreement number 14740, Precision owes Amada approximately $313,108.10. (*See* Exhibit I).

31.    The first installment payment for Agreement number 14741, in the amount of $11,291.87, was due to Amada on May 15, 2007. (*See* Exhibit "G")

32.    Precision failed to remit this payment, or any other required payment on Agreement number 14741, and consequently late charges were assessed in the amount of $564.59 per month, and interest compounded at a rate of 9.75% per month. (*See* Exhibit I).

33.    To date, because of its failure to remit any payment whatsoever as required by Agreement number 14741, Precision owes Amada approximately $549,225.89. (*See* Exhibit I).

34.    Precision's failure to pay any of the required installments of any of the Agreements, after accepting the goods delivered by Amada constitutes a breach of the Agreements.

35.    Amada has demanded payment from Precision under the Agreements in the original total principle amount of $1,104,240.00, plus interest and late charges. (*See* Letter to John Mazurek, President of Precision Metals, dated July 20, 2007, attached hereto as Exhibit J).

36.    Despite Amada's demands, Precision has failed to make any payment whatsoever on any of the amounts due under the Agreements. (*See* Exhibit I).

37.    The total now due to Amada is approximately $1,137,752.68. (*See* Exhibit I).

38.    Each of the Agreements states that "in the event any...judicial action or proceeding is initiated with respect to any matters relating to this Agreement...the party in whose favor any award shall be given...shall be entitled to recover from the other party all costs and expenses (including attorney's fees) incurred in such action." (*See* Exhibits A-G, Section D, ¶5).

Wherefore, Plaintiff Amada America, Inc., pursuant to Section 2709 of the California Commercial Code, prays for judgment against the Defendant, Precision American Metals, LLC, in the amount of $1,137,752.68, and for prejudgment interest, costs and attorneys' fees.

## Count II
## Breach of Personal Guaranty Against John Mazurek

1-38    Plaintiff repeats and realleges paragraphs 1-38 of Count 1 as paragraphs 1-36 of this Count II, as if fully set forth herein.

39.    As a supplement to the Agreements, on or about July 20, 2006, Defendant John Mazurek executed a document entitled "Unconditional Continuing Guaranty" (Attached hereto as Exhibit K).    That Guaranty provides, in pertinent part, that "[g]uarantors unconditionally guaranty and promise to pay to Seller, on demand, any indebtedness of Buyer to Seller not paid when due." (*See* Exhibit K, ¶1).

40.    Amada has demanded that John Mazurek pay the amount presently due by Precision. (*See* Letter to John Mazurek, Guarantor, dated July 20, 2007, attached hereto as Exhibit L).

41.    Despite Amada's demands, and in direct breach of the Guaranty, John Mazurek has failed to make any payment whatsoever on any of the amounts due under the Agreements. (*See* Exhibit I).

42.    The Unconditional Continuing Guaranty states, in part, "[g]uarantors agree to pay reasonable attorneys' fees and all other costs and expenses which may be incurred by [Amada] in the enforcement of this…Guaranty". (*See* Exhibit K, ¶6).

Wherefore, Plaintiff Amada America, Inc. prays for judgment against the Defendant, John M. Mazurek, in the amount of $1,137,752.68, and for prejudgment interest, costs and attorneys' fees.

## Count III
### Breach of Personal Guaranty Against Pamela Mazurek

1-42    Plaintiff repeats and realleges paragraphs 1-42 of Counts I & II as paragraphs 1-42 of this Count III, as if fully set forth herein.

43.    As a supplement to the Agreements, on or about July 20, 2006, Defendant Pamela Mazurek executed a document entitled "Unconditional Continuing Guaranty" (Attached hereto as Exhibit K).    That Guaranty provides, in pertinent part, that

"[g]uarantors unconditionally guaranty and promise to pay to Seller, on demand, any indebtedness of Buyer to Seller not paid when due." (*See* Exhibit K, ¶1).

44.     Amada has demanded that Pamela Mazurek pay the amount presently due by Precision. (*See* Letter to Pamela Mazurek, Guarantor, dated July 20, 2007, attached hereto as Exhibit M).

45.     Despite Amada's demands, and in direct breach of the Guaranty, Pamela Mazurek has failed to make any payment whatsoever on any of the amounts due under the Agreements. (*See* Exhibit I).

46.     The Unconditional Continuing Guaranty states, in part, "[g]uarantors agree to pay reasonable attorneys' fees and all other costs and expenses which may be incurred by [Amada] in the enforcement of this...Guaranty". (*See* Exhibit K, ¶6).

Wherefore, Plaintiff Amada America, Inc. prays for judgment against the Defendant, Pamela F. Mazurek, in the amount of $1,137,752.68, and for prejudgment interest, costs and attorneys' fees.

### Count IV
### Accounting

1-46     Plaintiff repeats and realleges paragraphs 1-46 of Counts I-III as paragraphs 1-46 of this Count IV as if fully set forth herein.

47.     Each of the Agreements executed by the Defendants states that "for so long as any amounts are owed by Buyer to Seller under this Agreement, Buyer... (h) shall promptly furnish to Seller upon request current financial statements of Buyer." (See Exhibits A-G, Section B, ¶3).

48.     Amada has demanded current financial statements from Precision, but Precision has failed and refused to honor that demand, in violation of the Agreements.

WHEREFORE, Plaintiff, Amada America, Inc., respectfully prays for the entry of an Order requiring Precision to account to Amada and provide current financial statements from October 1, 2006 to the date of its accounting, and requiring Precision to continue such accounting on a monthly basis after its initial accounting.

Respectfully Submitted,

Amada America, Inc.,

By:_____
One of its Attorneys

Matthew P. Connelly
Cory D. Anderson
CONNELLY ROBERTS & McGIVNEY, L.L.C
55 W. Monroe St., Suite 1700
Chicago, Illinois 60602
312.251.9600

10

# AMADA AMERICA, INC.

AGREEMENT NUMBER  14747

FILE/? NUMBER  12901-C000

7025 Firestone Blvd., Buena Park, CA 90621

## EQUIPMENT PURCHASE AND SECURITY AGREEMENT

Buyer (described in Item 1.A. below) agrees to purchase from AMADA AMERICA, INC. ("Seller") and Seller agrees to sell to Buyer for business pu... only the equipment and other personal property described in Item 3, below ("Property"), on the terms and conditions set forth in this Agre... including without limitation the terms and conditions set forth on the reverse hereof.

**TYPE OR PRINT ONLY**

**ITEM 1 BUYER**

**A. DESCRIPTION OF BUYER**

| BUYER'S FULL NAME | | BUYER'S TRADE NAME OR STYLE | |
|---|---|---|---|
| PRECISION AMERICAN METALS, LLC | | | |

| ☐ CORPORATION  ☑ LIMITED LIABILITY CO. | ☐ OTHER | ORGANIZED UNDER THE LAWS OF THE STATE OF: IL | AMADA CUSTOMER NU... 29897 |
| ☐ PARTNERSHIP  ☐ PROPRIETORSHIP | | | |

| STREET ADDRESS OF BUYER'S CHIEF EXECUTIVE OFFICE | P.O. BOX | CITY BATAVIA | COUNTY | STATE IL | ZIP CODE 60510 | TELEPHONE ( 630 ) 406-7775 |
|---|---|---|---|---|---|---|
| 1050 KINGSLAND DR. | | | | | | |

**B. INSTALLATION SITE**

| COMPANY NAME | | BRANCH / DIVISION | | |
|---|---|---|---|---|
| SAME AS "A" | | | | |

| STREET ADDRESS | | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE ( ) |
|---|---|---|---|---|---|---|

| REQUEST DELIVERY DATE | SHIPPING INSTRUCTIONS FOB SHIPPING POINT | AMADA CUSTOMER NUMBER | CONTACT JOHN MAZUREK |
|---|---|---|---|

**C. BILLING INFORMATION**

| BILLING ADDRESS | P.O. BOX | CITY ALPHARETTA | COUNTY | STATE GA | ZIP CODE 30022 | TELEPHONE ( 678 ) 642-7409 |
|---|---|---|---|---|---|---|
| 11005 PINBHIGH DR. | | | | | | |

| BILLING INSTRUCTIONS | AMADA CUSTOMER NUMBER 29897-1 | CONTACT DICK CLARK |
|---|---|---|

**D. FOR SELLER'S REFERENCE ONLY**

| REGION NO. 72 | DIVISION NO. | SALESMAN NAME 922 | SALESMAN NAME JOHN WOODRUFF | CUSTOMER P.O. NO. PAM6300601 | P.O. 06/30... |
|---|---|---|---|---|---|

**ITEM 2 PAYMENT TERMS**

| A. ☐ NET 30 DAYS  ☐ C.O.D.  ☑ MONTHLY INSTALLMENTS (TOTAL NO. OF PAYMENTS 60 )  ☐ OTHER | | 9,75... |
|---|---|---|

| B. AMOUNT OF EACH MONTHLY INSTALLMENT $365.13 | C. DUE DATE OF FIRST INSTALLMENT (TO BE COMPLETED BY SELLER) 10-1-06 | D. TAX EXEMPT PURCHASE ☑ YES  ☐ NO | E. INSERT CERTIFICATE NO. HERE (SEE SECTION A.2 ON REVERSE HER... |
|---|---|---|---|

If this Agreement is for installment payments, Buyer shall make each installment payment to:
AMADA CAPITAL CORPORATION (DIVISION OF AC-2096) Cerritos, California 91130-2096

**ITEM 3 DESCRIPTION OF PROPERTY**

| A. MACHINE MODEL NO. TOGU III | B. SERIAL NO. | C. ☑ NEW  ☐ DEMO ☐ USED | D. MACHINE DESCRIPTION: ONE (1) AMADA TOOL GRINDER |
|---|---|---|---|

| E. TOOLING, ATTACHMENTS, OPTIONS AND OTHER ADDITIONS (INCLUDING SPECIFICATIONS) | QTY. | CASH PRICE |
|---|---|---|
| | | |

**ITEM 4 PRICE**

| A. CASH PURCHASE PRICE FOR MAC... | $21,600... |
|---|---|
| B. CASH PURCHASE PRICE FOR TOOLING... | |
| C. | |
| D. TOTAL CASH PURCHASE PRICE A... | $21,600... |
| E. SALES TAX (RATE + ___%) | |
| F. | |
| G. | |
| H. SUBTOTAL (D + E + F + G) | $21,600... |
| I. LESS CREDIT FOR TRADE-IN FRO... | |
| J. LESS CASH DOWN PAYMENT | $4,320... |
| K. SUBTOTAL (H - I - J) (CASH PRIC... | $17,2... |
| L. TIME PRICE DIFFERENTIAL | $4,627... |
| M. TIME BALANCE (K + L) | $21,907... |

| TOTAL TO 4B | |
|---|---|
| F. DESCRIBE TRADE-IN | H. VALUE OF TRADE-IN |
| | LESS LIENS TO ALC  < > |
| G. CALCULATE CREDIT FOR TRADE-IN ABOVE AND INSERT IN ITEM 4I. | J. CREDIT FOR TRADE-IN (H-I) |

**ITEM 5 CASUALTY & LIABILITY INSURANCE FOR ALL FINANCE ONLY**

| BUYER'S INSURANCE COMPANY | P.O... | NAME OF AGENT |
|---|---|---|
| Transcontinental Mutual | | Jim Parilli |

| BUYER'S INSURANCE AGENCY Weiss Ins | | P.O. BOX |
|---|---|---|

| INSURANCE AGENCY'S ADDRESS 31 W 60 Army Trail | | | TELEPHONE (630) 584 1717 |
|---|---|---|---|

| CITY Wayne | STATE IL | ZIP CODE 60184 | |
|---|---|---|---|

NOTE: Section B.4 on the reverse hereof sets forth certain requirements for insurance which must be provided by Buyer. Please review these requirements carefully with your insurance provider.

Buyer agrees to the terms and conditions set forth herein and on the reverse side of this Agreement. BY ITS EXECUTION BELO... ACKNOWLEDGES THAT BUYER HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS ON THE REVERSE SIDE OF THIS AG... INCLUDING WITHOUT LIMITATION THE WARRANTY DISCLAIMERS AND LIMITATION OF LIABILITY SET FORTH IN SECTION A.10, AND T... JURISDICTION PROVISIONS SET FORTH IN SECTIONS B.4, RESPECTIVELY, AND UNDERSTANDS THAT THE AGREEMENT CREATES IN... SELLER A SECURITY INTEREST IN THE PROPERTY.

If Buyer has elected to purchase the Property on an installment payment basis, Buyer acknowledges that Seller has offered both a cash purchase p... installment payment purchase price to Buyer and that Buyer has made its election based on a comparison of these prices. Buyer authorizes Seller to c... blank, including without limitation the date of first payment in Item 2.C, and correct any typographical or other error on the facing page of this Agreement ... execution of this Agreement by Buyer.

This Agreement shall not be binding upon Seller until executed by a duly authorized officer or manager of Seller in Buena Park, California. NO REPRE... OR WARRANTY RELATING TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT IS BINDING ON OR ENFORCEABLE AGAINST SELL... SET FORTH IN THIS AGREEMENT.

| BUYER IDENTIFIED IN ITEM 1.A. ABOVE | BY | TITLE President | DATE 7/... |
|---|---|---|---|

## A. Terms and Conditions of Sale

1. **Price and Price Adjustments.** The cash purchase price of the Property is FOB point of shipment within the United States as designated by Seller, and is free to thirty (30) days after the date of execution of this Agreement by Seller. After such period Seller may, in its absolute discretion, alter the purchase price of any unshipped Property to reflect cost increases and changes in market conditions. Seller will give Buyer written notice of any such price adjustments. Unless within seven (7) days after receiving such notice Buyer gives Seller written notice of any objections to any such price adjustment, there will be deemed to have waived all such objections.

2. **Taxes.** The cash purchase price of the Property is exclusive of any and all excise, sales, use or other taxes levied by any federal, state, county, municipal or other governmental authorities, all of which are for the account of Buyer. Seller is authorized to recover payment of any such taxes directly to the taxing authority, and Buyer will reimburse Seller therefor. Such reimbursement will be made on demand unless otherwise expressly agreed in writing. If Buyer claims an exemption from such taxes, Buyer must provide evidence of such exemption acceptable to Seller.

3. **Freight Charges.** Freight changes for shipment of the Property to Buyer, including taxes on freight changes, if any, are for the account of Buyer and will be billed freight collect. Freight changes for tooling and accessories will be separately invoiced to Buyer and are payable net 30 days from the date of invoice unless otherwise agreed in writing.

4. **Late Charges.** Any payment of Buyer not received by the ninth (9th) day following the date due will be subject to a late charge of five percent (5%) of the amount due as liquidated damages.

5. **Shipping Instructions.** Seller will arrange for shipment and routing of the Property in accordance with the instructions of Buyer (if any) set forth on facing page hereof, provided however, if such instructions are unclear, incomplete or impractical of implementation, or if no shipping instructions are set forth on the facing page hereof, Seller may, and is hereby authorized by Buyer to arrange for shipment and routing of the Property as Seller deems appropriate. In no event will Seller be liable for any failure of the carrier to follow shipping instructions of either Buyer or Seller. Changes will be billed freight collect.

6. **Shipment.** Seller may ship the Property in partial shipments. Seller will use reasonable commercial efforts to deliver the Property on or about the delivery date, set forth on the facing page hereof, but will have no liability to Buyer for late shipment.

7. **Title, Risk of Loss and Insurance.** Title to and all risk of loss of or damage to the Property will pass from Seller to Buyer at the shipping point. Unless otherwise expressly agreed in writing, the cost of insurance on the Property while in transit will be borne by Buyer.

8. **Rigging.** All costs of unloading the Property from the carrier upon arrival at the shipping destination and moving the Property to the installation site are for the account of Buyer. Seller has no liability to the Buyer and Buyer assumes all risk of damage to or loss of the Property occurring in connection with such unloading and moving.

9. **Installation.** Buyer will, at its expense, take all necessary steps to prepare the installation site for the installation of the Property. The cost of installation is included in the purchase price of the Property. Installation includes set up, start up and initial adjustment of operating performance. Buyer has no responsibility or liability for any failure of any of the Property to meet any applicable codes or standards established by any private organization or any federal, state, county, municipal or other governmental authority, provided, however, that in the event of any such failure to meet such codes or standards, Seller or its designee will, at the request of Buyer, make such modifications to any of the Property as may be necessary to bring such Property into compliance with any such codes or standards, unless Seller determines that the cost to Seller of making any such modifications is expected to exceed ten percent (10%) of the purchase price of the Property of which case Buyer may in lieu of such compliance (including the completion of any necessary inspection and the obtaining of any necessary permits or approvals) be expected to accept ninety (90) days, in which case Seller may upon returning to Buyer payments received in respect of the canceled portion of this Agreement (less freight changes and applicable charges), cancel this Agreement in whole or in part without further liability to Buyer; and provided further that if Buyer so requests, Seller may, but shall not be obligated to, proceed with such modifications at the sole expense of Buyer, payment for which shall be made by Buyer in advance of Seller's performance.

10. **Warranty and Limitation of Liability.** EXCEPT AS MAY OTHERWISE BE SET FORTH IN A WRITTEN WARRANTY OF THE PROPERTY EXECUTED BY SELLER, SELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AND HEREBY EXPRESSLY DISCLAIMS ALL SUCH WARRANTIES, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE. IN NO EVENT SHALL SELLER BE LIABLE FOR ANY INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES (INCLUDING WITHOUT LIMITATION LOST PROFITS), AND IN NO EVENT SHALL SELLER'S LIABILITY EXCEED THE STATED PURCHASE PRICE OF THE PROPERTY.

11. **Trade-In.** Buyer represents and warrants to Seller that Buyer has good and marketable title to any trade-in, claimed to be item 3.1 on the facing page hereof, and that any such trade-in is in good operating condition and will be transferred to Seller free and clear of all claims, liens, charges, security interests or encumbrances of any kind party. In the event that subsequent to such transfer any third party, including without limitation Angela Capital Corporation ("ACC"), asserts a lien on or other interest in such trade-in, Buyer hereby grants to Seller a license to store any such trade-in on Buyer's premises until such trade-in may be conveniently moved or resold, and Buyer will indemnify and hold Seller harmless from any loss or damage to such trade-in and any claim against Seller arising out of such storage or any unauthorized operation of such trade-in.

12. **Force Majeure.** In the event that Seller or any of its suppliers or delegates is unable to carry out Seller's obligations hereunder due to acts of God or of the public enemy, war, insurrection, riots, strikes, lockouts, labor disputes, fires, floods, earthquakes, natural disasters, unavoidable casualty, freight embargoes, shortages of labor or material, changes in governmental policy, laws or regulations (including but not limited to money exchange or transfer restrictions, impositions of quotas or limitation of shipments), or any other cause or causes beyond the control of Seller or its suppliers or delegates, whether or not specified above, Seller may extend that time of performance of its obligations to such extent as may be necessary to enable Seller and its suppliers and delegates to complete performance with the exercise of reasonable diligence after the cause or causes of delay have been removed. In the event any such delay continues for a period of more than six (6) months, either party may terminate its obligations hereunder by so notifying the other party in writing.

13. **Termination.** Upon the occurrence of an Event of Default (as defined in Section B.6), Seller will, in addition to the other rights set forth in this Agreement, have the right to immediately terminate this Agreement as to any unshipped Property with or without notice of termination.

14. **Indemnification.** Buyer will defend, indemnify and hold Seller harmless from and against any and all claims, liabilities, damages, costs and expenses (including reasonable attorney's fees) arising out of or in connection with any use of the Property by Buyer or any breach of this Agreement by Buyer.

15. **Condition Precedent to Seller's Obligations.** On all installment sales the written approval of ACC for such other financing company as may be involved) to the terms of this Agreement is a condition precedent to the performance of Seller's obligations under this Agreement, and any of the Property delivered to Buyer prior to the obtaining of such written approval will be deemed to be held by Buyer as a bailee for its own benefit under a bailment revocable at will by Seller.

16. **Financing.** Buyer has sole responsibility for obtaining any necessary financing for the purchase of the Property. Any efforts of Seller to arrange any such financing are solely an accommodation to Buyer and do not obligate Seller in any way.

## B. Security Interest

1. **Grant of Security Interest.** To secure payment of the purchase price of the Property, Buyer hereby grants to Seller security interest in the Property, and in all accessions thereto and replacements or modifications thereof, as well as all proceeds (including insurance proceeds) of the foregoing. The security interest granted hereby constitutes a purchase money security interest under the California Uniform Commercial Code. In addition, the security interest granted hereby shall secure the full and faithful performance by Buyer and all of Buyer's obligations under this Agreement. Notwithstanding the foregoing, the provisions of this Part B do not apply with respect to COD sales of Property for which payment is actually received by Seller from Buyer prior to or at the time of delivery of the Property to Buyer's facility.

2. **Information Regarding Buyer.** Buyer represents and warrants to Seller that all of the information regarding Buyer set forth on the facing page of this Agreement is true and correct.

3. **Certain Covenants of Buyer.** For so long as any amounts are owed by Buyer to Seller under this Agreement, Buyer (a) shall use the Property in compliance with all applicable laws, regulations and ordinances; (b) shall maintain the Property in good condition and repair, reasonable wear and tear excepted; (c) shall pay when due all taxes, charges and impositions on the Property or the ownership, use, disposition or sale of same; (d) shall keep the Property free of all liens, charges, claims, security interests and encumbrances of any third party; (e) shall permit Seller to inspect the Property, each Buyer's books and records relating thereto, during normal business hours; (f) shall promptly notify Seller of the occurrence of any event which materially and adversely affects the value of the Property or the ability of Buyer to perform; and shall promptly notify Seller in writing of any change of the name or location of Buyer or the location of any of the Property. Buyer conducts its business, and the organization or financial structure of Buyer; (g) shall promptly furnish to Seller upon request current financial statements of Buyer; and (h) shall not, without prior written consent of Seller, sell, assign, exchange, lease, loan, license the use of, pledge, encumber, grant a security interest in, or dispose of the Property or allow any of the Property to become a fixture or accession.

4. **Financing.** [text continues]

5. **Insurance.** Buyer shall keep the Property insured against all risk of loss or damage from every cause or occurrence for which insurance is commercially available, in a coverage amount not less than the total cash purchase price of the Property, under policies providing that losses shall be payable to Seller and naming the nature to give Seller not less than thirty (30) days prior written notice of the effective date of any alteration or cancellation of any such policy. All such insurance policies shall otherwise be in form and substance and with companies satisfactory to Seller. Buyer shall deliver such insurance policies to Seller, or shall furnish to Seller such other evidence of insurance as Seller may from time to time request.

---

The proceeds of such insurance shall be applied, at the option of Seller, to replacement, restoration or repair of any Property which has been stolen, damaged or destroyed or to payment of the obligations of Buyer hereunder. Buyer hereby irrevocably appoints Seller as attorney-in-fact, which appointment is coupled with an interest, to make claims for, receive and execute and endorse all documents, checks, or drafts received in payment of any loss under any such policy of insurance. If Buyer fails to procure or maintain such insurance, Seller have the right, but shall not be obligated, to obtain and maintain such insurance, and reimburse Seller for the cost thereof.

5. **Covenants Regarding Location of Property.** Buyer will not remove any of the Property from the location at which installed or change the location of any of the Property without the prior written consent of Seller to such removal. EACH SIGNATORY HERETO WILL BE FREE AND CLEAR OF ALL LOSS OR DAMAGE SUSTAINED BY SELLER AS ANY CHANGE IN LOCATION OF THE PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF SELLER, SPECIFICALLY INCLUDING, WITHOUT LIMITATION, ANY DAMAGE ARISING FROM THE LOSS OF PERFECTION OF SELLER'S OR ACC'S SECURITY INTEREST IN THE PROPERTY.

6. **Default.** The occurrence of any of the following shall constitute an Event of Default: (a) a default by Buyer in the payment, when due or payable of the purchase price of the Property or any portion thereof or interest thereon; (b) any breach of Buyer of any representation, warranty or agreement contained in this Agreement and set forth in this Agreement or any other agreement between Buyer and Seller or arising by operation of law or otherwise, which breach is not cured within thirty (30) days following written notice thereof by Seller to Buyer; (c) the issuance of entry of any injunction or attachment against Buyer, the Property or any other property of Buyer; (d) any notice of such sale or intended bulk sale by Buyer; (e) the appointment of a receiver or creditors or liquidating agents, the offering of a composition or extension to creditors, the assignment by the benefit of creditors or the commencement of any proceeding, suit or negotiation, dissolution or liquidation under any bankruptcy or other laws relating to debtors, to the extent that any of the foregoing is by, for, on behalf of or with respect to the insolvency of Buyer, the suspension, termination, discharge or unenforceability of an executed in favor of Seller with respect to any of the obligations secured hereby; or (h) the condition or others financial or otherwise of Buyer which in the good faith judgment impairs Seller's security or increase its risk.

7. **Remedies on Default.** Upon the occurrence of an Event of Default, or at any time thereafter, the Event of Default shall be continuing, in addition to any other rights or remedies Seller may shall have any or all of the following rights and remedies: (a) Seller shall have all of the remedies of a secured party under the California Commercial Code as in effect in any jurisdiction which enforcement hereof is sought; (b) Seller may, at its option, accelerate and declare the indebtedness secured hereby to be immediately due and payable; (c) Seller shall have the immediate and exclusive possession of any and all of the Property, wherever located, and interference from Buyer and for this purpose Seller may, with or without judicial process enter upon without notice, enter peacefully upon the premises where such Property may be found and remove the Property from such location for disposition or proceed to liquidate or otherwise, the Property from such location; (d) Seller may require Buyer, at Buyer's expense, to cause Property or any part thereof, at mutually convenient location reasonably acceptable, or sell, resell, transfer, assign, dispose of and deliver the Property, in one or more parcels, with or without notice, and at public or private sale, for cash or credit, on such terms as Seller may deem appropriate, at wholesale or retail, at one or more times, and at such time and place as Seller may determine, free and clear of any claim or right of any person and all such sale may, at Seller's election, be on Seller's premises or on the premises of Buyer; (e) in connection with any disposition of the Property and purchase any Property, and by such purchase acquire all right, title and interest therein; (f) Seller may for and on behalf of Buyer, make and deliver to any purchaser of any of the Property, a conveyance sufficient bill of sale or other evidence of transfer of all right, title and interest of Buyer to such purchaser; and (g) Seller may in its own name or in the name of and on behalf of and all actions required to cure any such Event of Default, and all sums expended by Seller such cure shall be secured hereby.

8. **Application of Proceeds.** The net proceeds realized upon any liquidation or disposition of Property, after deduction for the expense of retaking, holding, preparing for sale or lease, leasing and the like, and for reasonable attorney's fees and legal expenses and costs, Seller in enforcing or exercising any of its rights or remedies under this Agreement, shall in satisfaction of the obligations of Buyer secured under this Agreement in such order as may appropriate by Seller. Any surplus of such proceeds shall be paid to the person or persons entitled thereto, and the Buyer shall be liable to Seller for and shall immediately pay the amount of any deficiency.

9. **Buyer's Waiver.** Except as to the notice of intention to dispose of Property provided Seller may exercise any of its rights and remedies without demand, advertisement or notice, any or as required by law. To the fullest extent permitted by law, Buyer waives any demand, protest, notice of acceptance of this Agreement, or other action taken in reliance hereon demands and notices of any description.

10. **Financing Statements.** Fixture filings and further assurances. Buyer hereby authorizes execute and file financing statements authenticated records, and fixture filings of any kind to any of the Property, in each case without Buyer's signature to the extent permitted Seller's request, Buyer shall execute one or more financing statements, fixture filings, statements or other filings pursuant to the Uniform Commercial Code in form satisfactory Buyer shall take any and all steps required by Seller to maintain the perfection of the secutity granted hereunder, or to help assure to Seller its rights under this Agreement.

## C. Assignment

1. **Assignment to Angela Capital Corporation.** Unless otherwise agreed by the parties Seller may at any time assign this Agreement and its rights hereunder, in whole or in part. Buyer hereby waives any right to assert against ACC any claims, defenses or offsets which have against Seller, and Buyer hereby expressly agrees not to assert any such claims, offsets against ACC.

2. **Assignment by Buyer.** Buyer may not assign, delegate or transfer any of its rights, obligations under this Agreement to any third party without the prior written consent of Seller.

## D. Miscellaneous

1. The order of application of Buyers payments to be at the discretion of Seller. Seller may at apply and all of a Buyer's payment to any outstanding balances owing by Buyer hereunder, limited to Buyer late changes.

2. **Notices.** All notices, demands or consents required or permitted to be given under this shall be in writing and shall be deemed effective upon delivery if delivered personally or other mailing if sent by first class United States mail, postage prepaid, addressed to the address set forth herein or to such other address as shall be given by either party to the other.

3. **Waiver, Amendment or Modification.** No waiver, amendment or modification of a breach of any right or remedy hereunder shall be effective unless in writing and signed to be bound. No failure by Seller to exercise, and no delay by Seller in exercising, any right remedy granted hereunder shall operate as a waiver of any such right, power or remedy, any right or remedy by Seller on any one occasion shall not be construed as a bar to or right or remedy on any future occasion. All rights and remedies of Seller are separate and the exercise of any right or remedy shall not limit or prejudice the exercise of any remedy.

4. **Court Jurisdiction.** Any controversy, claim, action or dispute arising out of or in this Agreement will be subject to the laws of the State of California and the parties hereto parties being adjudicated in the jurisdiction of California.

5. **Attorneys' Fees.** In the event any arbitration or judicial action or proceeding is initiated to any matters relating to this Agreement or in the event either party seeks relief from the a of 11 U.S.C. Section 362 or any successor statue thereto, then the party to whose favor award shall be given or any relief shall be granted or judgment shall be entered shall recover from the other party all costs and expenses (including attorneys' fees) incurred in t proceeding and any appeal therefrom.

6. **Severability.** In the event any provision or portion of any provision of this Agreement by a court of competent jurisdiction to be unenforceable or invalid, the remaining provisi thereof shall remain in full force and effect.

7. **Entire Agreement.** Notwithstanding any purchase order submitted by Buyer which on the facing page hereof or attached hereto, this Agreement constitutes the entire between Buyer and Seller pertaining to the subject matter hereof. Any and all w agreements or understandings heretofore existing between the parties pertaining to the s hereof are expressly superseded and cancelled by this Agreement.

8. **Time is of the Essence.** Except as to the provisions of this Agreement relating to st and shipping delays, time is of the essence with respect to each of the terms, condition and covenants of this Agreement.

9. **Binding Effect.** Subject to Part C of this Agreement, this Agreement shall be bind shall inure to the benefit of the parties and their legal representatives, successors and assi

10. **Headings.** Headings contained in this Agreement are for purposes of convenience not part of this Agreement.

EXHIBIT
B

UNIT NUMBER  14540

# AMADA AMERI
7025 Firestone Blvd., Buena Park, CA 90621

FILE NUMBER  2901-C0000

## EQUIPMENT PURCHASE AND SECURITY AGREEMENT

Buyer (described in Item 1.A. below) agrees to purchase from AMADA AMERICA, INC. ("Seller") and Seller agrees to sell to Buyer for business pu
nly the equipment and other personal property described in Item 3, below ("Property"), on the terms and conditions set forth in this Agre
including without limitation the terms and conditions set forth on the reverse hereof.

TYPE OR PRINT ONLY

### ITEM 1. BUYER

**A. DESCRIPTION OF BUYER**

| BUYER'S FULL NAME | | | BUYER'S TRADE NAME OR STYLE | | |
|---|---|---|---|---|---|
| PRECISION AMERICAN METALS, LLC | | | | | |

| ☐ CORPORATION | ☑ LIMITED LIABILITY CO. | | | ORGANIZED UNDER THE LAWS OF THE STATE OF: | IL | AMADA CUSTOMER NU 29897 |
| ☐ PARTNERSHIP | ☐ PROPRIETORSHIP | ☐ OTHER | | | | |

| STREET ADDRESS OF BUYER'S CHIEF EXECUTIVE OFFICE | P.O. BOX | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|---|
| 1050 KINGSLAND DR. | | BATAVIA | IL | IL | 60510 | ( 630 ) 406-7773 |

**B. INSTALLATION SITE:**

| COMPANY NAME | BRANCH / DIVISION |
|---|---|
| SAME AS "A" | |

| STREET ADDRESS | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|
| | | | | | ( ) |

| REQUEST DELIVERY DATE | SHIPPING INSTRUCTIONS | AMADA CUSTOMER NUMBER | CONTACT |
|---|---|---|---|
| | FOB SHIPPING POINT | | JOHN MAZUREK |

**C. BILLING INFORMATION:**

| BILLING ADDRESS | P.O. BOX | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|---|
| 11005 PINEHIGH DR. | | ALPHARETTA | | GA | 30022 | ( 678 ) 642-7409 |

| BILLING INSTRUCTIONS | AMADA CUSTOMER NUMBER | CONTACT |
|---|---|---|
| | 29897-1 | DICK CLARK |

**D. FOR SELLERS REFERENCE ONLY:**

| REGION NO. | DIVISION NO. | SALESMAN NO. | SALESMAN NAME | CUSTOMER P.O. NO. | P.O. DATE |
|---|---|---|---|---|---|
| 72 | 004 | 922 | JOHN WOODRUFF | PAM6300601 | 06/30/ |

### ITEM 2. PAYMENT TERMS

| A. ☐ NET 30 DAYS | ☐ C.O.D. | ☑ MONTHLY INSTALLMENTS (TOTAL NO. OF PAYMENTS ___ 60 ___) | ☐ OTHER | 9.75% |
|---|---|---|---|---|

| B. AMOUNT OF EACH MONTHLY INSTALLMENT | C. DUE DATE OF FIRST INSTALLMENT (TO BE COMPLETED BY SELLER) | D. TAX EXEMPT PURCHASE | E. INSERT CERTIFICATE NO. HERE ___ (SEE SECTION A.2 ON REVERSE HERE |
|---|---|---|---|
| $540.93 | 10-1-06 | ☑ YES  ☐ NO | |

This is a retail installment sale. Buyer shall make each installment payment to
AMADA CAPITAL CORPORATION [901] LA20996, Pasadena, California 91185-2096]

### ITEM 3. DESCRIPTION OF PROPERTY

| A. MACHINE MODEL NO. | B. SERIAL NO. | C. ☑ NEW  ☐ DEMO ☐ USED | D. MACHINE DESCRIPTION: ONE (1) AMADA | ITEM 4. PRICE | |
|---|---|---|---|---|---|
| ID40SF | | | SPOT WELDER | A. CASH PURCHASE PRICE FOR MAC | $32,000.0 |

| E. TOOLING, ATTACHMENTS, OPTIONS AND OTHER ADDITIONS (INCLUDING SPECIFICATIONS) | QTY | CASH PRICE | | |
|---|---|---|---|---|
| | | | B. CASH PURCHASE PRICE FOR TOOLING/ACC | |
| | | | C. | |
| | | | D. TOTAL CASH PURCHASE PRICE | $32,000.00 |
| | | | E. SALES TAX (RATE + ___ %) | N |
| | | | F. | |
| | | | G. | |
| TOTAL TO 4B | | | H. SUBTOTAL (D + E + F + | $32,000.0 |
| F. DESCRIBE TRADE-IN | H. VALUE OF TRADE-IN | | I. LESS CREDIT FOR TRADE-IN FRO < | |
| | I. LESS LIENS O ALC | < | > | J. LESS CASH DOWN PAYMENT < | $6,400.0 |
| G. CALCULATE CREDIT FOR TRADE-IN ABOVE AND INSERT IN ITEM 4I. | J. CREDIT FOR TRADE-IN (H-I) | | K. SUBTOTAL (H - I - J) (CASH BAL | $25,600.0 |
| | | | L. TIME PRICE DIFFERENTIAL (K - K | $6,855. |
| | | | M. TIME BALANCE (K + L | $32,455. |

### ITEM 5. INSURANCE & LIABILITY (COMPLETE FOR ALL A FINANCE ONLY)

| BUYER'S INSURANCE COMPANY | Travelan Indm | POLICY NO. | 097774874 |
|---|---|---|---|
| BUYER'S INSURANCE AGENCY | Weiss Ins. | NAME OF AGENT | Jon O'Neill |
| INSURANCE AGENCY'S ADDRESS | 31 W 680 Beecher Trail Rd | P.O. BOX | |
| CITY | WAYNE | STATE | IL | ZIP CODE | 60184 | TELEPHONE | 630 584 1717 |

NOTE: Section B.4 on the reverse hereof sets forth certain requirements for insurance which must be provided
by Buyer. Please review these requirements carefully with your insurance provider.

Buyer agrees to the terms and conditions set forth herein and on the reverse side of this Agreement. BY ITS EXECUTION BELOW
ACKNOWLEDGES THAT BUYER HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS ON THE REVERSE SIDE OF THIS AGR
INCLUDING WITHOUT LIMITATION THE WARRANTY DISCLAIMERS AND LIMITATION OF LIABILITY SET FORTH IN SECTION A.10, AND TH
JURISDICTION PROVISIONS SET FORTH IN SECTIONS B.4, RESPECTIVELY, AND UNDERSTANDS THAT THE AGREEMENT CREATES IN F
SELLER A SECURITY INTEREST IN THE PROPERTY.

If Buyer has elected to purchase the Property on an installment payment basis, Buyer acknowledges that Seller has offered both a cash purchase pri
installment payment purchase price to Buyer and that Buyer has made its election based on a comparison of these prices. Buyer authorizes Seller to co
blank, including without limitation the date of first payment in item 2.C, and correct any typographical or other error on the facing page of this Agreer
execution of this Agreement by Buyer.

This Agreement shall not be binding upon Seller until executed by a duly authorized officer or manager of Seller in Buena Park, California. NO REPRES
OR WARRANTY RELATING TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT IS BINDING ON OR ENFORCEABLE AGAINST SELLER
SET FORTH IN THIS AGREEMENT.

| BUYER (IDENTIFIED IN ITEM 1.A. ABOVE) | BY | TITLE President | DATE 7/20 |
|---|---|---|---|
| AMADA AMERICA, INC. (SELLER) | BY | TITLE | DATE |

## A. Terms and Conditions of Sale

1. **Price and Price Adjustments.** The cash purchase price of the Property is FOB point of shipment from mill in the United States or designated by Seller, and is due for thirty (30) days after the date of execution of this Agreement by Seller. After such period Seller may, in its discretion, adjust the purchase price of any unshipped Property to reflect cost increases and changes in market conditions. Seller will give Buyer written notice of any such price adjustments. Unless within seven (7) days after receiving such notice Buyer gives Seller written notice of any objections to any such price adjustment, Buyer will be deemed to have waived all such objections.

2. **Taxes.** The cash purchase price of the Property is exclusive of any and all excise, sales, use or other taxes levied by any federal, state, county, municipal or other governmental authorities, all of which are for the account of Buyer. Seller is authorized to make payment of any such taxes directly to the taxing authority, and Buyer will reimburse Seller therefor. Such reimbursement will be made on demand unless otherwise expressly agreed in writing. If Buyer claims an exemption from such taxes, Buyer must provide evidence of such exemption acceptable to Seller.

3. **Freight Charges.** Freight charges for shipment of the Property, including taxes on freight charges, if any, are for the account of Buyer and will be billed freight collect. Freight changes for hauling and accessorials will be separately invoiced to Buyer and are payable net 30 days from the date of invoice unless otherwise agreed in writing.

4. **Late Charges.** Any payment of Buyer not received by the ninth (9th) day following the date due will be subject to a late charge of five percent (5%) of the amount due as liquidated damages.

5. **Shipping Instructions.** Seller will arrange for shipment and routing of the Property in accordance with the instructions of Buyer (if any) set forth on the facing page hereof; provided however, if such instructions are unclear incomplete or impractical of implementation, or if any shipping instructions are not set forth on the facing page hereof, Seller is hereby authorized by Buyer to arrange for shipment and routing of the Property as Seller deems appropriate. In no event will Seller be liable for any failure of the carrier to follow shipping instructions of either Seller or Buyer. Charges will be billed freight collect.

6. **Shipment.** Seller may ship the Property in partial shipments. Seller will use reasonable commercial efforts to deliver the Property by the requested delivery date, set forth on the facing page hereof, but will have no liability to Buyer for late shipments.

7. **Title, Risk of Loss and Insurance.** Title to and all risk of loss of or damage to the Property will pass from Seller to Buyer at the shipping point. Title otherwise expressly agreed in writing, the cost of insurance on the Property while in transit will be borne by Buyer.

8. **Rigging.** All costs of unloading the Property from the carrier upon arrival at the shipping destination and moving the Property to the installation site are for the account of Buyer. Seller has no liability for the Buyer and Buyer assumes all risk of damage to or loss of the Property occurring in connection with such unloading and moving.

9. **Installation.** Buyer will, at its expense, take all necessary steps to prepare the installation site for the installation of the Property. Installation includes set up, start up and initial adjustment of operating performance. Seller has no responsibility or liability for any failure of any of the Property to meet any applicable codes or standards established by any private corporations or any federal, state, county, municipal or other governmental authority; provided, however, that in the event of any such failure to meet such codes or standards, Seller in its delegative will, at the request of Buyer, make such modifications to any of the Property as may be necessary to bring such Property into compliance with any such codes or standards, unless Seller determines that the cost to Seller of making any such modifications is expected to exceed ten percent (10%) of the purchase price of the Property or that the time required to effect such compliance (including the completion of any necessary inspections and the obtaining of any necessary permits or approvals) is expected to exceed ninety (90) days, in which case Seller may upon electing to Buyer payments received in respect of the canceled portion of this Agreement does bright charges and applicable offsets, cancel this Agreement in whole or in part without further liability to Buyer; and provided further that if Buyer so requests, Seller may, but shall not be obligated to, proceed with such modifications at the sole expense of Buyer. Otherwise for which shall be made by Buyer in advance of Seller's performance.

10. **Warranty and Limitation of Liability.** EXCEPT AS MAY OTHERWISE BE SET FORTH IN A WRITTEN WARRANTY OF THE PROPERTY EXECUTED BY SELLER, SELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AND HEREBY EXPRESSLY DISCLAIMS ALL SUCH WARRANTIES, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE. IN NO EVENT SHALL SELLER BE LIABLE FOR ANY INCIDENTAL, SPECIAL, GENERAL, DIRECT OR CONSEQUENTIAL DAMAGES (INCLUDING WITHOUT LIMITATION LOST PROFITS), AND IN NO EVENT SHALL SELLER'S LIABILITY EXCEED THE STATED PURCHASE PRICE OF THE PROPERTY.

11. **Trade-In.** Buyer represents and warrants to Seller that Buyer has good and marketable title to any trade-in referred to in Item 3.F on the facing page hereof, and that any such trade-in is in good operating condition and will be transferred to Seller free and clear of all claims, liens, charges, security interests or encumbrances of any third party. In the event that subsequent to such transfer any third party asserts any claim, lien, charge or security interest in respect to any trade-in, Buyer is hereby authorized to pay in Seller a amount to store any such trade-in, and to take such lawful or other remedial measures to protect Seller's rights as Buyer deems reasonable to such trade-in and Buyer will indemnify and hold Seller harmless from any loss or damage to such trade-in and any claims against Seller arising out of such storage or any unauthorized operation of such trade-in.

12. **Force Majeure.** In the event that Seller or any of its suppliers or delegates is unable to carry out Seller's obligations hereunder due to acts of God or of the public enemy, war, insurrection, riots, strikes, lockouts, labor disputes, fires, floods, earthquakes, natural disasters, irresistable casualty, freight embargoes, shortages of labor or material, changes in governmental policy, laws or regulations (including but not limited to energy exchange or traffic restrictions), imposition of quotas or limitation of shipments), or any other cause or causes beyond the control of Seller or its suppliers or delegates, whether or not specified above, Seller may extend the time of performance of its obligations to such extent as may be necessary to enable Seller and its suppliers and delegates to complete performance with the exercise of reasonable diligence after the cause or causes of delay have been removed. In the event any such delay continues for a period of more than six (6) months, either party may terminate its obligations hereunder by so notifying the other party in writing.

13. **Termination.** Upon the occurrence of an Event of Default (as defined in Section B.8), Seller will, in addition to the other rights set forth in this Agreement, have the right to immediately terminate this Agreement as to any unshipped Property in Seller's possession, with or without notice of termination.

14. **Indemnification.** Buyer will defend, indemnify and hold Seller harmless from and against any and all claims, liabilities, damages, costs and expenses (including reasonable attorney's fees) arising out of or in connection with any use of the Property by Buyer or any breach of this Agreement by Buyer.

15. **Condition Precedent to Seller's Obligations.** On all installment sales the written approval of ACC for such other financing company as may be involved to the terms of this Agreement is a condition precedent to the performance of Seller's obligations under this Agreement, and any of the Property delivered to Buyer prior to the obtaining of such written approval will be deemed to be held by Buyer as a bailee for its own benefit under a bailment revocable at will by Seller.

16. **Financing.** Buyer has sole responsibility for obtaining any necessary financing for the purchase of the Property. Any efforts of Seller to arrange any such financing are solely an accommodation to Buyer and do not obligate Seller in any way.

## B. Security Interest

1. **Grant of Security Interest.** To secure payment of the purchase price of the Property, Buyer hereby grants to Seller security interest in all accessions thereto and replacements or modifications thereof, as well as all proceeds (including insurance proceeds) of the foregoing. The security interest granted hereby constitutes a purchase money security interest under the California Uniform Commercial Code. In addition, the security interest granted hereby shall secure the full and faithful performance by Buyer of all of Buyer's obligations under this Agreement, and any of the Property delivered to Buyer prior to the obtaining of such written approval of the foregoing, the provisions of this Part B do not apply with respect to COD sales of Property for which payment is actually received by Seller from Buyer prior to or at the time of delivery of the Property to Buyer to facility.

2. **Information Regarding Buyer.** Buyer represents and warrants to Seller that all of the information regarding Buyer set forth on the facing page of this Agreement is true and correct.

3. **Certain Covenants of Buyer.** For so long as any amounts are owed by Buyer to Seller under this Agreement, Buyer (a) shall pay the Property in compliance with all applicable laws, regulations and ordinances; (b) shall maintain the Property in good condition and repair, reasonable wear and tear excepted; (c) shall pay when due all taxes, charges and impositions on the Property or the use thereof; (d) shall keep the Property free of all liens, charges, claims, security interests and encumbrances of any third party; (e) shall permit Seller to inspect the Property, and inspect and make extracts of all of Buyer's books and records relating thereto, during normal business hours; (f) shall promptly notify Seller of the occurrence of any events which materially and adversely affect the value of the Property or collateral; (g) shall promptly notify Seller of any change of the location of the Property or any change in the name of Buyer or in the form of organization or technical structure of Buyer; (h) shall promptly furnish to Seller upon request current financial statements of Buyer; and (i) shall not, without prior written consent of Seller, sell, assign, exchange, lease, lend, license the use of, pledge, mortgage, grant a security interest in or dispose of the Property or grant a rights therein, in one or operate the Property in a manner other than for the manufacture of its own products by any insurance policy covering the Property, or remove or withhold any residual oil at by Seller to the Property or give notice of Seller's security interest therein or any identifying labor, signal marker, or lettering on the Property, or permit the Property to become so with of security, or because a fixture.

4. **Insurance.** Buyer shall keep the Property insured against all risk of loss or damage from any cause or whatever, to the extent insurance is commercially available, to a coverage amount of not less than the total cash purchase price of the Property, under policies providing that losses shall be payable to Seller and requiring the insurer to give Seller not less than ten (10) days prior written notice of the effective date of any alteration or cancellation of any such policy. All such insurance policies shall constitute loss to Seller and evidence of the same insurance satisfactory to Seller. Buyer shall deliver such insurance policies to Seller or shall furnish to Seller such other evidence of insurance as Seller may from time to

time request. The proceeds of such insurance shall be applied, at the option of Seller, to the replacement, restoration or repair of any Property which is lost, stolen, damaged or destroyed, or to payment of the obligations of Buyer hereunder. Buyer hereby irrevocably appoints Seller as attorney-in-fact, which appointment is coupled with an interest, to make claims for, receive payment of and execute and endorse all documents, checks, or drafts received in payment of any loss or damage under any such policy of insurance. If Seller fails to procure or maintain such insurance, Seller shall have the right, but shall not be obligated, to obtain and maintain such insurance, and Buyer will reimburse Seller for the cost thereof.

5. **Covenants Regarding Location of Property.** Buyer will not remove any of the Property from the location at which it is installed or otherwise change the location of any of the Property within the location at which it is installed without the written consent of Seller. EACH OBLIGATORY HEREUNDER, BE PERFORMED AT SELLER FOR ANY ALL LOSS OR DAMAGE SUSTAINED BY SELLER AS A RESULT OF ANY CHANGE IN LOCATION OF THE PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF SELLER, SPECIFICALLY INCLUDING, WITHOUT LIMITATION, ANY DAMAGE ARISING FROM LOSS OF PERFECTION OF SELLER'S OR ACC'S SECURITY INTEREST IN THE PROPERTY.

6. **Default.** The occurrence of any of the following shall constitute an Event of Default: (a) failure by Buyer in the payment, when due or payable of the purchase price of the Property or any thereof or interest thereon; (b) any breach of Buyer of any representation, warranty or agreement (other than as to payment) set forth in this Agreement or any other agreement by Buyer and Seller or arising by operation of law or otherwise, which breach is not cured (if curable) the following notice thereof by Seller to Buyer; (c) the issuance or entry of any injunction or attachment against Buyer, the Property or any other property of Buyer; (d) the filing of any notice of lien or attachment with respect to any taxes payable by Buyer; (e) the appointment of a receiver or of creditors or liquidating agents, the closing of a composition or extension to creditors, the assignment for the benefit of creditors or the commencement of any proceeding, suit or reorganization, dissolution or liquidation under any bankruptcy or other laws relating to debtors, to the extent that any of the foregoing is for, on behalf of or with respect to the insolvency of Buyer, the insolvency, termination, discharge or unenforceability of any guaranty entered into in favor of Seller with respect to any of the obligations secured hereby; or that any condition or status thereunder is otherwise of Buyer which in the good faith of that under indeterminate impairs Seller's security or increase its risk.

7. **Remedies on Default.** Upon the occurrence of an Event of Default, or at any time thereafter, if any Event of Default shall be continuing, in addition to any other rights or remedies Seller may, at its option, accelerate and declare immediately due and payable all sums owing by Buyer to Seller under this Agreement. Seller shall have all of the remedies of a secured party under the Uniform Commercial Code as in effect in any jurisdiction which enforcement hereof is sought; all Seller may, at its option, accelerate and declare indebtedness secured hereby to be immediately due and payable; (c) Seller shall have the right immediate and exclusive possession of any or all of the Property, wherever located, without interference from Buyer and for any third party possession Seller may, with or without judicial process without notice, enter onto the premises where the property is located and take possession of and remove such Property, any or to possess Buyer from location to disposition or proceed to liquidate or otherwise manage the Property from such location; (d) Seller may require that Buyer, at Buyer's expense, for all Property and make it available to Seller at any mutually convenient location designated by Seller; (e) Seller may sell, lease or dispose of any or all of the Property, at public or private sale, in its sole discretion, any time and from time to time, and all right, title and interest therein property. Upon the occurrence of an Event of Default, at last ten (10) days prior written notice of its intention to dispose of any Property and is hereby agreed to be reasonable notice of the disposition of the Property on each time and in such sales to Seller may reasonable appreciate, or sell, resell, transfer, assign, dispose of and deliver the Property, in one or more parcels, at the same or at different times, and all right, title or interest therein, at public or private sale, for cash, upon credit or for future delivery, and if such sale or sales, as Seller may determine, (f) in connection with any disposition for and purchase any of Property, and by such purchase acquire all right, title and interest therein; (g) Seller may, for and on behalf of Buyer, make and deliver to any purchaser of any of the Property a sufficient bill of sale or other evidence of transfer of all right, title and interest of Buyer in and to such purchase; and (h) Seller may in its own name or in the name of and on behalf of and all actions required to cure any such Event of Default, and all sums expended by Seller such cure shall be secured hereby.

8. **Application of Proceeds.** The net proceeds realized upon any liquidation or disposition of Property, after deduction for the expense of retaking, holding, preparing for sale or lease, leasing and the like, and the reasonable attorney's fees and legal expenses and costs incurred Seller in enforcing or exercising any of its rights or remedies under this Agreement, shall be satisfaction of the obligations of Buyer secured under this Agreement in such order as may be appropriate by Seller. Any surplus of such proceeds shall be paid to the person or persons entitled thereto, and the Buyer shall be liable to Seller for any and all such indebtedness yet to amount of any deficiency.

9. **Buyer's Waiver.** Except as to the notice of intention to dispose of Property provided Seller may exercise any of its rights and remedies without demand, advertisement or notice as may or required by law. To the fullest extent permitted by law, Buyer waives demand protest, notice of acceptance of this Agreement or other action taken in reliance hereon and demands and notices of any description.

10. **Financing Statements.** Future filings and further assurances. Buyer hereby authorizes execute and file financing statements under identified records, and future filings of other to any of the Property, in each case without Buyer's signature to the extent permitted Seller's request, Buyer shall execute one or more financing statements, future filings statements or other filings pursuant to the Uniform Commercial Code in form satisfactory Buyer shall take any and all steps required by Seller to maintain perfection of the secu granted hereunder, or to fully assure to Seller its rights under this Agreement.

## C. Assignment

1. **Assignment to Angelo Capital Corporation.** Unless otherwise agreed by the parties Seller may at any time assign this Agreement and the rights hereunder, in whole or in part Buyer hereby waives any right to assert against ACC any claims, defenses or offsets which have against Seller, and Buyer hereby expressly agrees not to assert any such claims, d offsets against ACC.

2. **Assignment by Buyer.** Buyer may not assign, delegate or transfer any of its rights, obli under this Agreement to any third party without the prior written consent of Seller.

## D. Miscellaneous

1. The order of application of Buyer payments is at the discretion of Seller. Seller may at apply and all of a Buyer's payment to any outstanding balances owing by Seller includ limited to Buyer late charges.

2. **Notices.** All notices, demands or consents required or permitted to be given under this shall be in writing and shall be deemed effective upon delivery if delivered personally or be after mailing if sent by first class United States mail, postage prepaid, addressed to the address set forth herein or to such other address as shall be given by either party to the other

3. **Waiver, Amendment or Modification.** No waiver, amendment or modification of an hereof or of any right or remedy hereunder shall be effective unless in writing and signed to be bound. No failure by Seller to exercise, and no delay by Seller in exercising, any right remedy granted hereunder shall operate as a waiver of any such right, power or remedy. any right or remedy by Seller on any one occasion shall not be construed as a bar or w right or remedy on any future occasion. All rights and remedies of Seller are separate and and the exercise of any right or remedy shall not limit or prejudice the exercise of any o remedy.

4. **Court Jurisdiction.** Any controversy, claim, action or dispute arising out of or rel agreement will be subject to the laws of the State of California and the parties hereto ap matters being adjudicated in the jurisdiction of California.

5. **Attorneys' Fees.** In the event any arbitration or judicial action or proceeding is initiated to any matters relating to this Agreement or in the event either party seeks relief from the au of 11 U.S.C. Section 362 (or any successor statue thereto), then the party to which favor award shall be given or any relief shall be granted or judgment shall be entered shall b recover from the other party all costs and expenses (including reasonable attorneys' fees) proceeding and any appeal therefrom.

6. **Severability.** In the event any provision or portion of any provision of this Agreement c by a court of competent jurisdiction to be unenforceable or invalid, the remaining provisio thereof shall remain in full force and effect.

7. **Entire Agreement.** Notwithstanding any purchase order submitted by Buyer whether on the facing page hereof or attached hereto, this Agreement constitutes the entire between Buyer and Seller pertaining to the subject matter hereof. Any and all writter agreements or understandings heretofore existing between the parties pertaining to the su hereof are expressly superseded and canceled by this Agreement.

8. **Time is of the Essence.** Except as to the provisions of this Agreement relating to gri and shipping delays, time is of the essence with respect to each of the terms, condition and covenants of this Agreement.

9. **Binding Effect.** Subject to Part C of this Agreement, this Agreement shall be binding shall inure to the benefit of the parties and their respective successors, assigns and legal

10. **Headings.** Headings contained in this Agreement are for purposes of convenience a not part of this Agreement.

EXHIBIT
C

AGREEMENT NUMBER 1473

# ◯MADA AMERICA, INC.

7025 Firestone Blvd., Buena Park, CA 90621

FILE NUMBER 12901-CB

## EQUIPMENT PURCHASE AND SECURITY AGREEMENT

Buyer (described in Item 1.A. below) agrees to purchase from AMADA AMERICA, INC. ("Seller") and Seller agrees to sell to Buyer for business only the equipment and other personal property described in Item 3, below ("Property"), on the terms and conditions set forth in this Ag including without limitation the terms and conditions set forth on the reverse hereof.

### TYPE OR PRINT ONLY

### ITEM 1 BUYER

**A. DESCRIPTION OF BUYER**

| BUYER'S FULL NAME | | BUYER'S TRADE NAME OR STYLE |
|---|---|---|
| PRECISION AMERICAN METALS, LLC | | |

| ☐ CORPORATION ☑ LIMITED LIABILITY CO. | | ORGANIZED UNDER THE LAWS OF THE STATE OF | IL | AMADA CUSTOMER 29897 |
| ☐ PARTNERSHIP ☐ PROPRIETORSHIP ☐ OTHER | | | | |

| STREET ADDRESS OF BUYER'S CHIEF EXECUTIVE OFFICE | P.O. BOX | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|---|
| 1050 KINGSLAND DR. | | BATAVIA | | IL | 60510 | (630) 406-777 |

**B. INSTALLATION SITE**

| COMPANY NAME | | BRANCH / DIVISION |
|---|---|---|
| SAME AS "A" | | |

| STREET ADDRESS | | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE ( ) |
|---|---|---|---|---|---|---|

| REQUEST DELIVERY DATE | SHIPPING INSTRUCTIONS FOB SHIPPING POINT | AMADA CUSTOMER NUMBER | CONTACT JOHN MAZUREK |
|---|---|---|---|

**C. BILLING INFORMATION**

| BILLING ADDRESS | P.O. BOX | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|---|
| 11005 PINEHIGH DR. | | ALPHARETTA | | GA | 30022 | (678) 642-740 |

| BILLING INSTRUCTIONS | AMADA CUSTOMER NUMBER 29897-1 | CONTACT DICK CLARK |
|---|---|---|

**D. FOR SELLERS REFERENCE ONLY**

| REGION NO. | DIVISION NO. | SALESMAN NO. | SALESMAN NAME | CUSTOMER P.O. NO. | P.O. DATE |
|---|---|---|---|---|---|
| 72 | 006 | 922 | JOHN WOODRUFF | PAM6300601 | 06/30 |

### ITEM 2 PAYMENT TERMS

A. ☐ NET 30 DAYS ☐ C.O.D. ☑ MONTHLY INSTALLMENTS (TOTAL NO. OF PAYMENTS 60 ) ☐ OTHER _____ 9.75

| B. AMOUNT OF EACH MONTHLY INSTALLMENT $1,519.33 | C. DUE DATE OF FIRST INSTALLMENT (TO BE COMPLETED BY SELLER) 5-16-07 | D. TAX EXEMPT CERTIFICATE ☑ YES ☐ NO | E. INSERT CERTIFICATE NO. HERE (SEE SECTION A 2 ON REVERSE HE |
|---|---|---|---|

If this Agreement is for an installment sale, Buyer shall make each installment payment to:
AMADA CAPITAL CORPORATION, Dept. LA22096, Pasadena, California 91185-2096.

### ITEM 3 DESCRIPTION OF PROPERTY

| A. MACHINE MODEL NO. APS | B. SERIAL NO. | C. ☑ NEW ☐ DEMO ☐ USED | D. MACHINE DESCRIPTION ONE (1) AMADA SOFTWARE PACKAGE | | A. CASH PURCHASE PRICE FOR MA $89,880. |
|---|---|---|---|---|---|

### ITEM 4 PRICE

| A. CASH PURCHASE PRICE FOR MA $89,880. |
|---|
| B. CASH PURCHASE PRICE FOR TOOL/RACK |
| C. |
| D. TOTAL CASH PURCHASE PRICE (A $89,880. |
| E. SALES TAX (RATE + ____%) N |
| F. |
| G. |
| H. SUBTOTAL (D + E + F + G) $89,880. |
| I. LESS CREDIT FOR TRADE-IN FROM |
| J. LESS CASH DOWN PAYMENT < $17,976. |
| K. SUBTOTAL (H. - I. - J) (CASH BALA $71,904. |
| L. TIME PRICE DIFFERENTIAL (I.P. + $19,255. |
| M. TIME BALANCE (K + L $91,159. |

| E. TOOLING, ATTACHMENTS, OPTIONS AND OTHER ADDITIONS (INCLUDING SPECIFICATIONS) | QTY. | CASH PRICE |
|---|---|---|

| | TOTAL TO 4B |
|---|---|
| F. DESCRIBE TRADE IN | H. VALUE OF TRADE-IN |
| | I. LESS LIENS ☐ ALC < > |
| G. CALCULATE CREDIT FOR TRADE-IN ABOVE AND INSERT IN ITEM 4I. | J. CREDIT FOR TRADE-IN (H.I) |

### ITEM 5 CASUALTY & LIABILITY INSURANCE FOR ALL FINANCED

| BUYER'S INSURANCE COMPANY | _Rankin Mesh Patrol_ | TELEPHONE | 630-947-4874 |
|---|---|---|---|
| BUYER'S INSURANCE AGENCY | _Neiss Ins_ | NAME OF AGENT | _Tim O'Neill_ |
| INSURANCE AGENCY'S ADDRESS | _31 W 680 Cherry Trail_ | | P.O. BOX |
| CITY _Wayne_ | STATE _IL_ | ZIP CODE _60184_ | TELEPHONE (630) 584-177 |

NOTE: Section B.4 on the reverse hereof sets forth certain requirements for insurance which must be provided by Buyer. Please review these requirements carefully with your insurance provider.

Buyer agrees to the terms and conditions set forth herein and on the reverse side of this Agreement. BY ITS EXECUTION BELOW ACKNOWLEDGES THAT BUYER HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS ON THE REVERSE SIDE OF THIS AGI INCLUDING WITHOUT LIMITATION THE WARRANTY DISCLAIMERS AND LIMITATION OF LIABILITY SET FORTH IN SECTION A.10, AND TH JURISDICTION PROVISIONS SET FORTH IN SECTIONS D.4, RESPECTIVELY, AND UNDERSTANDS THAT THE AGREEMENT CREATES IN I SELLER A SECURITY INTEREST IN THE PROPERTY.

If Buyer has elected to purchase the Property on an installment payment basis, Buyer acknowledges that Seller has offered both a cash purchase pr installment purchase price to Buyer and that Buyer has made its election based on a comparison of these prices. Buyer authorizes Seller to co blank, including without limitation the date of first payment in item 2.C, and correct any typographical or other error on the facing page of this Agree execution of this Agreement by Buyer.

This Agreement shall not be binding upon Seller until executed by a duly authorized officer or manager of Seller in Buena Park, California. NO REPRES OR WARRANTY RELATING TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT IS BINDING ON OR ENFORCEABLE AGAINST SELLER SET FORTH IN THIS AGREEMENT.

| BUYER (IDENTIFIED IN ITEM 1.A. ABOVE) | BY _(signature)_ | TITLE _President_ | DATE _7/2_ |
|---|---|---|---|
| AMADA AMERICA, INC. (SELLER) | BY | TITLE | DATE |

## A. Terms and Conditions of Sale

EXHIBIT D

AGREEMENT NUMBER 1455

# AMADA AMERICA, INC.

7025 Firestone Blvd., Buena Park, CA 90621

FILE NUMBER 12901-CBC

## EQUIPMENT PURCHASE AND SECURITY AGREEMENT

Buyer (described in Item 1.A. below) agrees to purchase from AMADA AMERICA, INC. ("Seller") and Seller agrees to sell to Buyer for business only the equipment and other personal property described in Item 3, below ("Property"), on the terms and conditions set forth in this Ag including without limitation the terms and conditions set forth on the reverse hereof.

TYPE OR PRINT ONLY

### ITEM 1: BUYER

**A. DESCRIPTION OF BUYER:**

| BUYER'S FULL NAME | BUYER'S TRADE NAME OR STYLE |
|---|---|
| PRECISION AMERICAN METALS, LLC | |

☐ CORPORATION ☑ LIMITED LIABILITY CO. ☐ PARTNERSHIP ☐ PROPRIETORSHIP ☐ OTHER ___

ORGANIZED UNDER THE LAWS OF THE STATE OF: IL

AMADA CUSTOMER NO. 29897

| STREET ADDRESS OF BUYER'S CHIEF EXECUTIVE OFFICE | P.O. BOX | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|---|
| 1050 KINGSLAND DR. | | BATAVIA | | IL | 60510 | (630) 406-777 |

**B. INSTALLATION SITE:**

| COMPANY NAME | BRANCH / DIVISION |
|---|---|
| SAME AS "A" | |

| STREET ADDRESS | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE ( ) |
|---|---|---|---|---|---|

| REQUEST DELIVERY DATE | SHIPPING INSTRUCTIONS FOB SHIPPING POINT | AMADA CUSTOMER NUMBER | CONTACT JOHN MAZUREK |
|---|---|---|---|

**C. BILLING INFORMATION:**

| BILLING ADDRESS | P.O. BOX | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|---|
| 11003 PINEHIGH DR. | | ALPHARETTA | | GA | 30022 | (678) 642-740 |

| BILLING INSTRUCTIONS | AMADA CUSTOMER NUMBER 29897-1 | CONTACT DICK CLARK |
|---|---|---|

**D. FOR SELLER'S REFERENCE ONLY:**

| REGION NO. 72 | DIVISION NO. 006 | SALESMAN NO. 922 | SALESMAN NAME JOHN WOODRUFF | CUSTOMER P.O. NO. PAM6300601 | P.O. DATE 06/30 |
|---|---|---|---|---|---|

### ITEM 2: PAYMENT TERMS

A. ☐ NET 30 DAYS ☐ C.O.D. ☑ MONTHLY INSTALLMENTS (TOTAL NO. OF PAYMENTS 60 ) ☐ OTHER ___ 9

| B. AMOUNT OF EACH MONTHLY INSTALLMENT | C. DUE DATE OF FIRST INSTALLMENT (TO BE COMPLETED BY SELLER) | D. TAX EXEMPT PURCHASE | E. INSERT CERTIFICATE NO. HERE (SEE SECTION A.2 ON REVERSE HEI |
|---|---|---|---|
| $1,132.57 | 5-5-07 | ☑ YES ☐ NO | |

If this Agreement is an installment sale, Buyer shall make each installment payment to: AMADA CAPITAL CORPORATION, Dept. LA22096, Pasadena, California 91185-2096

### ITEM 3: DESCRIPTION OF PROPERTY

| A. MACHINE MODEL NO. FABRIVISION | B. SERIAL NO. | C. ☑ NEW ☐ DEMO ☐ USED | D. MACHINE DESCRIPTION: ONE (1) AMADA INSPECTION MACHINE |
|---|---|---|---|

### ITEM 4: PRICE

| | A. CASH PURCHASE PRICE FOR MA $64,700 |
|---|---|

| E. TOOLING, ATTACHMENTS, OPTIONS AND OTHER ADDITIONS (INCLUDING SPECIFICATIONS) | QTY | CASH PRICE |
|---|---|---|
| | | |
| FREIGHT | | $1,800.00 |
| | | |
| EPSA SUPERSEDES PURCHASE ORDER | | |

B. CASH PURCHASE PRICE FOR TOOLING/ACC

C. $1,800

D. TOTAL CASH PURCHASE PRICE (A $66,500

E. SALES TAX (RATE + ___%) N

F.

| | | TOTAL TO 4B |
|---|---|---|

G. SUBTOTAL (D + E + F + G) $66,500

| F. DESCRIBE TRADE-IN | H. VALUE OF TRADE-IN |
|---|---|

I. LESS CREDIT FOR TRADE-IN FRO

| | LESS LIENS □ ALC | < . . > |
|---|---|---|

J. LESS CASH DOWN PAYMENT < $12,900

| G. CALCULATE CREDIT FOR TRADE-IN ABOVE AND INSERT IN ITEM 4I. | J. CREDIT FOR TRADE-IN (H.I) |
|---|---|

K. SUBTOTAL (H - I - J) (CASH BAL $53,600

### ITEM 5: BUYER'S LIABILITY INSURANCE FOR ALL FINANCE ONLY

| BUYER'S INSURANCE COMPANY FRANKENMUTH MUTUAL INS | POLICY CPP1979814 |
|---|---|

L. TIME PRICE DIFFERENTIAL $14,034

| BUYER'S INSURANCE AGENCY WEISS INS | NAME OF AGENT JIM PARILLI |
|---|---|

M. TIME BALANCE (K + L) $67,954

| INSURANCE AGENCY'S ADDRESS 31 W680 ARMY TRAIL | P.O. BOX |
|---|---|

| CITY WAYNE | STATE IL | ZIP CODE 60184 | TELEPHONE (630) 584-1717 |
|---|---|---|---|

NOTE: Section B.4 on the reverse hereof sets forth certain requirements for insurance which must be provided by Buyer. Please review these requirements carefully with your insurance provider.

Buyer agrees to the terms and conditions set forth herein and on the reverse side of this Agreement. BY ITS EXECUTION BELOW ACKNOWLEDGES THAT BUYER HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS ON THE REVERSE SIDE OF THIS AG INCLUDING WITHOUT LIMITATION THE WARRANTY DISCLAIMERS AND LIMITATION OF LIABILITY SET FORTH IN SECTION A.10, AND THE JURISDICTION PROVISIONS SET FORTH IN SECTIONS D.4, RESPECTIVELY, AND UNDERSTANDS THAT THE AGREEMENT CREATES IN SELLER A SECURITY INTEREST IN THE PROPERTY.

If Buyer has elected to purchase the Property on an installment payment basis, Buyer acknowledges that Seller has offered both a cash purchase pr installment payment purchase price to Buyer and that Buyer has made its election based on a comparison of these prices. Buyer authorizes Seller to co blank, including without limitation the date of first payment in Item 2.C, and correct any typographical or other error on the facing page of this Agree execution of this Agreement by Buyer.

This Agreement shall not be binding upon Seller until executed by a duly authorized officer or manager of Seller in Buena Park, California. NO REPRES OR WARRANTY RELATING TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT IS BINDING ON OR ENFORCEABLE AGAINST SELLE SET FORTH IN THIS AGREEMENT.

| BUYER (IDENTIFIED IN ITEM 1.A., ABOVE) | X BY | X TITLE Pres | X DATE 7/27 |
|---|---|---|---|

AMADA AMERICA, INC. (SELLER) BY TITLE DATE

## A. Terms and Conditions of Sale

1. **Price and Price Adjustments.** The cash purchase price of the Property is FOB point of shipment from within the United States as designated by Seller, and in lieu thereof [the] cash price on date of execution of this Agreement by Seller. After such period Seller may, in its discretion, adjust the purchase price of any unshipped Property to reflect cost increases and changes in market conditions. Seller will give Buyer written notice of any such price adjustments. Unless within seven (7) days after receiving such notice Buyer gives Seller written notice of any objections to any such price adjustment, Buyer will be deemed to have waived any such objections.

2. **Taxes.** The cash purchase price of the Property is exclusive of any and all excise, sales, use or other taxes levied by any federal, state, county, municipal or other governmental authorities, all of which are for the account of Buyer. Seller is authorized to collect payment of any such taxes directly to the taxing authority, and Buyer will reimburse Seller therefor. Such reimbursement will be made on demand unless otherwise expressly agreed in writing. If Buyer claims an exemption from such taxes, Buyer must provide evidence of such exemption acceptable to Seller.

3. **Freight Charges.** Freight charges for shipment of the Property to Buyer, including fees on freight charges, if any, are for the account of Buyer and will be billed freight collect. Freight charges for tooling and accessories will be separately invoiced to Buyer and are payable net 30 days from the date of invoice unless otherwise agreed in writing.

4. **Late Charges.** Any payment of Buyer not received by the ninth (9th) day following the date due will be subject to a late charge of the amount [5%] of the amount due as liquidated damages.

5. **Shipping Instructions.** Seller will arrange for shipment and routing of the Property in accordance with the instructions of Buyer (if any) set forth on the facing page hereof; provided however, if such instructions are unclear incomplete or impractical of implementation, or if no shipping instructions are set forth on the facing page hereof, Seller may, and is hereby authorized by Buyer to arrange for shipment and routing of the Property as Seller deems appropriate. In no event will Seller be liable for any failure of the carrier to follow shipping instructions of Buyer or Seller. Charges will be billed freight collect.

6. **Shipment.** Seller may ship the Property in partial shipments. Seller will use reasonable commercial efforts to deliver the Property by the requested delivery date, set forth on the facing page hereof, but will have no liability to Buyer for late shipments.

7. **Title, Risk of Loss and Insurance.** Title to and all risk of loss of or damage to the Property will pass from Seller to Buyer at the shipping point. Unless otherwise expressly agreed in writing, the cost of insurance on the Property while in transit will be borne by Buyer.

8. **Rigging.** All costs of unloading the Property from the carrier upon arrival at the shipping destination and moving the Property to the installation site are for the account of Buyer. Seller has no liability to Buyer and Buyer assumes all risk of damage to or loss of the Property occurring in connection with such unloading and moving.

9. **Installation.** Buyer will, at its expense, take all necessary steps to prepare the installation site for the installation of the Property. The cost of installation is included in the purchase price of the Property. Installation includes set up, start up and initial adjustment of operating performance. Seller has no responsibility or liability for any failure of any of the Property to meet any applicable codes or standards established by any private organization or any federal, state, county, municipal or other governmental authority; provided, however, that in the event of any such failure to meet such codes or standards, Seller or its delegatee will, at the request of Buyer, make such modifications to any of the Property as may be necessary to bring such Property into compliance with any such codes or standards, unless Seller determines that the cost to Seller of making any such modifications is expected to exceed ten percent (10%) of the purchase price of the Property or that the time required to effect such compliance (including the completion of any necessary inspections and the obtaining of any necessary permits or approvals) is expected to exceed sixty (60) days, in which case Seller may upon refunding to Buyer payments received in respect of the excluded portion of this Agreement [less freight charges and applicable costs], cancel the portion of this Agreement relating to Buyer; and provided further, that if Buyer so requests, Seller may, but shall not be obligated to, proceed with such modifications at the sole expense of Buyer, payment for which shall be made by Buyer in advance of Seller's performance.

10. **Warranty and Limitation of Liability.** EXCEPT AS MAY OTHERWISE BE SET FORTH IN A WRITTEN WARRANTY OF THE PROPERTY EXECUTED BY SELLER, SELLER MAKES NO WARRANTY, EXPRESSED OR IMPLIED, WRITTEN OR ORAL, AND HEREBY EXPRESSLY DISCLAIMS ALL SUCH WARRANTIES, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE. IN NO EVENT SHALL SELLER BE LIABLE FOR ANY INCIDENTAL, SPECIAL, INDIRECT, DIRECT OR CONSEQUENTIAL DAMAGES (INCLUDING WITHOUT LIMITATION LOST PROFITS), AND IN NO EVENT SHALL SELLER'S LIABILITY EXCEED THE STATED PURCHASE PRICE OF THE PROPERTY.

11. **Trade-In.** Buyer represents and warrants to Seller that Buyer has good and marketable title to any trade-in, referred to in line 3T on the facing page hereof, and that any such trade-in is in good operating condition and will be transferred to Seller free and clear or all claims, liens, charges, security interests or encumbrances of any third party. In the event that subsequent to such transfer any third party, including without limitation Amada Capital Corporation ("ACC"), asserts a lien on or other interest in such trade-in, Buyer hereby grants to Seller a license to store any such trade-in on Buyer's premises until such trade-in may be conveniently moved or resold, and Buyer will indemnify and hold Seller harmless from any loss or damage to such trade-in and any claim against Seller arising out of such storage or any unauthorized conversion of such trade-in.

12. **Force Majeure.** In the event that Seller or any of its suppliers or delegatees is unable to carry out Seller's obligations hereunder due to acts of God or of the public enemy, war, insurrection, riots, strikes, lockouts, labor disputes, fires, floods, earthquakes, natural disasters, unavoidable casualty, freight embargoes, shortages of labor or material, changes to governmental policy, laws or regulation [including but not limited to reverse exchange or transfer restrictions, impositions of quotas or limitation of shipments], or any other cause or causes beyond the control of Seller or its suppliers or delegatees, whether or not specified above, Seller may extend the time of performance of its obligations to such extent as may be necessary to enable Seller and its suppliers and delegatees to complete performance with the exercise of reasonable diligence after the cause or causes of delay have been removed. In the event any such delay continues for a period of more than six (6) months, either party may terminate its obligations hereunder by so notifying the other party in writing.

13. **Termination.** Upon the occurrence of an Event of Default (as defined in Section B.8), Seller will, in addition to the other rights set forth in this Agreement, have the right to immediately terminate this Agreement as to any unshipped Property with or without notice of termination.

14. **Indemnification.** Buyer will defend, indemnify and hold Seller harmless from and against any and all claims, liabilities, damages, costs and expenses (including reasonable attorney's fees) arising out of or in connection with any use of the Property by Buyer or any breach of this Agreement by Buyer.

15. **Collection Precedent to Seller's Obligations.** Or all installment sales the entire payment of ACC for each other financing company as may be involved to the terms of this Agreement is a condition precedent to the performance of Seller's obligations under this Agreement, and any of the Property delivered to Buyer prior to the obtaining of such written approval will be deemed to be held by Buyer as a bailee for its own benefits under a bailment revocable at will by Seller.

16. **Financing.** Buyer has sole responsibility for obtaining any necessary financing for the purchase of the Property. Any efforts of Seller to arrange any such financing are solely as an accommodation to Buyer and do not obligate Seller in any way.

17. **Information Regarding Buyer.** Buyer represents and warrants to Seller that all of the information regarding Buyer set forth on the facing page of this Agreement is true and correct.

## B. Security Interest

1. **Grant of Security Interest.** To secure payment of the purchase price of the Property, Buyer hereby grants to Seller a security interest in the Property, and in all accessions thereto and replacements or modifications thereof, as well as all proceeds (including insurance proceeds) of the foregoing. The security interest granted hereby constitutes a purchase money security interest under the California Uniform Commercial Code. In addition, the security interest granted hereby shall secure the full and faithful performance by Buyer and all of Buyer's obligations under this Agreement. Notwithstanding the foregoing, the provisions of this Part B do not apply with respect to COD sales of Property for which payment is actually received by Seller from Buyer prior to or at the time of delivery of the Property to Buyer's facility.

2. **Information Regarding Buyer.** Buyer represents and warrants to Seller that all of the information regarding Buyer set forth on the facing page of this Agreement is true and correct.

3. **Certain Covenants of Buyer.** For so long as any amounts are owed by Buyer to Seller under this Agreement, Buyer (a) shall use the Property in compliance with all applicable laws, regulations and ordinances; (b) shall maintain the Property in good condition and repair, reasonable wear and tear excepted; (c) shall not [use, when due all taxes, charges and impositions] on the Property or the ownership, use, disposition or sale of same; (d) shall keep the Property free of all liens, charges, claims, security interests and encumbrances of any third party; (e) shall permit Seller to inspect the Property, and inspect and make extracts of all of Buyer's books and records relating thereto, during normal business hours; (f) shall promptly notify Seller of the occurrence of any events which materially and adversely affect (i) the value of the Property as collateral; or shall promptly notify Seller in writing of any change of Buyer's legal name or any landname or style, the form in which Buyer conducts its business, and the organizational or financial structure of Buyer; (g) shall promptly furnish to Seller upon request current financial statements of Buyer; and (h) grants to Seller continued control of Seller, toll, assign, exchange, lease, lend, license the use of, pledge, encumber, grant a security interest in or dispose of the Property or any rights therein, or use or operate the Property in a manner other than as intended by the manufacturer or in violation of any insurance policy covering the Property, or remove or obliterate any markings on any of the Property. The grant of this security interest therein or any right thereof being... [illegible]

4. **Information Regarding Buyer.** [illegible]

5. **Insurance.** Buyer shall keep the Property insured against all risks of loss or damage from any cause whatsoever for which insurance is commercially available, in a coverage amount not less than the total cash purchase price of the Property, under policies providing that losses shall be payable to Seller and requiring the insurer to give Seller not less than thirty (30) days prior written notice of the effective date of any reduction or cancellation of any such policy. All such insurance policies shall otherwise be satisfactory to Seller. Buyer shall deliver such insurance policies to Seller, or shall furnish to Seller such evidence of insurance as Seller may from time to...

time request. The proceeds of such insurance shall be applied, at the option of Seller, to the replacement, restoration or repair of any Property which is lost, stolen, damaged or destroyed, or in payment of the obligations of Buyer hereunder. Buyer hereby irrevocably appoints Seller as attorney-in-fact, which appointment is coupled with an interest, to make claims for, receive payment of, and execute and endorse all documents, checks, or drafts received in payment of any loss under any such policy of insurance. If Buyer fails to procure or maintain such insurance, Seller shall have the right, but shall not be obligated, to obtain and maintain such insurance, and reimburse Seller for the cost thereof.

6. **Covenants Regarding Location of Property.** Buyer will not remove any of the Property from the location at which installed or otherwise change the location of any of the Property after written consent of Seller in each instance. EACH SIGNATORY HERETO WILL BE RELIABLE TO SELLER FOR ANY ALL LOSS OR DAMAGE SUSTAINED BY SELLER AS A PROPERTY WHICH IS REMOVED OR RELOCATED OR OTHERWISE DISPOSED OF BY SELLER, SPECIFICALLY INCLUDING, WITHOUT LIMITATION, ANY DAMAGE ARISING FROM LOSS OF PROTECTION OF SELLER'S OR ACC'S SECURITY INTEREST IN THE PROPERTY.

8. **Default.** The occurrence of any of the following shall constitute an Event of Default: (a) failure by Buyer in the payment, when due or payable of the purchase price of the Property or any interest thereof or interest thereon; (b) any breach of Buyer of any representation, warranty, covenant or obligation of Buyer, or his payment set forth in this Agreement or any other agreement to which Buyer and Seller are a party; (c) failure by the operation of law or otherwise, which breach is not cured within thirty (30) day following notice thereof by Seller to Buyer; (d) the insolvence or entry of any injunction or attachment against Buyer, the Property or any other property of Buyer; (e) the failure of Buyer to pay its debts as they become due; (f) the appointment of a receiver or of conditions or liquidating agents, the offering of a composition or extension to creditors, the assignment for the benefit of creditors or the commencement of any proceeding such reorganization, dissolution or liquidation under any bankruptcy or other laws relating to debtors, to the extent that any of the foregoing is by, for, on behalf of or with respect to the insolvency of Buyer, the suspension, termination, discharge or unenforceability of as executed in favor of Seller with respect to any of the obligations secured hereby; or (h) the condition or affairs (financial or otherwise) of Buyer which in the good faith determination of Seller impairs Seller's security or increase its risk.

7. **Remedies on Default.** Upon the occurrence of an Event of Default, or at any time thereafter and during the continuance of an Event of Default, in addition to any other rights or remedies Seller may have under any or all of the following rights and remedies; (a) Seller shall have all of the remedies of a secured party under the Uniform Commercial Code as in effect in any jurisdiction in which enforcement hereof is sought; (b) Seller may, at its option, accelerate and declare all indebtedness secured hereby to be immediately due and payable; (c) Seller shall have the immediate and exclusive possession of any and all of the Property, wherever located, and Buyer shall, at the request of Seller, make available to Seller such Property at such location reasonably convenient to both Seller and Buyer; (d) Seller may enter upon the premises where such Property may be located (with or without judicial process and without force, and peaceably upon the premises where such Property may be located) and there repossess the Property from such location for disposition or proceed to liquidate or otherwise dispose of the Property from such location; (e) Seller may require Buyer, at Buyer's expense, to assemble the Property and make it available to Seller at any mutually convenient location reasonably convenient to both Seller and Buyer; (f) Seller may, in its sole discretion, any time and from time to time, but only after such time as shall have been given Buyer at least ten (10) days prior written notice of its intention to dispose of the Property is hereby agreed to be reasonable notice, lease any of the Property for such terms and in such manner as Seller may consider appropriate, or sell, lease, transfer, assign, dispose of and deliver the Property, in one or more parcels, at the same or different times, and all right, title, interest, claim and demand of public or private sale, for cash, upon credit or for future delivery, and at such price as Seller may determine, (f) in connection with any disposition by and purchase any of Property; and by such purchase acquire all right, title and interest therein; (g) Seller may, for and on behalf of Buyer, make and deliver to any purchaser of any of the Property a sufficient bill of sale or other evidence of transfer of all right, title and interest to any Property; and (h) Seller may in its own name or in the name of and on behalf of Buyer execute any and all actions expedient to Seller such care shall be secured hereby.

**Application of Proceeds.** The net proceeds realized upon any liquidation or disposition of Property, after deduction for the expense of retaking, holding, preparing for sale or lease, leasing and the like, and the reasonable attorney's fees and legal expenses and costs Seller in enforcing or exercising any of its rights or remedies under this Agreement, shall in satisfaction of the obligations of Buyer secured under this Agreement in such order as may be appropriate by Seller. Any surplus of such proceeds shall be paid to the person or persons entitled thereto, and the Buyer shall be liable to Seller for and shall immediately pay to Seller the amount of any deficiency.

**Buyer's Waiver.** Except as to the notice of intention to dispose of Property provided for above, Seller may exercise any of its rights and remedies without demand, advertisement or notice to any as required by law. To the fullest extent permitted by law, Buyer waives demand, protest, notice of acceptance of this Agreement or other action taken in reliance hereon and demands and notices of any description.

**Financing Statements.** Buyer from time to time hereby authorizes Seller to execute and file financing statements authenticated records, and future filings at any time to any of the Property, in each case without Buyer's signature to the extent permitted Seller's consent. Buyer shall execute one or more financing statements, fixture filings, or statements or other filings pursuant to the Uniform Commercial Code in form satisfactory to Seller. Buyer shall take any and all steps required by Seller to maintain perfection of the security interest granted hereunder, or to fully assure to Seller its rights under this Agreement.

## C. Assignment

1. **Assignment to Amada Capital Corporation.** Unless otherwise agreed by the parties, Seller may at any time assign this Agreement and its rights hereunder, in whole or in part. Buyer hereby waives any right to assert against ACC any claims, defenses or claims which have against Seller, and Buyer hereby expressly agrees not to assert any such claims, offsets against ACC.

2. **Assignment by Buyer.** Buyer may not assign, delegate or transfer any of its rights, obligations under this Agreement to any third party without the prior written consent of Seller.

## D. Miscellaneous

1. The order of application of Buyer payments is at the discretion of Seller. Seller may at any apply and all of a Buyer's payment to any outstanding balances owing by Seller including, but not limited to Buyer late charges.

2. **Notices.** All notices, demands or consents required or permitted to be given under this Agreement shall be in writing and shall be deemed effective upon delivery if delivered personally or after mailing if sent by first class United States mail, postage prepaid, addressed to the address set forth herein or to such other address as shall be given by either party to the other.

3. **Waiver, Amendment or Modification.** No waiver, amendment or modification of or hereof or of any right or remedy hereunder shall be effective unless in writing and signed to be bound. No failure by Seller to exercise, and no delay by Seller in exercising, any right hereby granted hereunder shall operate as a waiver of any such right, power or remedy; any right or remedy by Seller on any one occasion shall not be construed as a bar to or a right or remedy on any future occasion. All rights and remedies of Seller are separate and are the exercise of any right or remedy shall not limit or prejudice the exercise of any other remedy.

4. **Court Jurisdiction.** Any controversy, claim, action or dispute arising out of or related agreement will be subject to the laws of the State of California and the parties hereby agree to matters being adjudicated in the jurisdiction of California.

5. **Attorneys' Fees.** In the event any arbitration or judicial action or proceeding is initiated to any matters relating to this Agreement or in the event either party seeks relief from the automatic of 11 U.S.C. Section 362 for any successor statue thereof, then the party in whose favor an award shall be given or any relief shall be granted or judgment shall be entered shall be entitled to recover from the other party all costs and expenses (including attorneys' fees) incurred in such proceeding and any appeal therefrom.

6. **Severability.** In the event any provision or portion of any provision of this Agreement by a court of competent jurisdiction to be unenforceable or invalid, the remaining provisions thereof shall remain in full force and effect.

7. **Entire Agreement.** Notwithstanding any purchase order submitted by Buyer relating on the facing page hereof or attached hereto, this Agreement constitutes the entire agreement between Buyer and Seller pertaining to the subject matter hereof. Any and all verbal agreements or understandings heretofore existing between the parties pertaining to the subject matter hereof are expressly superseded and cancelled by this Agreement.

8. **Time is of the Essence.** Except as to the provisions of this Agreement relating to the and shipping delays, time is of the essence with respect to each of the terms, conditions and covenants of this Agreement.

9. **Binding Effect.** Subject to Part C of this Agreement, this Agreement shall be binding shall inure to the benefit of the parties and their legal representatives, successors and assigns.

10. **Headings.** Headings contained in this Agreement are for purposes of convenience a not part of this Agreement.

EXHIBIT

E

**AGREEMENT NUMBER** 147~

# ⦿AMADA AMERICA, INC.

7025 Firestone Blvd., Buena Park, CA 90621

FILE NUMBER 2901-CB~

## EQUIPMENT PURCHASE AND SECURITY AGREEMENT

Buyer (described in Item 1.A. below) agrees to purchase from AMADA AMERICA, INC. ("Seller") and Seller agrees to sell to Buyer for business only the equipment and other personal property described in Item 3, below ("Property"), on the terms and conditions set forth in this A~ including without limitation the terms and conditions set forth on the reverse hereof.

**TYPE OR PRINT ONLY**

### ITEM 1 BUYER

**A. DESCRIPTION OF BUYER**

| BUYER'S FULL NAME | | BUYER'S TRADE NAME OR STYLE | | | |
|---|---|---|---|---|---|
| PRECISION AMERICAN METALS, LLC | | | | | |
| ☐ CORPORATION ☑ LIMITED LIABILITY CO ☐ PARTNERSHIP ☐ PROPRIETORSHIP ☐ OTHER | | ORGANIZED UNDER THE LAWS OF THE STATE OF: IL | | | AMADA CUSTOMER 29897 |
| STREET ADDRESS OF BUYER'S CHIEF EXECUTIVE OFFICE 1050 KINGSLAND DR. | P.O. BOX | CITY BATAVIA | COUNTY | STATE IL | ZIP CODE 60510 | TELEPHONE ( 630 ) 406-777 |

**B. INSTALLATION SITE**

| COMPANY NAME SAME AS "A" | | BRANCH / DIVISION | | | |
|---|---|---|---|---|---|
| STREET ADDRESS | | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE ( ) |
| REQUEST DELIVERY DATE | SHIPPING INSTRUCTIONS FOB SHIPPING POINT | AMADA CUSTOMER NUMBER | CONTACT JOHN MAZUREK |

**C. BILLING INFORMATION**

| BILLING ADDRESS 11005 PINEHIGH DR. | P.O. BOX | CITY ALPHARETTA | COUNTY | STATE GA | ZIP CODE 30022 | TELEPHONE ( 678 ) 642-740 |
|---|---|---|---|---|---|---|
| BILLING INSTRUCTIONS | | AMADA CUSTOMER NUMBER 29897-1 | | CONTACT DICK CLARK | |

**D. FOR SELLERS REFERENCE ONLY**

| REGION NO. 72 | DIVISION NO. 005 | SALESMAN NO. 922 | SALESMAN NAME JOHN WOODRUFF | CUSTOMER P.O. NO. PAM6300601 | P.O. DATE 06/3~ |
|---|---|---|---|---|---|

### ITEM 2 PAYMENT TERMS

A. ☐ NET 30 DAYS   ☐ C.O.D.   ☑ MONTHLY INSTALLMENTS (TOTAL NO. OF PAYMENTS 60 ) ☐ OTHER     9.75

| B. AMOUNT OF EACH MONTHLY INSTALLMENT $2,045.38 | C. DUE DATE OF FIRST INSTALLMENT (TO BE COMPLETED BY SELLER) 5-16-07 | D. TAX EXEMPT PURCHASE ☑ YES ☐ NO | E. INSERT CERTIFICATE NO. HERE (SEE SECTION A.2 ON REVERSE HE~ |
|---|---|---|---|

If this Agreement is for an installment sale, Buyer shall make each installment payment to:
AMADA CAPITAL CORPORATION, Dept. LA22096, Pasadena, California 91185-2096

### ITEM 3 DESCRIPTION OF PROPERTY

| A. MACHINE MODEL NO. | B. SERIAL NO. | C. ☑ NEW ☐ DEMO ☐ USED | D. MACHINE DESCRIPTION: ONE (1) AMADA |
|---|---|---|---|
| MP1225NJ | | | MANIPULATOR SYSTEM |

| E. TOOLING, ATTACHMENTS, OPTIONS AND OTHER ADDITIONS (INCLUDING SPECIFICATIONS) | QTY. | CASH PRICE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | TOTAL TO 4B | |

| F. DESCRIBE TRADE-IN | H. VALUE OF TRADE-IN |
|---|---|
| | I. LESS LIENS ☐ ALC |
| G. CALCULATE CREDIT FOR TRADE-IN ABOVE AND INSERT IN ITEM 4L | J. CREDIT FOR TRADE-IN (H-I) |

### ITEM PRICE

| | |
|---|---|
| A. CASH PURCHASE PRICE FOR MA~ | $121,000. |
| B. CASH PURCHASE PRICE FOR TOOLING/AC~ | |
| C. | |
| D. TOTAL CASH PURCHASE PRICE (A~ | $121,000. |
| E. SALES TAX (RATE + %) | N |
| F. | |
| G. | |
| H. SUBTOTAL (D + E + F + G) | $121,000. |
| I. LESS CREDIT FOR TRADE-IN FRO~ < | |
| J. LESS CASH DOWN PAYMENT < | $24,200.~ |
| K. SUBTOTAL ( H - I - J ) (CASH BAL~ | $96,800.~ |
| L. TIME PRICE DIFFERENTIAL (M~ | $25,922.~ |
| M. TIME BALANCE (K + L) | $122,722.~ |

### ITEM 4 CASUALTY & LIABILITY INSURANCE (FOR ALL FINANCE ONLY)

| BUYER'S INSURANCE COMPANY FRANKENMUTH MUTUAL | POLICY # 974874 |
|---|---|
| BUYER'S INSURANCE AGENCY WEISS INS. | NAME OF AGENT IV~ PAZILLI |
| INSURANCE AGENCY'S ADDRESS 31 W 680 Army Trail | P.O. BOX |
| CITY WAYNE | STATE IL | ZIP CODE 60184 | TELEPHONE 630 584-1717 |

NOTE: Section B.4 on the reverse hereof sets forth certain requirements for insurance which must be provided by Buyer. Please review those requirements carefully with your insurance provider.

Buyer agrees to the terms and conditions set forth herein and on the reverse side of this Agreement. BY ITS EXECUTION BELOW~ ACKNOWLEDGES THAT BUYER HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS ON THE REVERSE SIDE OF THIS AGI INCLUDING WITHOUT LIMITATION THE WARRANTY DISCLAIMERS AND LIMITATION OF LIABILITY SET FORTH IN SECTION A.10, AND TH~ JURISDICTION PROVISIONS SET FORTH IN SECTIONS D.4, RESPECTIVELY, AND UNDERSTANDS THAT THE AGREEMENT CREATES IN ~ SELLER A SECURITY INTEREST IN THE PROPERTY.

If Buyer has elected to purchase the Property on an installment payment basis, Buyer acknowledges that Seller has offered both a cash purchase pr~ installment payment purchase price to Buyer and that Buyer has made its election based on a comparison of these prices. Buyer authorizes Seller to co~ blank, including without limitation the date of first payment in item 2.C, and correct any typographical or other error on the facing page of this Agreement~ execution of this Agreement by Buyer.

This Agreement shall not be binding upon Seller until executed by a duly authorized officer or manager of Seller in Buena Park, California. NO REPRES~ OR WARRANTY RELATING TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT IS BINDING ON OR ENFORCEABLE AGAINST SELLE~ SET FORTH IN THIS AGREEMENT.

| BUYER (IDENTIFIED IN ITEM 1.A., ABOVE) | BY | TITLE PRESIDENT | DATE 7/3~ |
|---|---|---|---|
| AMADA AMERICA, INC. (SELLER) | BY | TITLE | DATE |

## A. Terms and Conditions of Sale

1. **Price and Price Adjustments.** The cash purchase price of the Property is FOB point of shipment from within the United States as designated by Seller, and is due the thirty (30) days after the date of execution of this Agreement by Seller. Any such product Seller may, in its discretion, adjust the purchase price of any unshipped Property to reflect cost increases and changes in market conditions. Seller will give Buyer written notice of any such price adjustments. Unless within seven (7) days after receiving such notice Buyer gives Seller written notice of any objections to any such price adjustment, Buyer will be deemed to have waived all such objections.

2. **Taxes.** The cash purchase price of the Property is exclusive of any and all excise, sales, use or other taxes levied by any federal, state, county, municipal or other governmental authority, all of which are to the account of Buyer. Seller is indicated to make payment of any such taxes directly to the taxing authority, and Buyer will reimburse Seller thereto. Such reimbursement will be made on demand unless otherwise expressly agreed in writing. If Buyer claims an exemption from such taxes, Buyer must provide evidence of such exemption acceptable to Seller.

3. **Freight Charges.** Freight charges for shipment of the Property, including taxes on freight charges, if any, are for the account of Buyer and will be billed freight collect. Freight charges for loading and accessories will be separately invoiced to Buyer and are payable net 30 days from the date of invoice unless otherwise agreed in writing.

4. **Late Charges.** Any payment of Buyer not received by the sixth (6th) day following the date due will be subject to a late charge of five percent (5%) of the amount due as liquidated damages.

5. **Shipping Instructions.** Seller will arrange for shipment and routing of the Property in accordance with the instructions of Buyer (if any) set forth on facing page hereof; provided however, if such instructions are unclear, incomplete or impractical of implementation, or if no shipping instructions are set forth on the facing page hereof, Seller may, and is hereby authorized by Buyer to arrange for shipment and routing of the Property as Seller deems appropriate. In no event will Seller be liable for any failure of the carrier to follow shipping instructions of either Buyer or Seller. Charges will be billed freight collect.

6. **Shipment.** Seller may ship the Property in partial shipments. Seller will use reasonable commercial efforts to deliver the Property by the requested delivery date, set forth on the facing page hereof, but will have no liability to Buyer for late shipments.

7. **Title, Risk of Loss and Insurance.** Title to and all risk of loss or damage to the Property will pass from Seller to Buyer at the shipping point. Unless otherwise expressly agreed in writing, the cost of insurance on the Property while in transit will be borne by Buyer.

8. **Rigging.** All costs of unloading the Property from the carrier upon arrival at the shipping destination and moving the Property to the installation site are for the account of Buyer. Seller has no liability for Rigger and Buyer assumes all risk of damage to or loss of the Property occurring in connection with such unloading and moving.

9. **Installation.** Buyer will, at its expense, take all necessary steps to prepare the installation site for the installation of the Property. The cost of installation is included in the purchase price of the Property. Installation includes set up, start up and initial adjustment of operating performance. Seller has no responsibility or liability for any failure of any of the Property to meet any applicable codes or standards established by any federal, state, county or municipal regulation or any federal, state, county, municipal or other governmental authority; provided, however, that in the event of any such failure to meet such codes or standards, Seller in its delegation will, at the request of Buyer, make such modifications to any of the Property as may be necessary to bring such Property into compliance with any such codes or standards; unless Seller determines that the cost to Seller of making any such modifications is expected to exceed ten percent (10%) of the purchase price of the Property or that the time required to effect such compliance (including the completion of any necessary inspections and the obtaining of any necessary permits or approvals) is expected to exceed ninety (90) days, in which case Seller may upon subscribing to Buyer payments received in respect of the canceled portion of this Agreement (less bright charges) and applicable charges), cancel that portion of the Property in whole or in part without further liability to Buyer; and provided further that if Buyer so requests, Seller may, but shall not be obligated to, proceed with such modifications at the sole expense of Buyer, payment for which shall be made by Buyer in advance of Seller's performance.

10. **Warranty and Limitation of Liability.** EXCEPT AS MAY OTHERWISE BE SET FORTH IN A WRITTEN WARRANTY OF THE PROPERTY EXECUTED BY SELLER, SELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AND HEREBY EXPRESSLY DISCLAIMS ALL SUCH WARRANTIES, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE. IN NO EVENT SHALL SELLER BE LIABLE FOR ANY INCIDENTAL, SPECIAL, INDIRECT, DIRECT OR CONSEQUENTIAL DAMAGES (INCLUDING WITHOUT LIMITATION LOST PROFITS), AND IN NO EVENT SHALL SELLER'S LIABILITY EXCEED THE STATED PURCHASE PRICE OF THE PROPERTY.

11. **Trade-Ins.** Buyer represents and warrants to Seller that Buyer has good and marketable title to any trade-in, referred to in item 3.F on the facing page hereof, and that any such trade-in is in good operating condition and will be transferred to Seller free and clear of all claims, liens, charges, security interests or encumbrances of any third party. In the event that subsequent to such transfer any third party, including without limitation Amada Capital Corporation ("ACC"), asserts a lien on or other interest in such trade-in, Buyer hereby grants to Seller a license to take any such trade-in or Buyer's premises until such trade-in may be conveniently moved or resold, and Buyer will indemnify and hold Seller harmless from any loss or damage to such trade-in and any claims against Seller arising out of such storage or any unauthorized operation of such trade-in.

12. **Force Majeure.** In the event that Seller or any of its suppliers or delegation is unable to carry out Seller's obligations hereunder due to acts of God or the public enemy, war, insurrection, riots, strikes, lockouts, labor disputes, fires, floods, earthquakes, natural disasters, unavoidable casualty, freight embargoes, shortages of labor or material, changes in governmental policy, laws or regulations (including but not limited to money exchange or transfer restrictions, importation of quotas or limitations of shipments), or any other cause or causes beyond the control of Seller or its suppliers or delegation, whether or not specified above, Seller may extend the time of performance of its obligation to such extent as may be necessary to enable Seller and its suppliers and delegation to complete performance with the exercise of reasonable diligence after the cause or causes of delay have been removed. In the event any such delay continues for a period of more than six (6) months, either party may terminate its obligations hereunder by so notifying the other party in writing.

13. **Termination.** Upon the occurrence of an Event of Default (as defined in Section B.9), Seller will, in addition to the other rights set forth in this Agreement, have the right to immediately terminate this Agreement as to any un-shipped Property with or without notice of termination.

14. **Indemnification.** Buyer will defend, indemnify and hold Seller harmless from and against any and all claims, liabilities, damages, costs and expenses (including reasonable attorney's fees) arising out of or in connection with any use of the Property by Buyer or any third parties in this Agreement by Buyer.

15. **Condition Precedent to Seller's Obligations.** On all installment sales the written approval of ACC for such other financing company as may be involved) to the terms of this Agreement is a condition precedent to the performance of Seller's obligations under this Agreement, and any of the Property delivered to Buyer prior to the obtaining of such written approval will be deemed to be sold by Buyer as a bailee for its own benefit under a bailment revocable at will by Seller.

16. **Financing.** Buyer has sole responsibility for obtaining any necessary financing for the purchase of the Property. Any advice of Seller to arrange any such financing as solely an accommodation for Buyer and do not obligate Seller to any way.

## B. Security Interest

1. **Grant of Security Interest.** To secure payment of the purchase price of the Property, Buyer hereby grants to Seller a security interest in the Property, and in all accessions thereto and replacements or modifications thereof, as well as all proceeds (including insurance proceeds) of the foregoing. The security interest granted hereby constitutes a purchase money security interest under the California Uniform Commercial Code. In addition, the security interest granted hereby shall secure the full and faithful performance by Buyer and of all Buyer's obligations under this Agreement. Notwithstanding the foregoing, the provisions of this Part B do not apply with respect to COD sales of Property for which payment is actually received by Seller from Buyer prior to or at the time of delivery of the Property to Buyer's facility.

2. **Information Regarding Buyer.** Buyer represents and warrants to Seller that all of the information regarding Buyer set forth on the facing page of this Agreement is true and correct.

3. **Certain Covenants of Buyer.** For so long as any amounts are owed by Buyer to Seller under this Agreement, Buyer (a) shall use the Property in compliance with all applicable laws, regulations and ordinances; (b) shall maintain the Property in good condition and repair, reasonable wear and tear excepted; (c) shall not, unless otherwise agreed in writing by Seller, remove the Property from the location of installation set forth on the facing page hereof; (d) shall permit Seller to inspect the Property, and inspect and make extracts of all of Buyer's books and records relating thereto, during normal business hours; (e) shall promptly notify Seller of the occurrence of any events which materially and adversely affect the value of the Property, or collateral; (f) shall promptly notify Seller in writing of any change of the name or legal name or any fictitious or style, the form in which Buyer conducts its business, and the organizational or financial structure of Buyer; (g) shall promptly furnish to Seller upon request current financial statements of Buyer; and (h) shall not, without prior written consent of Seller, sell, assign, exchange, lease, lend, license the use of, pledge, encumber, grant a security interest in or dispose of the Property (if Buyer's rights therein, or use or otherwise dispose of the Property in a manner other than as intended by the manufacturer or in violation of any insurance policy covering the Property, or create or otherwise use any coverage affected by Seller to the Property or give notice of Seller's security interest therein or any interfering lodge a social number, or letterhead on the Property, or permit the Property to become or also subject to or become a lease.

4. **Insurance.** Buyer shall keep the Property insured against all risk of loss or damage from every other cause in such amounts and with such insurers as Seller may approve. Buyer shall pay as they become due all premiums in respect of such insurance, and will promptly notify Seller of the effect of any interruption in or loss of any Property, under Buyer's obligation to furnish to Seller evidence of insurance as Seller may from time to

## time request.

The proceeds of such insurance shall be applied, at the option of Seller, to the replacement, restoration or repair of any Property which is lost, stolen, damaged or destroyed, or to the payment of the obligations of Buyer hereunder. Buyer hereby irrevocably appoints Seller, as attorney-in-fact, with empowerment to coupled with an interest, to make claims for, receive payment of and execute and endorse all documents, checks, or drafts received in payment of any loss or damage under any such policy of insurance. If Buyer fails to procure or maintain such insurance, Seller may have the right, but shall not be obligated, to obtain and maintain such insurance, and if reimburse Seller for the cost thereof.

5. **Covenants Regarding Location of Property.** Buyer will not remove any of the Property from the location at which installed or otherwise change the location of any of the Property without the written consent of Seller in each instance. EACH SIGNATORY HERETO WILL BE FIRMLY LIABLE TO SELLER FOR ANY AND ALL LOSS OR DAMAGE SUSTAINED BY SELLER AS A RESULT OF ANY CHANGE IN LOCATION OF THE PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF SELLER, SPECIFICALLY INCLUDING, WITHOUT LIMITATION, ANY DAMAGE ARISING FROM THE LOSS OF PERFECTION OF SELLER'S OR ACC'S SECURITY INTEREST IN THE PROPERTY.

6. **Default.** The occurrence of any of the following shall constitute an Event of Default: (a) by Buyer in the payment, when due or payable of the purchase price of the Property or any part thereof or interest thereon; (b) any breach of Buyer of any representation, warranty, covenant or agreement (other than as to payment set forth in this Agreement or any other agreement between Buyer and Seller or arising by operation of law or otherwise, which breach is not cured for fifth (5th) day following notice thereof by Seller to Buyer; (c) the insolvency or entry of any injunction or attachment against Buyer, the Property or any other property of Buyer; (d) the making of any notice of bulk sale or intended bulk sale by Buyer; (e) the appointment of a receiver or other custodian of creditors or liquidating agents, the altering of a composition or extension to creditors, the making of an assignment for the benefit of creditors or the commencement of any proceeding, suit or reorganization, dissolution or liquidation under any bankruptcy or other laws relating to the relief of debtors, to the extent that any of the foregoing is by, for, on behalf of or with respect to Buyer; (f) the insolvency of Buyer, the suspension, termination, discharge or unenforceability of any guaranty executed in favor of Seller with respect to any of the obligations secured hereby; or (g) any the condition or affairs financial or otherwise of Buyer which in the good faith determination of Seller impairs Seller's security or increase its risk.

7. **Remedies on Default.** Upon the occurrence of an Event of Default, or at any time thereafter (i) such Event of Default shall be continuing, in addition to any other rights or remedies Seller may have shall have any or all of the following rights and remedies: (a) Seller shall have all of the remedies of a secured party under the Uniform Commercial Code as in effect in any jurisdiction which enforcement hereof is sought; (b) Seller may, at its option, accelerate and declare the indebtedness secured hereby to be immediately due and payable; (c) Seller shall have the right to immediate and exclusive possession of any and all of the Property, whereon located, and in furtherance from Buyer and the third parties Seller may, with or without judicial process and without prior notice, enter peacefully upon the premises where such Property may be found and remove the Property from such location for disposition or proceed to liquidate or otherwise dispose of the Property from such location; (d) Seller may require Buyer, at Buyer's expense, to assemble the Property and make it available to Seller at a place to be designated by Seller which is reasonably convenient to both parties; and (e) Seller may sell the Property or any portion thereof at one or more public or private sales, for cash, upon credit or for future delivery, and at such price or prices as Seller may determine; (f) in connection with any disposition for and purchase any or all Property, and to purchase any or all of the Property at any such sale, free of Seller may, for and on behalf of Buyer, make and deliver to any purchaser of any of the Property a sufficient bill of sale or other evidence of transfer of all right, title and interest in and to such property; and (h) Seller may in its own name or in the name of and on behalf of Seller and all actions required to use any such Event of Default, and all sums expended by Seller in such case shall be secured hereby.

8. **Application of Proceeds.** The net proceeds realized upon any liquidation or disposition of Property, after deduction for the expense of retaking, holding, preparing for sale or lease, leasing and the like, and the reasonable attorney's fees and legal expenses and costs incurred by Seller in enforcing or exercising any of its rights or remedies under this Agreement, shall be applied to the satisfaction of the obligations of Buyer secured under this Agreement in such order as may be appropriate by Seller. Any surplus of such proceeds shall be paid to the persons or parties entitled thereto, and the Buyer shall be liable to Seller for and shall immediately pay to amount of any deficiency.

9. **Buyer's Waiver.** Except as to the notice of intention to dispose of Property provided for Seller may exercise any of its rights and remedies without demand, advertisement or notice, as may be required by law. To the fullest extent permitted by law, Buyer waives demand, protest, notice of acceptance of this Agreement or other action taken in reliance hereon and demands and notices of any description.

10. **Financing Statements.** Unless Bloan and Seller assurances. Buyer hereby authorizes execute and file financing statements authenticated records, and follow all steps at any time to any of the Property, in each case without Buyer's signature to the extent permitted by. Seller's request. Buyer shall execute one or more financing statements, financing statements, or statements or other filings pursuant to the Uniform Commercial Code as Seller may satisfactorily. Buyer shall take any and all steps required by Seller to maintain perfection of the security granted hereunder, or to fully secure to Seller its rights under this Agreement.

## C. Assignment

1. **Assignment to Amada Capital Corporation.** Unless otherwise agreed by the parties, Seller may at any time assign this Agreement and its rights hereunder, in whole or in part. Buyer hereby waives any right to assert against ACC any claims, defenses or offsets which have against Seller, and Buyer hereby expressly agrees not to assert any such claims, defenses or offsets against ACC.

2. **Assignment by Buyer.** Buyer may not assign, delegate or transfer any of its rights, duties under this Agreement to any third party without the prior written consent of Seller.

## D. Miscellaneous

1. The order of application of Buyer payments is at the discretion of Seller. Seller may at its apply and all of a Buyer's payment to any outstanding balances owing by Seller including but not limited to Buyer late charges.

2. **Notices.** All notices, demands or consents required or permitted to be given under this Agreement shall be in writing and shall be deemed effective upon delivery if delivered personally or if after mailing if sent by first class United States mail, postage prepaid, addressed to the at its address set forth herein or to such other address as may be given by either party to the other.

3. **Waiver, Amendment or Modification.** No waiver, amendment or modification of any breach of or any right or remedy hereunder shall be effective unless in writing and signed by the party hereof. No failure by Seller to exercise, and no delay by Seller in exercising, any right or remedy granted hereunder shall operate as a waiver of any such right, power or remedy; or any right or remedy by Seller on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All rights and remedies of Seller are separate and and the exercise of any right or remedy shall not bar or prejudice the exercise of any other remedy.

4. **Court Jurisdiction.** Any controversy, claim, action or dispute arising out of or relating agreement will be subject to the laws of the State of California and the parties hereto agree matters being adjudicated in the jurisdiction of California.

5. **Attorneys' Fees.** In the event any arbitration or judicial action or proceeding is initiated any matters relating to this Agreement or in the event either party seeks relief from the auto of 11 U.S.C. Section 362 (or any successor statue thereto), then the party in whose favor any award shall be given or any relief shall be granted or judgment shall be entered shall be recover from the other party all costs and expenses (including attorneys' fees) incurred in this proceeding and any appeal therefrom.

6. **Severability.** In the event any provision or portion of any provision of this Agreement by a court of competent jurisdiction to be unenforceable or invalid, in the remaining provisions thereof shall remain in full force and effect.

7. **Entire Agreement.** Notwithstanding any purchase order submitted by Buyer either on the facing page hereof or attached hereto, this Agreement constitutes the entire between Buyer and Seller pertaining to the subject matter hereof. Any and all previous agreements or understandings heretofore existing between the parties pertaining to the hereof are expressly superseded and canceled by this Agreement.

8. **Time is of the Essence.** Except as to the provisions of this Agreement relating to ship and shipping delays, time is of the essence with respect to each of the terms, conditions and covenants of this Agreement.

9. **Binding Effect.** Subject to Part C of this agreement, this Agreement shall be binding shall inure to the benefit of the parties and their legal representatives, successors and assigns.

10. **Headings.** Headings contained in this Agreement are for purposes of convenience or not part of this Agreement.

EXHIBIT
E



AGREEMENT NUMBER 1470...

# AMADA AMERICA, INC.
7025 Firestone Blvd., Buena Park, CA 90621

FILE NUMBER 13901-CB00...

## EQUIPMENT PURCHASE AND SECURITY AGREEMENT

Buyer (described in Item 1.A. below) agrees to purchase from AMADA AMERICA, INC. ("Seller") and Seller agrees to sell to Buyer for business only the equipment and other personal property described in Item 3, below ("Property"), on the terms and conditions set forth in this Agreement including without limitation the terms and conditions set forth on the reverse hereof.

**TYPE OR PRINT ONLY**

### A. DESCRIPTION OF BUYER:

| BUYER'S FULL NAME | BUYER'S TRADE NAME OR STYLE |
|---|---|
| PRECISION AMERICAN METALS, LLC | |

☐ CORPORATION ☑ LIMITED LIABILITY CO.
☐ PARTNERSHIP ☐ PROPRIETORSHIP ☐ OTHER _____

| | ORGANIZED UNDER THE LAWS OF THE STATE OF: | IL | AMADA CUSTOMER NO. 29897 |
|---|---|---|---|

| STREET ADDRESS OF BUYER'S CHIEF EXECUTIVE OFFICE | P.O. BOX | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|---|
| 1050 KINGSLAND DR. | | BATAVIA | | IL | 60510 | ( 630 ) 406-777 |

### B. INSTALLATION SITE:

| COMPANY NAME | BRANCH / DIVISION |
|---|---|
| SAME AS "A" | |

| STREET ADDRESS | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|
| | | | | | ( ) |

| REQUEST DELIVERY DATE | SHIPPING INSTRUCTIONS | AMADA CUSTOMER NUMBER | CONTACT |
|---|---|---|---|
| | FOB SHIPPING POINT | | JOHN MAZUREK |

### C. BILLING INFORMATION:

| BILLING ADDRESS | P.O. BOX | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|---|
| 11005 PINEHIGH DR. | | ALPHARETTA | | GA | 30022 | ( 678 ) 642-740 |

| BILLING INSTRUCTIONS | AMADA CUSTOMER NUMBER | CONTACT |
|---|---|---|
| | 29897-1 | DICK CLARK |

### D. FOR SELLER'S REFERENCE ONLY:

| REGION NO. | DIVISION NO. | SALESMAN NO. | SALESMAN NAME | CUSTOMER P.O. NO. | P.O. DATE |
|---|---|---|---|---|---|
| 72 | 001 | 922 | JOHN WOODRUFF | PAM6300601 | 06/30 |

### TERM / PAYMENT TERMS:

A. ☐ NET 30 DAYS  ☐ C.O.D.  ☑ MONTHLY INSTALLMENTS (TOTAL NO. OF PAYMENTS 60 )  ☐ OTHER ___ 9.75

| B. AMOUNT OF EACH MONTHLY INSTALLMENT | C. DUE DATE OF FIRST INSTALLMENT (TO BE COMPLETED BY SELLER) | D. TAX EXEMPT PURCHASE | E. INSERT CERTIFICATE NO. HERE (SEE SECTION A.2 OF REVERSE HERE |
|---|---|---|---|
| $6,437.38 | 5-15-07 | ☑ YES ☐ NO | |

If this Agreement is for an installment sale, Buyer shall make each installment payment to:
AMADA CAPITAL CORPORATION, Dept. LA22096, Pasadena, California 91185-2096

### ITEM 3 SPECIFICATION OF PROPERTY:

| A. MACHINE MODEL NO. | B. SERIAL NO. | C. ☑ NEW ☐ DEMO ☐ USED | D. MACHINE DESCRIPTION: ONE (1) AMADA |
|---|---|---|---|
| EM2510NT | | | TURRET PUNCH PRESS |

### ITEM 4 PRICE:

| A. CASH PURCHASE PRICE FOR MACHINE | |
|---|---|
| | $307,235.0 |

| B. CASH PURCHASE PRICE FOR TOOLING/ATTACHMENT | |
|---|---|
| | $73,585.0 |

| E. TOOLING, ATTACHMENTS, OPTIONS AND OTHER ADDITIONS (INCLUDING SPECIFICATIONS) | QTY. | CASH PRICE |
|---|---|---|
| TOOLING PACKAGE ($88000) | | $66,880.00 |
| SCRAP CONVEYOR | | $6,705.00 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| TOTAL TO 4B | | $73,385.00 |

C. ___

D. TOTAL CASH PURCHASE PRICE (A __
$380,820.0

E. SALES TAX (RATE + ___ %) ___
N

F. ___

G. ___

H. SUBTOTAL (D + E + F + G) ___
$380,820.

| F. DESCRIBE TRADE-IN | H. VALUE OF TRADE-IN |
|---|---|
| | I. LESS LIENS ☐ ALC |

I. LESS CREDIT FOR TRADE-IN FROM ___
<

J. LESS CASH DOWN PAYMENT ___
<

G. CALCULATE CREDIT FOR TRADE-IN ABOVE AND INSERT IN ITEM 4I.  J. CREDIT FOR TRADE-IN (H-I) ___ >

K. SUBTOTAL (H - I - J) (CASH BALAN __
$304,656.

### ITEM 5 BUYER'S INSURANCE FOR ALL INSTALLMENT FINANCE PURCHASES:

| BUYER'S INSURANCE COMPANY | POLICY NO. |
|---|---|
| FRANKENMUTH MUTUAL | DPP1974874 |

| BUYER'S INSURANCE AGENCY | NAME OF AGENT |
|---|---|
| WEISS INS. | JIM PARNLI |

| INSURANCE AGENCY'S ADDRESS | P.O. BOX |
|---|---|
| 31 N 680 ARMY TRAIL RD. | |

| CITY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|
| WAYNE | IL | 60184 | (630) 584-1717 |

L. TIME PRICE DIFFERENTIAL (M - K __
$81,586.

M. TIME BALANCE (K + L) ___
$386,242.

NOTE: Section B.4 on the reverse hereof sets forth certain requirements for insurance which must be provided by Buyer. Please review these requirements carefully with your insurance provider.

Buyer agrees to the terms and conditions set forth herein and on the reverse side of this Agreement. BY ITS EXECUTION BELOW ACKNOWLEDGES THAT BUYER HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS ON THE REVERSE SIDE OF THIS AGR INCLUDING WITHOUT LIMITATION THE WARRANTY DISCLAIMERS AND LIMITATION OF LIABILITY SET FORTH IN SECTION A.10, AND TH JURISDICTION PROVISIONS SET FORTH IN SECTIONS D.4, RESPECTIVELY, AND UNDERSTANDS THAT THE AGREEMENT CREATES IN P SELLER A SECURITY INTEREST IN THE PROPERTY.

If Buyer has elected to purchase the Property on an installment payment basis, Buyer acknowledges that Seller has offered both a cash purchase pri installment purchase price to Buyer and that Buyer has made its election based on a comparison of these prices. Buyer authorizes Seller to co blank, including without limitation the date of first payment in Item 2.C, and correct any typographical or other error on the facing page of this Agreemen execution of this Agreement by Buyer.

This Agreement shall not be binding upon Seller until executed by a duly authorized officer or manager of Seller in Buena Park, California. NO REPRESE OR WARRANTY RELATING TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT IS BINDING ON OR ENFORCEABLE AGAINST SELLER SET FORTH IN THIS AGREEMENT.

| BUYER (IDENTIFIED IN ITEM 1.A., ABOVE) | BY _____ | TITLE President | DATE 7/20 |
|---|---|---|---|
| AMADA AMERICA, INC. ("SELLER") | BY | TITLE | DATE |

## A. Terms and Conditions of Sale

1. **Price and Price Adjustments.** The cash purchase price of the Property is FOB point of shipment from within the United States as designated by Seller, and is firm for thirty (30) days after the date of acceptance of this Agreement by Seller. After such period hereof may, in its discretion, adjust the purchase price of any unshipped Property to reflect cost increases and changes in market conditions. Seller will give Buyer written notice of any such price adjustments. Unless within seven (7) days after receiving such notice Buyer gives Seller written notice of any objections to any such price adjustment, Buyer will be deemed to have waived all such objections.

2. **Taxes.** The cash purchase price of the Property is exclusive of any and all taxes, sales, use or other taxes levied by any federal, state, county, municipal or other governmental authorities, all of which are for the account of Buyer. Seller is authorized to make payment of any such taxes directly to the taxing authority, and Buyer will reimburse Seller therefor. Such reimbursement shall be due on demand unless otherwise expressly agreed in writing. If Buyer claims an exemption from such taxes, Buyer must provide evidence of such exemption acceptable to Seller.

3. **Freight Charges.** Freight charges for shipment of Property to Buyer, including taxes on freight charges, if any, are for the account of Buyer and will be billed freight collect. Freight charges for loading and accessorials will be separately invoiced to Buyer and are payable net 30 days from the date of invoice unless otherwise agreed in writing.

4. **Late Charges.** Any payment of Buyer not received by the sixth (6th) day following the date due will be subject to a late charge of five percent (5%) of the amount due as liquidated damages.

5. **Shipping Instructions.** Seller will arrange for shipment and routing of the Property in accordance with the instructions of Buyer (if any) set forth on facing page hereof; provided however, if such instructions are unclear incomplete or impractical of implementation, or if any shipping instructions are not set forth on the facing page hereof, Seller may, and is hereby authorized by Buyer to arrange for shipment and routing of the Property as Seller deems appropriate. In no event will Seller be liable for any failure of the carrier to follow shipping instructions of either Buyer or Seller. Charges will be billed freight collect.

6. **Installation.** Buyer will, at its expense, take all necessary steps to prepare the installation site for the installation of the Property. The cost of installation is included in the purchase price of the Property. Installation includes set up, start up and initial adjustment of operating performance. Seller has no responsibility or liability for any failure of any of the Property to meet any applicable codes or standards established by any private organization or any federal, state, county, municipal or other governmental authority; provided, however, that in the event of any such failure to meet such codes or standards, Seller or its delegatee will, at the account of Buyer, make such modifications to any of the Property as may be necessary to bring such Property into compliance. Unless otherwise indicated in writing, Seller determines that the cost to Seller of making any such modifications is expected to exceed ten percent (10%) of the purchase price of the Property or that the time required to effect such compliance (including the completion of any necessary inspections and the obtaining of any necessary permits or approvals) is expected to exceed ninety (90) days, in which case Seller may upon extending to Buyer payments received in respect of the cancelled portion of this Agreement (less freight charges and applicable offsets), cancel this Agreement in whole or in part without further liability to Buyer, and provided further that if Buyer so requests, Seller may, but shall not be obligated to, proceed with such modifications at the sole expense of Buyer, payment for which shall be made by Buyer in advance of Seller's performance.

7. **Shipment.** Seller may ship the Property in partial shipments. Seller will use reasonable commercial efforts to deliver the Property by the expected delivery date, set forth on the facing page hereof, but will have no liability to Buyer for late shipments.

8. **Title, Risk of Loss and Insurance.** Title to and all risk of loss of or damage to the Property will pass from Seller to Buyer at the shipping point. Unless otherwise expressly agreed in writing, the cost of insurance on the Property while in transit will be borne by Buyer.

9. **Rigging.** All costs of unloading the Property from the carrier upon arrival at the shipping destination and moving the Property to the installation site are for the account of Buyer. Seller has no liability for the Buyer and Buyer assumes all risk of damage to or loss of the Property occurring in connection with such unloading and moving.

10. **Warranty and Limitation of Liability. EXCEPT AS MAY OTHERWISE BE SET FORTH IN A WRITTEN WARRANTY OF THE PROPERTY EXECUTED BY SELLER, SELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AND HEREBY EXPRESSLY DISCLAIMS ALL SUCH WARRANTIES, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE. IN NO EVENT SHALL SELLER BE LIABLE FOR ANY INCIDENTAL, SPECIAL, GENERAL, INDIRECT OR CONSEQUENTIAL DAMAGES (INCLUDING WITHOUT LIMITATION LOST PROFITS), AND IN NO EVENT SHALL SELLER'S LIABILITY EXCEED THE STATED PURCHASE PRICE OF THE PROPERTY.**

11. **Trade-Ins.** Buyer represents and warrants to Seller that Buyer has good and marketable title to any trade-in, released to or from it, free of any liens, claims, charges, security interests or encumbrances of any third party. In the event that subsequent to such transfer any third party, including without limitation Amada Capital Corporation ("ACC"), asserts a lien on or other interest in such trade-in, Buyer hereby grants to Seller a license to store any such trade-in at Buyer's premises until such trade-in can be conveniently removed or resold, and Buyer will indemnify and hold Seller harmless from any loss or damage to such trade-in and any claims against Seller arising out of such storage or any unauthorized operation of such trade-in.

12. **Force Majeure.** In the event that Seller or any of its suppliers or delegatees is unable to carry out Seller's obligations hereunder due to acts of God or of the public enemy, war, insurrection, riots, strikes, lockouts, labor disputes, fires, floods, earthquakes, natural disasters, unavoidable casualty, freight embargoes, shortages of labor or material, changes in governmental policy, laws or regulations (including but not limited to money exchange or transfer restrictions), impositions of quotas or limitation of shipments, or any other cause or causes beyond the control of Seller or its suppliers or delegatees, whether or not specified above, Seller may extend the time of performance of its obligations to such extent as may be necessary to enable Seller and its suppliers and delegatees to complete performance with the exercise of reasonable diligence after the cause or causes of delay have been removed, to the event any such delay continues for a period of more than six (6) months, either party may terminate its obligations hereunder by so notifying the other party in writing.

13. **Termination.** Upon the occurrence of an Event of Default (as defined in Section B.5), Seller will, in addition to the other rights set forth in this Agreement, have the right to immediately terminate this Agreement as to any un-shipped Property without further obligation or liability to Buyer.

14. **Indemnification.** Buyer will defend, indemnify and hold Seller harmless from and against any and all claims, liabilities, damages, costs and expenses (including reasonable attorney's fees) arising out of or in connection with any use of the Property by Buyer or any breach of this Agreement by Buyer.

15. **Condition Precedent to Seller's Obligations.** On all installment orders the written approval of ACC for such other financing company as may be involved in the terms of this Agreement is a condition precedent to the performance of Seller's obligations under this Agreement, and any of the Property delivered to Buyer prior to the obtaining of such written approval will be deemed to be held by Buyer as a bailee for its own benefit under a bailment revocable at will by Seller.

16. **Financing.** Buyer has sole responsibility for obtaining any necessary financing for the purchase of the Property. Any efforts of Seller to arrange any such financing are solely an accommodation to Buyer and do not obligate Seller in any way.

## B. Security Interest

1. **Grant of Security Interest.** To secure payment of the purchase price of the Property, Buyer hereby grants to Seller a security interest in the Property, and in all accessions thereto and replacements or modifications thereof, as well as all proceeds (including insurance proceeds) of the foregoing. This security interest granted hereby constitutes a purchase money security interest under the California Uniform Commercial Code. In addition, the security interest granted hereby shall secure the full and faithful performance by Buyer and all of Buyer's obligations under this Agreement. Notwithstanding the foregoing, the provisions of this Part B do not apply with respect to COD sales of Property for which payment is actually received by Seller from Buyer prior to or at the time of delivery of the Property to Buyer's facility.

2. **Information Regarding Buyer.** Buyer represents and warrants to Seller that all of the information regarding Buyer set forth on the facing page of this Agreement is true and correct.

3. **Certain Covenants of Buyer.** For so long as any amounts are owed by Buyer to Seller under this Agreement, Buyer (a) shall use the Property in compliance with all applicable laws, regulations and ordinances; (b) shall maintain the Property in good condition and repair, reasonable wear and tear excepted; (c) shall pay when due all taxes, charges and levies/liens on the Property or the ownership, use, disposition or sale of same; (d) shall keep the Property free of all liens, charges, claims, security interests and encumbrances of any third party; (e) shall permit Seller to inspect the Property, and inspect and make extracts of all of Buyer's books and records relating thereto, during normal business hours; (f) shall promptly notify Seller of the occurrence of any events which materially and adversely affects the value of the Property or Buyer's ability to promptly notify Seller in writing of any change of Buyer's legal name or of any tradename or style, the form in which Buyer conducts its business, or the organizational or financial structure of Buyer; (g) shall promptly furnish to Seller upon request current financial statements of Buyer; and (i) shall not, without the prior written consent of Seller, sell, assign, exchange, lease, lend, license the use of, pledge, encumber, grant a security interest in or dispose of the Property of Buyer's rights thereto, or use or operate the Property in a manner other than as intended by the manufacturer or in violation of any insurance policy covering the Property, or remove or otherwise use any privilege affixed by Seller to the Property or give notice of Seller's security interest therein or any lien affixing to Buyer's legal name or to Seller therefor.

4. **Insurance.** Buyer shall keep the Property insured against all risk of loss or damage from every cause whatsoever for which insurance is commercially available, in a coverage amount not less than the total cash purchase price of the Property, under policies providing that losses shall be payable to Seller and naming the insurer to give Seller not less than thirty (30) days prior written notice of the effective date of any cancellation, of any such policy. Buyer shall furnish evidence reasonably satisfactory to Seller of such insurance upon request. Seller shall deliver such insurance policies to Seller, or shall furnish to Seller such other evidence of insurance as Seller may from time to time require. The proceeds of such insurance shall be applied, at the option of Seller, to the replacement, restoration or repair of any Property which is lost, stolen, damaged or destroyed or to the payment of the obligations of Buyer hereunder. Buyer hereby irrevocably appoints Seller as Buyer's attorney-in-fact, which appointment is coupled with an interest, to make claims for, receive payment of and execute and endorse all documents, checks, or drafts received in payment of any loss or damage under any such policy of insurance. If Buyer fails to procure or maintain such insurance, Seller shall have the right, but shall not be obligated, to obtain and maintain such insurance, and Seller may reimburse Seller for the cost thereof.

5. **Covenants Regarding Location of Property.** Buyer will not remove any of the Property from the location at which it is installed or otherwise change the location of any of the Property without written consent of Seller to such instance. EACH BREACH/ORY HEREOF WILL RENDER BUYER LIABLE TO SELLER FOR ANY LOSS OR DAMAGE SUSTAINED BY SELLER AS A RESULT OF ANY CHANGE IN LOCATION OF THE PROPERTY WITHOUT THE PRIOR CONSENT OF SELLER, SPECIFICALLY INCLUDING, WITHOUT LIMITATION, ANY DAMAGE ARISING LOSS OF PERFECTION OF SELLER'S OR ACC'S SECURITY INTEREST IN THE PROPERTY.

6. **Default.** The occurrence of any of the following shall constitute an Event of Default: (a) by Buyer in the payment, when due or payable of the purchase price of the Property, or any interest thereof or interest thereon; (b) any breach of Buyer of any representation, warranty, covenant or agreement (other than as to payment) set forth in this Agreement or any other agreement of Buyer and Seller or arising by operation of law or otherwise, which breach is not cured for thirty (30) day following notice thereof by Seller to Buyer; (c) the issuance or entry of any injunction or attachment against Buyer, the Property or any other property of Buyer; (d) the making of any notice of bulk sale or transfer sale by Buyer; (e) the appointment of a receiver or of creditors or liquidating agents for, the obtaining of a competition or extension to creditors, the making of an assignment for the benefit of creditors or the commencement of, the calling of reorganization, dissolution or liquidation under any bankruptcy or other laws relating to debtors, to the extent that any of the foregoing is by, for, on behalf of or with respect to the insolvency of Buyer, the suspension, termination, discharge or unenforceability of any executed in favor of Seller with respect to any of the obligations secured hereby; or (h) any the creditors or others (financial or otherwise) of Buyer which in the Seller good faith determination impairs Seller's security or increases its risk.

7. **Remedies on Default.** Upon the occurrence of an Event of Default, or at any time thereafter and for so long as such Event of Default be continuing, in addition to any other rights or remedies Seller may have under this Agreement or otherwise, Seller shall have any or all of the following rights and remedies: (a) Seller shall have the right to declare all of the obligations secured hereby to be immediately due and payable; (b) Seller shall have the right to take possession of any and all of the Property, wherever located; Buyer hereby consents to reasonable possession of any and all of the Property, wherever located; Buyer hereby interferences from Buyer and for this purpose Seller may, with or without judicial process enter upon any premises on which the Property may be found without thereby becoming liable to Buyer for trespass or damages; (c) to the extent permitted by applicable law, Seller shall have the right to remove the Property from such location; to dispose of or otherwise sell such Property may be in sole discretion, any time from time to time, but not only after given three at least ten (10) days prior written notice of its intention to dispose of the Property is hereby agreed to be reasonable notice, lease any of the Property on such terms and/or as Seller may conclude appropriate, or sell, resell, transfer, assign, dispose of and deliver all or any part of the Property, in one or more parcels, at the same or different times, and will sign, title or therein, at public or private sale, for cash, upon credit or for future delivery, and at such prices as Seller may otherwise; (d) in connection with any disposition for and purchase any of the Property, and by such purchase acquire all right, title and interest therein; (g) Seller may, for and on behalf of Buyer, make and perform any act or duty of the Property if sufficient bill of sale or other evidence of transfer of all right, title and interest in and to such purchaser; and (h) Seller may retain or repossess all or part of the Property and all actions required in case of any such Event of Default, and all such proceeds realized upon any sale or disposition of which such shall be secured hereby.

8. **Application of Proceeds.** The net proceeds realized upon any liquidation or disposition of the Property, after deduction for the expense of retaking, holding, preparing for sale or lease, leasing and the like, and the reasonable attorney's fees and expenses and court costs to Seller in enforcing or exercising any of its rights or remedies under this Agreement, shall be paid to the satisfaction of the obligations of Buyer secured under this Agreement in such order as may be appropriate by Seller. Any surplus of such proceeds shall be paid to the person or persons entitled thereto, and the Buyer shall be liable to Seller for any deficit immediately paid to account of any such deficiency.

9. **Buyer's Waiver.** Except as to the notice of intention to dispose of Property provided Seller may execute any of its rights and remedies without demand, advertisement or notice as may or required by law. To the extent extent permitted by law, Buyer waives demand, protest, notice of acceptance of this Agreement or other action taken in reliance hereon and demands and waives of any description.

10. **Financing Statements.** Fixture filings and further assurances. Buyer hereby authorizes execute and file financing statements authenticated records, and fixture filings at any time with to any of the Property, in such case without Buyer's signature to the extent permitted by law. To further assure Seller's request, Buyer shall execute one or more financing statements, fixture filings, continuation statements or other filings pursuant to the Uniform Commercial Code in form satisfactory to Seller. Buyer shall take any and all steps required by Seller to maintain perfection of the security granted hereunder, or to fully assure to Seller its rights under this Agreement.

## C. Assignment

1. **Assignment to Amada Capital Corporation.** Unless otherwise agreed by the parties, Seller may at any time assign this Agreement and its rights hereunder, in whole or in part, to Buyer hereby waives any right to assert against ACC any claims, defenses or offsets which have against Seller, and Buyer hereby expressly agrees not to assert any such claims, defenses or offsets against ACC.

2. **Assignment by Buyer.** Buyer may not assign, delegate or transfer any of its rights, duties under this Agreement to any third party without the prior written consent of Seller.

## D. Miscellaneous

1. The order of application of Buyer payments is at the discretion of Seller. Seller may at its option apply and all of a Buyer's payment to any outstanding balances owing by Seller including but not limited to Buyer late charges.

2. **Notices.** All notices, demands or consents required or permitted to be given under this shall be in writing and shall be deemed effective upon delivery if delivered personally or delivery mailed if sent by first class United States mail, postage prepaid, addressed to the party at the address set forth herein or to such other address as shall be given by either party to the other.

3. **Waiver, Amendment or Modification.** No waiver, amendment or modification of any hereof or of any right or remedy hereunder shall be effective unless in writing and signed to be bound. No failure by Seller to exercise, and no delay by Seller in exercising, any right remedy granted hereunder shall operate as a waiver of any such right, power or remedy. Any right or remedy by Seller on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All rights and remedies of Seller are separate and and the exercise of any right or remedy shall not limit or prejudice the exercise of any other remedy.

4. **Court Jurisdiction.** Any controversy, claim, action or proceeding is initiated by agreement will be subject to the laws of the State of California and the parties hereto agree matters being adjudicated in the jurisdiction of California.

5. **Attorneys' Fees.** In the event any arbitration or judicial action or proceeding is initiated to any matters relating to this Agreement or to the event either party seeks relief from the automatic stay of 11 U.S.C. Section 362 or any successor statute thereto, then the party in whose favor any award shall be given or any relief shall be granted or judgment shall be entered shall be to recover from the other party all costs and expenses (including attorneys' fees) incurred in such proceeding and any appeal therefrom.

6. **Severability.** In the event any provision or portion of any provision of this Agreement shall by a court of competent jurisdiction to be unenforceable or invalid, the remaining provisions thereof shall remain in full force and effect.

7. **Entire Agreement.** Notwithstanding any purchase order submitted by Buyer whether on the facing page hereof or attached hereto, this Agreement constitutes the entire agreement between Buyer and Seller pertaining to the subject matter hereof. Any and all with agreements or understandings heretofore existing between the parties relating to the subject hereof are expressly superseded and cancelled by this Agreement.

8. **Time is of the Essence.** Except as to the provisions of this Agreement relating to shipping and delivery of the Property, time is of the essence with respect to all of the terms, conditions and covenants of this Agreement.

9. **Binding Effect.** Subject to Part C of this Agreement, this Agreement shall be binding shall inure to the benefit of the parties and their legal representatives, successors and assigns.

10. **Headings.** Headings contained in this Agreement are for purposes of convenience only not part of this Agreement.

EXHIBIT
G

**AMADA AMERICA, INC.**
7025 Firestone Blvd., Buena Park, C

DOCUMENT NUMBER  147

FILE NUMBER  1290-CB0

## EQUIPMENT PURCHASE AND SECURITY AGREEMENT

Buyer (described in Item 1.A. below) agrees to purchase from AMADA AMERICA, INC. ("Seller") and Seller agrees to sell to Buyer for busines only the equipment and other personal property described in Item 3, below ("Property"), on the terms and conditions set forth in this A including without limitation the terms and conditions set forth on the reverse hereof.
TYPE OR PRINT ONLY

### ITEM 1. BUYER

**A. DESCRIPTION OF BUYER**

| BUYER'S FULL NAME | BUYER'S TRADE NAME OR STYLE |
|---|---|
| PRECISION AMERICAN METALS, LLC | |

☐ CORPORATION ☑ LIMITED LIABILITY CO.
☐ PARTNERSHIP ☐ PROPRIETORSHIP ☐ OTHER _____

ORGANIZED UNDER THE LAWS OF THE STATE OF: IL

AMADA CUSTOMER 29897

| STREET ADDRESS OF BUYER'S CHIEF EXECUTIVE OFFICE | P.O. BOX | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|---|
| 1050 KINGSLAND DR. | | BATAVIA | IL | IL | 60510 | ( 630 ) 406-77 |

**B. INSTALLATION SITE:**

| COMPANY NAME | BRANCH / DIVISION |
|---|---|
| SAME AS "A" | |

| STREET ADDRESS | | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|---|
| | | | | | | ( ) |

| REQUEST DELIVERY DATE | SHIPPING INSTRUCTIONS | AMADA CUSTOMER NUMBER | CONTACT |
|---|---|---|---|
| | FOB SHIPPING POINT | | JOHN MAZUREK |

**C. BILLING INFORMATION:**

| BILLING ADDRESS | P.O. BOX | CITY | COUNTY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|---|---|
| 11005 PINEHIGH DR. | | ALPHARETTA | | GA | 30022 | ( 678 ) 642-74 |

| BILLING INSTRUCTIONS | AMADA CUSTOMER NUMBER | CONTACT |
|---|---|---|
| | 29897-1 | DICK CLARK |

**D. FOR SELLER'S REFERENCE ONLY**

| REGION NO. | DIVISION NO. | SALESMAN NO. | SALESMAN NAME | CUSTOMER P.O. NO. | P.O. DAT |
|---|---|---|---|---|---|
| 72 | 011 | 922 | JOHN WOODRUFF | PAM6300601 | 06/3 |

### ITEM 2. PAYMENT TERMS

A. ☐ NET 30 DAYS ☐ C.O.D. ☑ MONTHLY INSTALLMENTS (TOTAL NO. OF PAYMENTS 60 ) ☐ OTHER _____ 9.7

| B. AMOUNT OF EACH MONTHLY INSTALLMENT | C. DUE DATE OF FIRST INSTALLMENT (TO BE COMPLETED BY SELLER) | D. TAX EXEMPT PURCHASE | E. INSERT CERTIFICATE NO. HERE (SEE SECTION A.2 OR REVERSE H |
|---|---|---|---|
| $11,291.87 | 5-15-07 | ☑ YES ☐ NO | |

If this Agreement is for an installment sale, Buyer shall make each installment payment to:
AMADA CAPITAL CORPORATION, Dept. LA22096, Pasadena, California 91185-2096

### ITEM 3. DESCRIPTION OF THE PROPERTY

| A. MACHINE MODEL NO. | B. SERIAL NO. | C. | D. MACHINE DESCRIPTION: ONE (1) AMADA |
|---|---|---|---|
| HDS1030NTR | | ☑ NEW ☐ DEMO ☐ USED | ROBOTIC PRESS BRAKE |

| E. TOOLING, ATTACHMENTS, OPTIONS AND OTHER ADDITIONS (INCLUDING SPECIFICATIONS) | QTY. | CASH PRICE |
|---|---|---|
| | | |
| TOOLING PACKAGE ($70,000) | | $63,000.00 |
| | | |
| | | |
| | | |
| | TOTAL TO 4B | $63,000.00 |

| F. DESCRIBE TRADE-IN | H. VALUE OF TRADE-IN |
|---|---|
| | |

LESS LIENS ☐ ALC < >

| G. CALCULATE CREDIT FOR TRADE-IN ABOVE AND INSERT IN ITEM 4.I. | J. CREDIT FOR TRADE-IN (H-I) |
|---|---|
| | |

### ITEM 4. PRICE

| | |
|---|---|
| A. CASH PURCHASE PRICE FOR MA | $605,000 |
| B. CASH PURCHASE PRICE FOR TOOLING | $63,000 |
| C. | |
| D. TOTAL CASH PURCHASE PRICE (A | $668,000 |
| E. SALES TAX (RATE + ____%) | |
| F. | |
| G. | |
| H. SUBTOTAL (D + E + F + G) | $668,000 |
| I. LESS CREDIT FOR TRADE-IN FRO < | |
| J. LESS CASH DOWN PAYMENT | $133,600 |
| K. SUBTOTAL (H - I - J) (CASH BAL | $534,400 |
| L. TIME PRICE DIFFERENTIAL (K - | $143,112 |
| M. TIME BALANCE (K + L) | $677,512 |

### ITEM 5. LIABILITY & LIABILITY INSURANCE FOR ALL FINANCE ONLY

| BUYER'S INSURANCE COMPANY | POLICY # |
|---|---|
| FRANKENMUTH MUTUAL | 631 974874 |

| BUYER'S INSURANCE AGENCY | NAME OF AGENT |
|---|---|
| Weiss Ins. | Vy Marli |

| INSURANCE AGENCY'S ADDRESS | P.O. BOX |
|---|---|
| 31 W630 Army Trail RD | |

| CITY | STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|
| WAYNE | IL | 60184 | 630 584-1717 |

NOTE: Section 5 on the reverse hereof sets forth certain requirements for insurance which must be provided by Buyer. Please review these requirements carefully with your insurance provider.

Buyer agrees to the terms and conditions set forth herein and on the reverse side of this Agreement. BY ITS EXECUTION BELO ACKNOWLEDGES THAT BUYER HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS ON THE REVERSE SIDE OF THIS AG INCLUDING WITHOUT LIMITATION THE WARRANTY DISCLAIMERS AND LIMITATION OF LIABILITY SET FORTH IN SECTION A.10, AND T JURISDICTION PROVISIONS SET FORTH IN SECTIONS D.4, RESPECTIVELY, AND UNDERSTANDS THAT THE AGREEMENT CREATES IN SELLER A SECURITY INTEREST IN THE PROPERTY.

If Buyer has elected to purchase the Property on an installment payment basis, Buyer acknowledges that Seller has offered both a cash purchase a installment payment price to Buyer and that Buyer has made its election based on a comparison of these prices. Buyer authorizes Seller to c blank, including without limitation the date of first payment in Item 2.C, and correct any typographical or other error on the facing page of this Agre execution of this Agreement by Buyer.

This Agreement shall not be binding upon Seller until executed by a duly authorized officer or manager of Seller in Buena Park, California. NO REPRE OR WARRANTY RELATING TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT IS BINDING ON OR ENFORCEABLE AGAINST SELLE SET FORTH IN THIS AGREEMENT.

| BUYER (IDENTIFIED IN ITEM 1.A ABOVE) | BY | TITLE PRESIDENT | DATE 7/2 |
|---|---|---|---|
| AMADA AMERICA, INC. (SELLER) | BY | TITLE | DATE |

REV. 1/03 BE

## A. Terms and Conditions of Sale

1. **Price and Price Adjustments.** The cash purchase price of the Property is FOB point of shipment from within the United States as designated by Seller, and is then the thirty (30) days after the date of execution of this Agreement by Seller. After such period Seller may, in its discretion, adjust the purchase price of any unshipped Property to reflect cost increases and changes in market conditions. Seller will give Buyer written notice of any such price adjustments. Unless within seven (7) days after receiving such notice Buyer gives Seller written notice of any objections to any such price adjustment, Buyer will be deemed to have waived all such objections.

2. **Taxes.** The cash purchase price of the Property is exclusive of any and all excise, sales, use or other taxes levied by any federal, state, county, municipal or other governmental authorities, all of which are for the account of Buyer. Seller is authorized to make payment of any such taxes directly to the taxing authority, and Buyer will reimburse Seller therefor. Such reimbursement will be made on demand unless otherwise expressly agreed in writing. If Buyer claims an exemption from such taxes, Buyer must provide evidence of such exemption acceptable to Seller.

3. **Freight Charges.** Freight charges for shipment of the Property to Buyer, including taxes on freight charges, if any, are for the account of Buyer and will be billed freight collect. Freight charges for loading and accessorials will be separately invoiced to Buyer and are payable net 30 days from the date of invoice unless otherwise agreed in writing.

4. **Late Charges.** Any payment of Buyer not received by the sixth (6th) day following the date due will be subject to a late charge of five percent (5%) of the amount due as liquidated damages.

5. **Shipping Instructions.** Seller will arrange for shipment and routing of the Property in accordance with the instructions of Buyer (if any) not inconsistent with the method herein provided; however, if such instructions are unclear, incomplete or impractical of implementation, or if no shipping instructions are set forth on the facing page hereof, Seller may, but is hereby authorized by Buyer to arrange for shipment and routing of the Property as Seller deems appropriate. In no event will Seller be liable for any failure of the carrier to follow shipping instructions of Buyer or Seller. Charges will be billed freight collect.

6. **Shipment.** Seller may ship the Property in partial shipments. Seller will use reasonable commercial efforts to deliver the Property by the requested delivery date, set forth on the facing page hereof, but will have no liability to Buyer for late shipments.

7. **Title, Risk of Loss and Insurance.** Title to and all risk of loss of or damage to the Property will pass from Seller to Buyer at the shipping point. Unless otherwise expressly agreed in writing, the cost of insurance on the Property while in transit will be borne by Buyer.

8. **Rigging.** All costs of unloading the Property from the carrier upon arrival at the shipping destination and moving the Property to the installation site are for the account of Buyer. Seller has no liability to the Buyer and Buyer assumes all risk of damage to or loss of the Property occurring in connection with such unloading and moving.

9. **Installation.** Buyer will, at its expense, take all necessary steps to prepare the installation site for the installation of the Property. The cost of installation is included in the purchase price of the Property. Installation includes set up, start up and initial adjustment of operating performance. Seller has no responsibility or liability for any failure of any of the Property to meet any applicable codes or standards established by any private organization or any federal, state, county, municipal or other governmental authority; provided, however, that to the extent of any such failure to meet such codes or standards, Seller or its designee will, at the request of Buyer, make such modifications to any of the Property as may be necessary to bring such Property into compliance with any such codes or standards, unless Seller determines that the cost to Seller of making any such modifications is expected to exceed ten percent (10%) of the purchase price of the Property or that the cost required to effect such compliance (including the completion of any necessary inspections and the obtaining of any necessary permits or approvals) is expected to exceed ninety (90) days, in which case Seller will, upon refunding to Buyer payments received in respect of the canceled portion of this Agreement less freight charges and applicable offsets), cancel this Agreement in whole or in part without further liability to Buyer; and provided further that if Buyer so requests, Seller may, but shall not be obligated to, proceed with such modifications at the sole expense of Buyer, payment for which shall be made by Buyer in advance of Seller's performance.

10. **Warranty and Limitation of Liability. EXCEPT AS MAY OTHERWISE BE SET FORTH IN A WRITTEN WARRANTY OF THE PROPERTY EXECUTED BY SELLER, SELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AND HEREBY EXPRESSLY DISCLAIMS ALL SUCH WARRANTIES, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE. IN NO EVENT SHALL SELLER BE LIABLE FOR ANY INCIDENTAL, SPECIAL, INDIRECT, DIRECT OR CONSEQUENTIAL DAMAGES (INCLUDING WITHOUT LIMITATION LOST PROFITS), AND IN NO EVENT SHALL SELLER'S LIABILITY EXCEED THE STATED PURCHASE PRICE OF THE PROPERTY.**

11. **Trade-In.** Buyer represents and warrants to Seller that Buyer has good and marketable title to any trade-in, referred to in Item 37 on the facing page hereof, and that any such trade-in is in good operating condition and will be transferred to Seller free and clear of all claims, liens, charges, security interests or encumbrances of any third party. In the event that subsequent to such transfer any third party, including without limitation Amada Capital Corporation ("ACC"), asserts a lien on or other interest in such trade-in, Buyer hereby grants to Seller a license to store any such trade-in on Buyer's premises until such trade-in may be conveniently removed or resold, and Buyer will indemnify and hold Seller harmless from any loss or damage to such trade-in and any claims against Seller arising out of such storage or any unauthorized operation of such trade-in.

12. **Force Majeure.** In the event that Seller or any of its suppliers or delegates is unable to carry out Seller's obligations hereunder due to acts of God or the public enemy, war, insurrection, riots, strikes, lockouts, labor disputes, fires, floods, earthquakes, natural disasters, unavoidable casualty, freight embargoes, shortages of labor or material, changes in governmental policy, laws or regulations (including but not limited to money exchange or transfer restrictions), impositions of quotas or limitation of shipments), or any other cause or causes beyond the control of Seller or its suppliers or delegates, whether or not specified above, Seller may extend the time of performance of its obligation to such extent as may be necessary to enable Seller and its suppliers and delegates to complete performance with the exercise of reasonable diligence after the cause or causes of delay have been removed. In the event any such delay continues for a period of more than six (6) months, either party may terminate its obligations hereunder by so notifying the other party in writing.

13. **Termination.** Upon the occurrence of an Event of Default (as defined in Section B.6), Seller will, in addition to the other rights set forth in this Agreement, have the right to immediately terminate this Agreement as to any un-shipped Property with or without notice of termination.

14. **Indemnification.** Buyer will defend, indemnify and hold Seller harmless from and against any and all claims, liabilities, damages, costs and expenses (including reasonable attorney's fees) arising out of or in connection with any use of the Property by Buyer or from breach of this Agreement by Buyer.

15. **Condition Precedent to Seller's Obligations.** On all installment sales the written approval of ACC for each class financing company as may be involved to the terms of this Agreement is a condition precedent to the performance of Seller's obligations under this Agreement, and any of the Property delivered to Buyer prior to the obtaining of such written approval will be deemed to be held by Buyer as a bailee for its own benefits under a bailment revocable at will by Seller.

16. **Financing.** Buyer has sole responsibility for obtaining any necessary financing for the purchase of the Property. Any efforts of Seller to arrange any such financing are solely an accommodation to Buyer and do not obligate Seller in any way.

## B. Security Interest

1. **Grant of Security Interest.** To secure payment of the purchase price of the Property, Buyer hereby grants to Seller a security interest in the Property and in all accessions thereto and replacements or modifications thereof, as well as all proceeds (including insurance proceeds) of the foregoing. This security interest granted hereby constitutes a purchase money security interest under the California Uniform Commercial Code. In addition, the security interest granted hereby shall secure the full and faithful performance by Buyer and of all of Buyer's obligations under this Agreement. Notwithstanding the foregoing, the provisions of this Part B do not apply with respect to COD sales of Property to which payment is actually received by Seller from Buyer prior to or at the time of delivery of the Property to Buyer's facility.

2. **Information Regarding Buyer.** Buyer represents and warrants to Seller that all of the information regarding Buyer set forth on the facing page of this Agreement is true and correct.

3. **Certain Covenants of Buyer.** For so long as any amounts are owed by Buyer to Seller under this Agreement, Buyer (a) shall use the Property in compliance with all applicable laws, regulations and ordinances; (b) shall maintain the Property in good condition and repair, reasonable wear and tear excepted; (c) shall pay when due all taxes, charges and impositions on the Property or its ownership, use, disposition or sale of some; (d) shall keep the Property free of all liens, charges, claims, security interests and encumbrances of any third party; (e) shall permit Seller to inspect the Property, and inspect and make extracts of or from those books and records relating thereto, during normal business hours; (f) shall promptly notify Seller of the occurrence of any events which materially and adversely affect (i) the value of the Property or (ii) Buyer's ability to perform Buyer's obligations under this Agreement; (g) shall not, without the prior written consent of Seller, sell, assign, give or lend some or pay backwance or right, the form in which Buyer conducts its business, and the change of organizational or financial structure of Buyer; (h) shall promptly furnish to Seller upon request current financial statements of Buyer; and (i) shall not, without prior written consent of Seller, sell, assign, exchange, lease, lend, license the Property, or remove or dispose of the Property or any of Buyer's rights therein, or use or operate the Property in a manner other than as intended by the manufacturer, or in violation of any insurance policy covering the Property, or remove or obliterate any markings set off by Seller to the Property or give notice of Seller's security interest therein or any identifying instrument, serial number, or lettering on the Property, or permit the Property to become so affixed to realty as to become a fixture.

4. **Insurance.** Buyer shall keep the Property insured against all risk of loss or damage from every cause whatsoever of which insurance is commercially available, in a coverage amount not less than the total cash purchase price of the Property, under policies and in forms acceptable to Seller and naming the insurer to give Seller not less than thirty (30) days prior written notice of the effective date of any alteration or cancellation of any such policy. All such insurance policies shall otherwise be in form and substance and with companies satisfactory to Seller. Buyer shall deliver such insurance policies to Seller, or shall furnish to Seller such other evidence of insurance as Seller may from time to

time request. The proceeds of such insurance shall be applied, at the option of Seller, to the replacement, restoration or repair of any Property which is lost, stolen, damaged or destroyed, or to the payment of the obligations of Buyer hereunder. Buyer hereby irrevocably appoints Seller attorney-in-fact, which appointment is coupled with an interest, to make claims for, receive payment of, and execute and endorse all documents, checks, or drafts received in payment of any loss under any such policy of insurance. If Buyer fails to procure or maintain such insurance, Seller shall have the right, but shall not be obligated, to obtain and maintain such insurance, and Seller shall reimburse Seller for the cost thereof.

5. **Covenants Regarding Location of Property.** Buyer will not remove any of the Property from the location at which installed or otherwise change its location of any of the Property without written consent of Seller in each instance. EACH SIGNATORY HERETO WILL BE FREE TO CHANGE ITS PLACE FOR ANY ALL LOSS OR DAMAGE SUSTAINED BY SELLER AS A RESULT OF ANY CHANGE IN LOCATION OF THE PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF SELLER, SPECIFICALLY INCLUDING, WITHOUT LIMITATION, ANY DAMAGE ARISING FROM THE LOSS OF PERFECTION OF SELLER'S OR ACC'S SECURITY INTEREST IN THE PROPERTY.

6. **Default.** The occurrence of any of the following shall constitute an Event of Default: (a) the failure by Buyer in the payment, when due or payable of the purchase price of the Property or any other payment due hereunder thereon; (b) any breach of Buyer of any representation, warranty, covenant or agreement (other than as to payment) set forth in this Agreement or any other agreement of Buyer and Seller or arising by operation of law or otherwise, which breach is not cured (i) within thirty (30) day following notice thereof by Seller to Buyer; (c) the issuance or entry of any injunction or attachment against Buyer, the Property or any other property of Buyer; (d) in any notice of bulk sale is intended bulk sale by Buyer; (e) the appointment of a receiver or of capitol or liquidating agents, the calling of a composition or extension to creditors, the assignment for the benefit of creditors, or the commencement of any proceeding, suit or reorganization, dissolution or liquidation under any bankruptcy or other laws relating to the relief of debtors, to the extent that any of the foregoing is by, for, on behalf of or with respect to the insolvency of Buyer, the suspension, termination, discharge or unenforceability of any executed in favor of Seller with respect to any of the obligations secured hereby; or (h) the condition or affairs (financial or otherwise) of Buyer which in the good faith determination impairs Seller's security or increase its risk.

7. **Remedies on Default.** Upon the occurrence of an Event of Default, or at any time thereafter during the continuance of an Event of Default shall be continuing, in addition to any other rights or remedies Seller may have, Seller shall have any or all of the following rights and remedies: (a) Seller shall have all of the remedies of a secured party under the Uniform Commercial Code as in effect in any jurisdiction wherein enforcement hereof is sought; (b) Seller may, at its option, accelerate and declare the indebtedness secured hereby to be immediately due and payable; (c) Seller shall have the right to immediate and exclusive possession of any part all of the Property, wherever located. Buyer hereby grants Seller the right to enter into the premises (only in any of Buyer's facility), without prior judicial process. (d) Seller may, without prior legal process or prior notice, and with or without judicial process, enter the premises where such Property may be or is believed by Seller to be, and repossess all or any part thereof, disconnecting and separating all such Property from any other property and using all force that may be necessary or permitted by law so to do, and Buyer hereby expressly waives all further rights to possession of the Property after the occurrence of an Event of Default, and all claims for injuries suffered through or loss caused by such entering and/or repossession; (e) Seller may require Buyer to assemble the Property and make it available to Seller at a place to be designated by Seller that is reasonably convenient to both parties; (f) Seller may sell, lease or otherwise dispose of any or all of the Property, whether in its then condition or after further manufacture or processing thereof, at public or private sale or at any broker's board or securities exchange, for cash, upon credit, or for future delivery, and at such price or prices as Seller may deem satisfactory; and Seller may be the purchaser at any such public or private sale; (g) Seller may, in connection with any disposition for and purchase any or all of the Property, and by such purchase acquire all right, title and interest therein; (h) Seller may, for and on behalf of Buyer, make and deliver to any purchaser of any of the Property a sufficient bill of sale or other evidence of transfer at all right, title and interest of Buyer in and to such Property; and (i) Seller may in its own name or in the name of and on behalf of Buyer demand, sue for, collect or receive any such Event of Default, and all sums expended by Seller in such case shall be secured hereby.

8. **Application of Proceeds.** The net proceeds realized upon any liquidation or disposition of the Property, after deduction for the expense of retaking, holding, preparing for sale or lease, selling and the like, and the reasonable attorney's fees and legal expenses and costs incurred by Seller in enforcing or exercising any of its rights or remedies under this Agreement, shall be applied to the satisfaction of the obligations of Buyer secured under this Agreement in such order as may be appropriate by Seller. Any surplus of such proceeds shall be paid to the person or persons entitled thereto, and the Buyer shall be liable to Seller for and shall immediately pay the amount of any deficiency.

9. **Buyer's Waiver.** Except as to the notice of intention to dispose of Property provided Seller may exercise any of its rights and remedies without demand, advertisement or notice as may or required by law. To the fullest extent permitted by law, Buyer waives demand, protest, notice of acceptance of this Agreement or other action taken in reliance hereon and all demands and notices of any description.

10. **Financing Statements.** Buyer hereby authorizes Seller to file financing statements and forms evidence, hereby authorizes to any of the Property, in such color without Buyer's signature to the extent permitted by Seller's request. Buyer shall execute one or more financing statements, chattel filings or statements or other filings payment to the Uniform Commercial Code in form satisfactory to Seller, and take any and all steps required by Seller to maintain the perfection of the security interest granted hereunder, or to fully assure to Seller its rights under this Agreement.

## C. Assignment

1. **Assignment to Amada Capital Corporation.** Unless otherwise agreed by the parties, Seller may at any time assign this Agreement and its rights hereunder, in whole or in part. Buyer hereby waives any right to assert against ACC any claims, defenses or offsets which Buyer may have against Seller, and Buyer hereby expressly agrees not to assert any such claims, defenses or offsets against ACC.

2. **Assignment by Buyer.** Buyer may not assign, delegate or transfer any of its rights, duties under this Agreement to any third party without the prior written consent of Seller.

## D. Miscellaneous

1. The order of application of Buyer payments is at the discretion of Seller. Seller may at its sole discretion apply and off a Buyer's payment to any outstanding balance owing by Buyer to Seller including limited to Buyer late charges.

2. **Notices.** All notices, demands or consents required or permitted to be given under this Agreement shall be in writing and shall be deemed effective upon delivery if delivered personally or three (3) business days after mailing by registered or certified mail, return receipt requested, addressed to the addressee at such address as set forth in this Agreement or to such other address as may be given from time to time in writing.

3. **Waiver, Amendment or Modification.** No waiver, amendment or modification of any hereof or of any right or remedy hereunder shall be effective unless in writing and signed by the party to be bound. No failure by Seller to exercise, and no delay by Seller in exercising, any right, remedy granted hereunder shall operate as a waiver of any such right, power or remedy. Any right at remedy by Seller on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All rights and remedies of Seller are separate and cumulative, and the exercise of any right or remedy shall not limit or preclude the exercise of any other right or remedy.

4. **Court Jurisdiction.** Any controversy, claim, action or dispute arising out of or relating to any matters relating to this Agreement or in the event either party seeks relief from the institution of 11 U.S.C. Section 362 on any successor stating therein, then the party in whose favor any award shall be given or any relief shall be granted or judgment shall be entered shall be recover from the other party all costs and expenses (including attorneys' fees) incurred in such proceeding and any appeal therefrom.

5. **Severability.** In the event any provision or portion of any provision of this Agreement shall by a court of competent jurisdiction to be unenforceable or invalid, the remaining provisions thereof shall remain in full force and effect.

6. **Entire Agreement.** Notwithstanding any purchase order submitted by Buyer whether prior to or on the facing page hereof or attached hereto, this Agreement constitutes the entire agreement between Buyer and Seller pertaining to the subject matter hereof. Any and all written agreements or understandings heretofore existing between the parties pertaining to the subject hereof are expressly superseded and cancelled by this Agreement.

7. **Time is of the Essence.** Except as to the provisions of this Agreement relating to shipping and shipping delays, time is of the essence with respect to each of the terms, conditions and covenants of this Agreement.

8. **Binding Effect.** Subject to Part C of this Agreement, this Agreement shall be binding upon and shall inure to the benefit of the parties and their legal representatives, successors and assigns.

9. **Headings.** Headings contained in this Agreement are for purposes of convenience only and part of this Agreement.

EXHIBIT
GROUP
H

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

2006 JUL 27 PM 4:30

A. NAME & PHONE OF CONTACT AT FILER [optional]
ELSIE HORST

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

AMADA CAPITAL CORPORATION
7025 FIRESTONE BLVD
BUENA PARK, CA 90621

UCU102/27/06:05:4450:
20.00 MB
SOSIL 14:11  11190731 FS

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PRECISION  AMERICAN METALS, LLC | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1050 KINGSLAND DRIVE | BATAVIA | IL | 60510 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | LLC | IL | 01876643 | ☐NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| AMADA CAPITAL CORPORATION | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7025 FIRESTONE BLVD | BUENA PARK | CA | 90621 | USA |

4. This FINANCING STATEMENT covers the following collateral:

ONE AMADA TOOL GRINDER, MODEL TOGUIII, COMPLETE WITH ALL ATTACHMENTS NOW OWNED OR HEREAFTER ACQUIRED.

THE UNDERSIGNED HEREBY GRANTS THE SECURITY INTEREST IN THE ABOVE REFERENCED EQUIPMENT TO SECURE PAYMENT OF ITS FULL PURCHASE PRICE.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐LESSEE/LESSOR | ☐CONSIGNEE/CONSIGNOR | ☐BAILEE/BAILOR | ☐SELLER/BUYER | ☐AG. LIEN | ☐NON-UCC FILING |
|---|---|---|---|---|---|---|

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum [if applicable]

7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional]    ☐All Debtors  ☐Debtor 1  ☐Debtor 2

8. OPTIONAL FILER REFERENCE DATA
PRECISION  AMERICAN METALS, LLC

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

RECEIVED
SECRETARY OF
UNIFORM COMM CODE DIV.

2006 JUL 27  PH 4: 30

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
ELSIE HORST

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

AMADA CAPITAL CORPORATION
7025 FIRESTONE BLVD
BUENA PARK, CA 90621

UCU107/27/06:05:4453:
20.00 MO
SOSIL 14:11  11190774 FS

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| PRECISION  AMERICAN METALS, LLC | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1050 KINGSLAND DRIVE | BATAVIA | IL | 60510 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | LLC | IL | 01876643 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| AMADA CAPITAL CORPORATION | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7025 FIRESTONE BLVD | BUENA PARK | CA | 90621 | USA |

4. This FINANCING STATEMENT covers the following collateral:

ONE AMADA SPOT WELDER, MODEL ID40ST, COMPLETE WITH ALL ATTACHMENTS NOW OWNED OR HEREAFTER ACQUIRED.

THE UNDERSIGNED HEREBY GRANTS THE SECURITY INTEREST IN THE ABOVE REFERENCED EQUIPMENT TO SECURE PAYMENT OF ITS FULL PURCHASE PRICE.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum [if applicable]  |  7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]  [optional]  ☐ All Debtors  ☐ Debtor 1  ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA
PRECISION  AMERICAN METALS, LLC

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

SECRETARY OF STATE
UNIFORM COMM CODE DIV.

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

2006 JUL 27 PM 4: 30

A. NAME & PHONE OF CONTACT AT FILER [optional]

ELSIE HORST

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

AMADA CAPITAL CORPORATION
7025 FIRESTONE BLVD
BUENA PARK, CA  90621

UCU1G7/27/06:05:4456:
SOSIE 14*11  11190790 FS

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME

| PRECISION  AMERICAN METALS, LLC | | | | |
|---|---|---|---|---|
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1050 KINGSLAND DRIVE | BATAVIA | IL | 60510 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | LLC | IL | 01876643 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

2a. ORGANIZATION'S NAME

| | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME

| AMADA CAPITAL CORPORATION | | | | |
|---|---|---|---|---|
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7025 FIRESTONE BLVD | BUENA PARK | CA | 90621 | USA |

4. This FINANCING STATEMENT covers the following collateral:

ONE AMADA SOFTWARE PACKAGE COMPLETE WITH ALL ATTACHMENTS NOW OWNED OR HEREAFTER ACQUIRED.

THE UNDERSIGNED HEREBY GRANTS THE SECURITY INTEREST IN THE ABOVE REFERENCED EQUIPMENT TO SECURE PAYMENT OF ITS FULL PURCHASE PRICE.

5. ALTERNATIVE DESIGNATION [if applicable]:  ☐ LESSEE/LESSOR   ☐ CONSIGNEE/CONSIGNOR   ☐ BAILEE/BAILOR   ☐ SELLER/BUYER   ☐ AG. LIEN   ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum   7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [optional]   ☐ All Debtors   ☐ Debtor 1   ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

PRECISION  AMERICAN METALS, LLC

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

UNIFORM COMM CODE DIV.

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

2006 JUL 27  PM 4: 30

A. NAME & PHONE OF CONTACT AT FILER (optional)

ELSIE HORST

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

AMADA CAPITAL CORPORATION
7025 FIRESTONE BLVD
BUENA PARK, CA 90621

UCU107/27/06:05:4452:
20.00 MO
SOSIL 14:11  11190766 FS

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| PRECISION  AMERICAN METALS, LLC | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1050 KINGSLAND DRIVE | BATAVIA | IL | 60510 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | LLC | IL | 01876643 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| AMADA CAPITAL CORPORATION | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7025 FIRESTONE BLVD | BUENA PARK | CA | 90621 | USA |

4. This FINANCING STATEMENT covers the following collateral:

ONE AMADA INSPECTION MACHINE, MODEL FABRIVISION, COMPLETE WITH ALL ATTACHMENTS NOW OWNED OR HEREAFTER ACQUIRED.

THE UNDERSIGNED HEREBY GRANTS THE SECURITY INTEREST IN THE ABOVE REFERENCED EQUIPMENT TO SECURE PAYMENT OF ITS FULL PURCHASE PRICE.

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum | | ☐ if applicable | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA

PRECISION  AMERICAN METALS, LLC

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

RECEIVED
SECRETARY OF STATE
UNIFORM COMM CODE DIV.

2006 JUL 27 PM 4:30

A. NAME & PHONE OF CONTACT AT FILER [optional]

ELSIE HORST

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

AMADA CAPITAL CORPORATION
7025 FIRESTONE BLVD
BUENA PARK, CA 90621

UCU107/27/06:05:4451:
20.00 MO
SOSIL 14:11  11190758 FS

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PRECISION AMERICAN METALS, LLC | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1050 KINGSLAND DRIVE | BATAVIA | IL | 60510 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION LLC | 1f. JURISDICTION OF ORGANIZATION IL | 1g. ORGANIZATIONAL ID #, if any 01876643 | NONE |
|---|---|---|---|---|---|

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| AMADA CAPITAL CORPORATION | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7025 FIRESTONE BLVD | BUENA PARK | CA | 90621 | USA |

4. This FINANCING STATEMENT covers the following collateral:

ONE AMADA MANIPULATOR SYSTEM, MODEL MP1225NJ, COMPLETE WITH ALL ATTACHMENTS NOW OWNED OR HEREAFTER ACQUIRED.

THE UNDERSIGNED HEREBY GRANTS THE SECURITY INTEREST IN THE ABOVE REFERENCED EQUIPMENT TO SECURE PAYMENT OF ITS FULL PURCHASE PRICE.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [if applicable] [ADDITIONAL FEE] [optional] | | All Debtors | Debtor 1 | Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA

PRECISION AMERICAN METALS, LLC

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

RECEIVED
SECRETARY OF STATE
UNIFORM COMM CODE DIV.

2006 NOV 27　PM 4:30

A. NAME & PHONE OF CONTACT AT FILER [optional]
ELSIE HORST

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

AMADA CAPITAL CORPORATION
7025 FIRESTONE BLVD
BUENA PARK, CA 90621

UCU107/27/06:05:4449:
20.00 MO
SOSIL 14:10　11190723 FS

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PRECISION AMERICAN METALS, LLC | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1050 KINGSLAND DRIVE | BATAVIA | IL | 60510 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | LLC | IL | 01876643 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| AMADA CAPITAL CORPORATION | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7025 FIRESTONE BLVD | BUENA PARK | CA | 90621 | USA |

4. This FINANCING STATEMENT covers the following collateral:

ONE AMADA TURRET PUNCH PRESS, MODEL EM2510NT, WITH TOOLING PACKAGE, SCRAP CONVEYOR, COMPLETE WITH ALL ATTACHMENTS NOW OWNED OR HEREAFTER ACQUIRED.

THE UNDERSIGNED HEREBY GRANTS THE SECURITY INTEREST IN THE ABOVE REFERENCED EQUIPMENT TO SECURE PAYMENT OF ITS FULL PURCHASE PRICE.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA
PRECISION AMERICAN METALS, LLC

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

SECRETARY OF STATE
UNIFORM COMM CODE DIV.

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

2006 NOV 27 PM 4: 30

A. NAME & PHONE OF CONTACT AT FILER [optional]

ELSIE HORST

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

AMADA CAPITAL CORPORATION
7025 FIRESTONE BLVD
BUENA PARK, CA 90621

UCC107/27/06:05:4454:
20.00 MU
SOSIL 14:11  11190782 FS

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR PRECISION AMERICAN METALS, LLC | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1b. INDIVIDUAL'S LAST NAME | | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1050 KINGSLAND DRIVE | BATAVIA | IL | 60510 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|
| | | LLC | IL | 01876643 | |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2b. INDIVIDUAL'S LAST NAME | | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|
| | | | | | |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR AMADA CAPITAL CORPORATION | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3b. INDIVIDUAL'S LAST NAME | | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7025 FIRESTONE BLVD | BUENA PARK | CA | 90621 | USA |

4. This FINANCING STATEMENT covers the following collateral:

ONE AMADA ROBOTIC PRESS BRAKE, MODEL HDS1030NTR, WITH TOOLING PACKAGE, COMPLETE WITH ALL ATTACHMENTS NOW OWNED OR HEREAFTER ACQUIRED.

THE UNDERSIGNED HEREBY GRANTS THE SECURITY INTEREST IN THE ABOVE REFERENCED EQUIPMENT TO SECURE PAYMENT OF ITS FULL PURCHASE PRICE.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | All Debtors | Debtor 1 | Debtor 2

8. OPTIONAL FILER REFERENCE DATA

PRECISION AMERICAN METALS, LLC

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**EXHIBIT**

I

## Precision American Metals, LLC
### Payment History

### SUMMARY

| | 14744 | 14567 | 14388 | 14550 | 14742 | 14740 | 14741 | |
|---|---|---|---|---|---|---|---|---|
| Model Type | TOGUIII | ID40ST | APS-FABRIVISION | APS | MP1225NT | EM2510NT | HDS1030NT | |
| Contract No. | CB00003 | CB00004 | CB00001 | CB00002 | CB00005 | CB00006 | CB00007 | Total |
| Serial No. | 99520200 | 40800298 | — | 6065523 | A1225239 | 25100720 | 1300124 | |
| Book Date | 8/31/2006 | 8/31/2006 | 10/12/2006 | 4/5/2007 | 4/5/2007 | 4/5/2007 | 4/5/2007 | |
| 1st Pmt | 10/12/2006 | 10/12/2006 | 5/15/2007 | 5/15/2007 | 5/15/2007 | 5/15/2007 | 5/15/2007 | |
| Amt Fnc'd | 17,280.00 | 25,600.00 | 71,904.00 | 53,600.00 | 96,800.00 | 304,656.00 | 534,400.00 | 1,104,240.00 |
| Term (mths) | 60 | 60 | 60 | 60 | 60 | 60 | 60 | |
| Mthly Pmt | 365.13 | 540.93 | 1519.33 | 1,132.57 | 2,045.38 | 6,437.38 | 11,291.87 | 23,332.59 |
| Mthly L/C | 18.26 | 27.05 | 75.97 | 56.63 | 102.27 | 321.87 | 564.59 | 1,166.63 |
| Interest Rate | 9.75% | 9.75% | 9.75% | 9.75% | 9.75% | 9.75% | 9.75% | |
| Int Factor | 0.00812500 | 0.00812500 | 0.00812500 | 0.00812500 | 0.00812500 | 0.00812500 | 0.00812500 | |
| Delay | | | | | | | | |
| Pmts Made | 6 | 6 | 2 | 2 | 2 | 2 | 2 | |
| Pmts Remain | 60 | 60 | 0 | 0 | 0 | 0 | 0 | |
| Pmts Delq | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| L/C @ RPR | 109.56 | 162.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 271.86 |
| % Pmt to Tot | | | | | | | | |

**NOTE: Contracts Repurchased by Amada America, Inc. 3/31/2007**

### PAYMENT RECORD

#### TOGUIII - Tool Grinder — CB00003

| | Princ | Int | Pmt |
|---|---|---|---|
| Sep-06 | 17,280.00 | | |
| Oct-06 | 17,420.40 | 140.40 | 0.00 |
| Nov-06 | 17,561.94 | 141.54 | 0.00 |
| Dec-06 | 17,704.63 | 142.69 | 0.00 |
| Jan-07 | 17,848.48 | 143.85 | 0.00 |
| Feb-07 | 17,993.50 | 145.02 | 0.00 |
| Mar-07 | 18,139.70 | 146.20 | 0.00 |
| Apr-07 | 18,287.08 | 147.39 | 0.00 |
| May-07 | 18,435.67 | 148.58 | 0.00 |
| Jun-07 | 18,585.46 | 149.79 | 0.00 |
| Jul-07 | 18,736.46 | 151.01 | 0.00 |
| Aug-07 | 18,888.70 | 152.23 | 0.00 |
| Sep-07 | 19,042.17 | 153.47 | 0.00 |
| Oct-07 | 19,196.88 | 154.72 | 0.00 |
| Nov-07 | 19,352.86 | 155.97 | 0.00 |

#### ID40ST - Spotwelder — CB00004

| | Princ | Int | Pmt |
|---|---|---|---|
| Sep-06 | 25,600.00 | | |
| Oct-06 | 25,808.00 | 208.00 | 0.00 |
| Nov-06 | 26,017.69 | 209.69 | 0.00 |
| Dec-06 | 26,229.08 | 211.39 | 0.00 |
| Jan-07 | 26,442.20 | 213.11 | 0.00 |
| Feb-07 | 26,657.04 | 214.84 | 0.00 |
| Mar-07 | 26,873.63 | 216.59 | 0.00 |
| Apr-07 | 27,091.97 | 218.35 | 0.00 |
| May-07 | 27,312.10 | 220.12 | 0.00 |
| Jun-07 | 27,534.01 | 221.91 | 0.00 |
| Jul-07 | 27,757.72 | 223.71 | 0.00 |
| Aug-07 | 27,983.25 | 225.53 | 0.00 |
| Sep-07 | 28,210.62 | 227.36 | 0.00 |
| Oct-07 | 28,439.83 | 229.21 | 0.00 |
| Nov-07 | 28,670.90 | 231.07 | 0.00 |

#### APS — CB00001

| | Princ | Int | Pmt |
|---|---|---|---|
| Apr-07 | 71,904.00 | | |
| May-07 | 72,488.22 | 584.22 | 0.00 |
| Jun-07 | 73,077.19 | 588.97 | 0.00 |
| Jul-07 | 73,670.94 | 593.75 | 0.00 |
| Aug-07 | 74,269.52 | 598.58 | 0.00 |
| Sep-07 | 74,872.96 | 603.44 | 0.00 |
| Oct-07 | 75,481.30 | 608.34 | 0.00 |
| Nov-07 | 76,094.58 | 613.29 | 0.00 |

#### FABRIVISION — CB00002

| | Princ | Int | Pmt |
|---|---|---|---|
| Apr-07 | 53,600.00 | | |
| May-07 | 54,035.50 | 435.50 | 0.00 |
| Jun-07 | 54,474.54 | 439.04 | 0.00 |
| Jul-07 | 54,917.14 | 442.61 | 0.00 |
| Aug-07 | 55,363.35 | 446.20 | 0.00 |
| Sep-07 | 55,813.17 | 449.83 | 0.00 |
| Oct-07 | 56,266.66 | 453.48 | 0.00 |
| Nov-07 | 56,723.82 | 457.17 | 0.00 |

**MP1225NJ CB00003**

| | Princ | Int | Pmt |
|---|---|---|---|
| Mar-07 | 96,800.00 | | |
| Apr-07 | 97,586.50 | 786.50 | 0.00 |
| May-07 | 98,379.39 | 792.89 | 0.00 |
| Jun-07 | 99,178.72 | 799.33 | 0.00 |
| Jul-07 | 99,984.55 | 805.83 | 0.00 |
| Aug-07 | 100,796.92 | 812.37 | 0.00 |
| Sep-07 | 101,615.90 | 818.98 | 0.00 |
| Oct-07 | 102,441.53 | 825.63 | 0.00 |
| Nov-07 | | | 0.00 |

**EM2510NT CB00004**

| | Princ | Int | Pmt | Late/Charge | Aggregate L/C Amount Due |
|---|---|---|---|---|---|
| Mar-07 | 304,656.60 | | | 45.30 | 45.30 |
| Apr-07 | 307,131.33 | 2,475.33 | 0.00 | 45.30 | 45.30 |
| May-07 | 309,626.77 | 2,495.44 | 0.00 | 45.30 | 90.60 |
| Jun-07 | 312,142.49 | 2,515.72 | 0.00 | 45.30 | 135.90 |
| Jul-07 | 314,678.65 | 2,536.16 | 0.00 | 45.30 | 181.20 |
| Aug-07 | 317,235.41 | 2,556.76 | 0.00 | 45.30 | 226.50 |
| Sep-07 | 319,812.95 | 2,577.54 | 0.00 | 45.30 | 271.80 |
| Oct-07 | 322,411.43 | 2,598.48 | 0.00 | 45.30 | 317.10 |
| Nov-07 | | | 0.00 | | |

**HDS1930NTR CB00003**

| | Princ | Int | Pmt |
|---|---|---|---|
| Mar-07 | 534,400.00 | | |
| Apr-07 | 538,742.00 | 4,342.00 | 0.00 |
| May-07 | 543,119.28 | 4,377.28 | 0.00 |
| Jun-07 | 547,532.12 | 4,412.84 | 0.00 |
| Jul-07 | 551,980.82 | 4,448.70 | 0.00 |
| Aug-07 | 556,465.67 | 4,484.84 | 0.00 |
| Sep-07 | 560,986.95 | 4,521.28 | 0.00 |
| Oct-07 | 565,544.97 | 4,558.02 | 0.00 |
| Nov-07 | | | 0.00 |

**SUMMARY TOTAL**

| | Princ | Interest | Payment | Late/Charge | Aggregate L/C Amount Due | Gross Due Princ & L/C Amount Due |
|---|---|---|---|---|---|---|
| Sep-06 | 42,880.00 | | 0.00 | 45.30 | 45.30 | 42,880.00 |
| Oct-06 | 43,228.40 | 348.40 | 0.00 | 45.30 | 45.30 | 43,273.70 |
| Nov-06 | 43,579.63 | 351.23 | 0.00 | 45.30 | 90.60 | 43,670.23 |
| Dec-06 | 43,933.72 | 354.08 | 0.00 | 45.30 | 135.90 | 44,069.62 |
| Jan-07 | 44,290.68 | 356.96 | 0.00 | 45.30 | 181.20 | 44,471.88 |
| Feb-07 | 44,650.54 | 359.86 | 0.00 | 45.30 | 226.50 | 44,877.04 |
| Mar-07 | 45,013.32 | 362.79 | 0.00 | 45.30 | 271.80 | 45,285.12 |
| Apr-07 | 1,106,739.06 | 365.73 | 0.00 | 45.30 | 317.10 | 1,107,056.16 |
| May-07 | 1,115,731.31 | 8,992.25 | 0.00 | 1,166.63 | 1,483.73 | 1,117,215.04 |
| Jun-07 | 1,124,796.63 | 9,065.32 | 0.00 | 1,166.63 | 2,650.36 | 1,127,446.99 |
| Jul-07 | 1,133,935.60 | 9,138.97 | 0.00 | 1,166.63 | 3,816.99 | 1,137,752.59 |
| Aug-07 | 1,143,148.83 | 9,213.23 | 0.00 | 1,166.63 | 4,983.62 | 1,148,132.45 |
| Sep-07 | 1,152,436.91 | 9,288.08 | 0.00 | 1,166.63 | 6,150.25 | 1,158,587.16 |
| Oct-07 | 1,161,800.46 | 9,363.55 | 0.00 | 1,166.63 | 7,316.88 | 1,169,117.34 |
| Nov-07 | 1,171,240.09 | 9,439.63 | 0.00 | 0.00 | 8,483.51 | 1,179,723.60 |

53 WEST MONROE STREET, SUITE 1700, CHICAGO    ILLINOIS 60603
TELEPHONE: 312-251-9600
FACSIMILE: 312-251-9601
EMAIL: MPCONNELLY@CRMLAW.COM

MATTHEW P. CONNELLY

CONNELLY ROBERTS & McGIVNEY LLC

July 20, 2007

John Mazurek, President
Precision American Metals, LLC
1050 Kingsland Dr.
Batavia, Illinois 60510

Re:    **Amada America, Inc.  Agreements in Default:**
       <u>**Payment Necessary to Avoid Proceedings**</u>

Dear Mr. Mazurek:

Please be advised that I represent Amada America, Inc. with regard to several agreements upon which Precision Metals owes Amada and has yet to make a payment.   The agreements are as follows:

a.   Agreement Number 14744, to purchase a ToguIII Tool Grinder from Amada for the purchase price of $21,600.00.  There is a present outstanding amount of $18,919.06 on this Agreement.

b.   Agreement Number 14546, dated July 20, 2006, to purchase a Spot Welder from Amada for the purchase price of $32,000.00. There is a present outstanding amount of $28,028.22 on this Agreement.

c.   Agreement Number 14738, to purchase an APS Software Package from Amada for the purchase price of $89,880.00. There is a present outstanding amount of $73,898.85 on this Agreement.

d.   Agreement Number 14550, to purchase a Fabrivision Inspection Machine from Amada for the purchase price of $64,700.00.   There is a present outstanding amount of $55,087.03 on this Agreement.

e.   Agreement Number 14742, to purchase a Manipulator System from Amada for the purchase price of $122,000.00. There is a present outstanding amount of $99,485.53 on this Agreement.

f.   Agreement Number 14740, to purchase a Turret Punch Press, with Tooling Package and Scrap Conveyor, from Amada for the purchase price of $307,235.00. There is a present outstanding amount of $313,108.10 on this Agreement.

EXHIBIT
J
tabbies

g.  Agreement Number 14741, to purchase a Robotic Press Brake with Tooling Package from Amada for the total purchase price of $605,000.00. There is a present outstanding amount of $549,225.89 on this Agreement.

Although you agreed to remit monthly payments beginning on October 1, 2006 for Agreements number 14744 and 14546, and on May 15, 2007 for Agreements number 14738, 14550, 14742, 14740 and 14741, no payment has yet been received on any of these Agreements. As such, Amada has exercised its right under Section B, Paragraph 7(b) of the Agreements and has accelerated all amounts owed by Precision, making the entire amount owed under each agreement due immediately.

Further, please note that Amada reserves its right under Section B, Paragraph 7(c) of the Agreements to take immediate possession of all Property that is the subject of any of the Agreements, namely, the ToguIII Tool Grinder; the Spot Welder, model number ID40ST; the APS software package; the Fabrivision Inspection Machine; the Manipulator System, model number MP1225NJ; the Turret Punch Press with Tooling Package and Scrap Conveyor, model number EM2510NT; and the Robotic Press Brake with Tooling Package, model number HDS1020NTR.

Pursuant to Section A, Paragraph 4 of the Terms and Conditions of each Agreement, a late fee has been and will continue to be assessed against each Agreement at a rate of 5% of the amount due. Furthermore, the interest on each agreement is still accruing at a rate of 9.75% per month. Accordingly, each month you put off repaying the total amount due to Amada, the amount you owe will continue to increase exponentially.

Your original principle amount due was $1,104,240.00. As of the date of this correspondence, however, the total amount you owe Amada, including any and all late fees and accrued interest, is $1,137,752.68. If you refuse to remit payment of the entire amount you currently owe to Amada America, Inc. within five days of receipt of this letter, we will have no choice but to bring legal action against you.

Please contact me as soon as possible to discuss payment of the total amount you owe.

Very truly yours,

Matthew P. Connelly

MAT:tre

c.c.:  Dave Kehrli
b.c.c.:  Timothy Eavenson

# AMADA AMERICA, INC.

AMADA AMERICA, INC., 7025 Firestone Blvd., Buena Park, CA 90621

## EQUIPMENT PURCHASE AND SECURITY AGREEMENT
### (SUPPLEMENTAL DOCUMENTS)

| BUYER'S NAME | AMADA AMERICA, INC. CUSTOMER NUMBER |
|---|---|
| Precision American Metals, LLC | 29897 |

### UNCONDITIONAL CONTINUING GUARANTY

FOR VALUABLE CONSIDERATION RECEIVED, and to induce AMADA AMERICA, INC. ("Seller") to enter into an Equipment Purchase and Security Agreement ("Agreement"), other agreements and instruments, and any amendments thereto, with Buyer and to perform the obligations thereunder in connection with the sale of certain equipment and other personal property to Buyer on an installment payment basis, the undersigned (whether there be one or more than one, "Guarantors") agrees as follows:

1. Guarantors unconditionally guaranty and promise to pay to Seller, on demand, any indebtedness of Buyer to Seller not paid when due. Where Guarantors include more than one party their liability hereunder shall be joint and several. The word "indebtedness" includes without limitation any advance, debt, obligation or liability of Buyer to Seller, whether heretofore or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, whether recovery upon such indebtedness may be or hereafter become barred by any statute of limitations, and whether such indebtedness may be or hereafter become unenforceable. Without limiting the generality of the foregoing, the indebtedness guaranteed hereunder includes all indebtedness of Buyer to Seller arising out of any equipment purchase, installment sale, security or other agreement relating to the purchase of the Property by Buyer, including without limitation late charges, interest at the highest rate permitted by law, reasonable expense of retaking, holding, preparing for sale, and selling the Property, and deficiency or balance remaining after any sale or other disposition of the Property by Seller after default by Buyer, and all other reasonable expenses and costs incurred by Seller, including attorney's fees.

2. Guarantors authorize Seller, without notice or demand and without affecting the liability of Guarantors hereunder, from time to time to (a) renew, compromise, extend, accelerate or otherwise change the time for payment or change the terms of Buyer's indebtedness to Seller or any part thereof; (b) take and hold security for the payment of this Unconditional Continuing Guaranty or the indebtedness guaranteed hereunder, and exchange, enforce, waive and release any such security; (c) apply such security and direct the order or manner of sale thereof as Seller in its sole discretion may determine; and (d) release or substitute any one or more Guarantors. Seller may without notice assign this Unconditional Continuing Guaranty, in whole or in part, in which case this Unconditional Continuing Guaranty shall inure to the benefit of Seller's assigns and successors in interest.

3. Guarantors waive any right to require Seller to (a) proceed against Buyer or any other party; (b) proceed against or exhaust any security of Buyer held by Seller or any other party; or (c) pursue any other remedy in Seller's power whatsoever. Guarantors waive to the fullest extent permitted by law any defense arising by reason of any disability or other defense of Buyer, or by reason of the cessation from any cause whatsoever of the liability of Buyer. Until all indebtedness of Buyer to Seller shall have been paid in full, Guarantors shall have no right of subrogation and waive any right to enforce any remedy which Seller now has or may hereafter have against Buyer, and waive any benefit of, and any right to participate in, any security now or hereafter held by Seller. Guarantors waive all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance of, and notices of the existence, creation or incurring of new or additional indebtedness under this Unconditional Continuing Guaranty.

4. Any indebtedness of Buyer now or hereafter held by Guarantors is hereby subordinated to the indebtedness of Buyer to Seller. Such indebtedness of Buyer to Guarantors, if Seller so requests, shall be collected, enforced and received by Guarantors as trustees for Seller and be paid over to Seller on account of the indebtedness of Buyer to Seller without reducing or affecting in any manner the liability of Guarantors under the other provisions of this Unconditional Continuing Guaranty.

5. If any of Guarantors is a corporation or partnership, it represents and warrants that the execution of this Unconditional Continuing Guaranty has been authorized by all necessary corporate or partnership action.

6. Guarantors agree to pay reasonable attorneys' fees and all other costs and expenses which may be incurred by Seller in the enforcement of this Unconditional Continuing Guaranty. This Unconditional Continuing Guaranty shall be binding upon the heirs, executors, administrators and assigns of Guarantors. Any amounts due hereunder not paid when due shall accrue interest at the highest rate permitted by law.

7. This Unconditional Continuing Guaranty shall be governed by and construed under the laws of the State of California. Guarantors consent to the non-exclusive jurisdiction of the state and federal courts located in Los Angeles, California and agree that Seller may maintain an action in any such court to collect any amounts payable by Guarantors to Seller hereunder.

IN WITNESS WHEREOF, the undersigned Guarantors have executed this Unconditional Continuing Guaranty

X at 1050 Kingsland Dr. , as of July 20 , 19 2006

### A. INDIVIDUAL GUARANTORS

| SIGNATURE | _John M. Mazurek_ | HOME ADDRESS | 7N295 Whispering Trail Rd ST. Charles, IL 60175 |
| PRINT NAME | JOHN M. MAZUREK | | |
| SIGNATURE | _Pamela Mazurek_ | HOME ADDRESS | 7N795 Whispering Trail Rd ST. Charles, IL 60175 |
| PRINT NAME | PAMELA F. MAZUREK | | |

### B. PARTNERSHIP GUARANTORS

NAME OF PARTNERSHIP

GENERAL PARTNER'S SIGNATURE

PRINT NAME

### C. CORPORATE GUARANTORS

NAME OF CORPORATION

SIGNATURE

PRINT NAME AND TITLE

ATTACH ADDITIONAL SHEETS IF NECESSARY

CORPORATE AND PARTNERSHIP GUARANTORS MUST COMPLETE THE CERTIFICATE OF RESOLUTION OR THE CERTIFICATE OF AUTHORIZATION, AS APPROPRIATE.

**EXHIBIT**

**K**

55 WEST MONROE STREET, SUITE 1700, CHICAGO, ILLINOIS 60603
TELEPHONE: 312-251-9600
FACSIMILE: 312-251-9601
EMAIL: MPCONNELLY@CRMLAW.COM

MATTHEW P. CONNELLY

CONNELLY ROBERTS & McGIVNEY LLC

July 20, 2007

John Mazurek, Guarantor
7N295 Whispering Trail Road
St. Charles, Illinois 60175

> Re:    **Amada America, Inc.  Agreements in Default:**
> **Payment Necessary to Avoid Proceedings**

Dear Mr. Mazurek:

Please be advised that I represent Amada America, Inc. with regard to several agreements upon which Precision Metals owes Amada and has yet to make a payment.  As Guarantor of these agreements, you are responsible for their repayment.   The agreements are as follows:

a.  Agreement Number 14744, to purchase a ToguIII Tool Grinder from Amada for the purchase price of $21,600.00.  There is a present outstanding amount of $18,919.06 on this Agreement.

b.  Agreement Number 14546, dated July 20, 2006, to purchase a Spot Welder from Amada for the purchase price of $32,000.00. There is a present outstanding amount of $28,028.22 on this Agreement.

c.  Agreement Number 14738, to purchase an APS Software Package from Amada for the purchase price of $89,880.00. There is a present outstanding amount of $73,898.85 on this Agreement.

d.  Agreement Number 14550, to purchase a Fabrivision Inspection Machine from Amada for the purchase price of $64,700.00.   There is a present outstanding amount of $55,087.03 on this Agreement.

e.  Agreement Number 14742, to purchase a Manipulator System from Amada for the purchase price of $122,000.00. There is a present outstanding amount of $99,485.53 on this Agreement.

f.  Agreement Number 14740, to purchase a Turret Punch Press, with Tooling Package and Scrap Conveyor, from Amada for the purchase price of $307,235.00. There is a present outstanding amount of $313,108.10 on this Agreement.

g.  Agreement Number 14741, to purchase a Robotic Press Brake with Tooling Package from Amada for the total purchase price of $605,000.00. There is a present outstanding amount of $549,225.89 on this Agreement.

**EXHIBIT**

tabbies®

L

Although Precision agreed to remit monthly payments beginning on October 1, 2006 for Agreements number 14744 and 14546, and on May 15, 2007 for Agreements number 14738, 14550, 14742, 14740 and 14741, no payment has yet been received on any of these Agreements. As such, Amada has exercised its right under Section B, Paragraph 7(b) of the Agreements and has accelerated all amounts owed by Precision, making the entire amount owed under each agreement due immediately.

Pursuant to the Unconditional Continuing Guaranty you signed, you individually and personally promised to pay Amada, on demand, any of Precision's indebtedness to Amada not paid when due. Amada hereby demands that you pay the full amount owed to it by Precision immediately.

Please note, pursuant to Section A, Paragraph 4 of the Terms and Conditions of each Agreement, a late fee has been and will continue to be assessed against each Agreement at a rate of 5% of the amount due. Furthermore, the interest on each agreement is still accruing at a rate of 9.75% per month. Accordingly, each month you put off repaying the total amount due to Amada, the amount you owe as Guarantor will continue to increase exponentially.

Precision's original, principle amount due was $1,104,240.00. As of the date of this correspondence, however, the total amount Precision owes Amada, including any and all late fees and accrued interest, is $1,137,752.68. If you refuse to remit payment of this entire amount currently owed to Amada America, Inc. within five days of receipt of this letter, we will have no choice but to bring legal action against you.

Please contact me as soon as possible to discuss payment of the total amount you owe.

Very truly yours,

Matthew P. Connelly

MAT:tre

c.c.:   Dave Kehrli
b.c.c.: Timothy Eavenson

55 WEST MONROE STREET, SUITE 1700, CHICAGO, Il    lIlS 60603
TELEPHONE: 312-251-9600
FACSIMILE: 312-251-9601
EMAIL: MPCONNELLY@CRMLAW.COM

MATTHEW P. CONNELLY

CONNELLY ROBERTS & McGIVNEY LLC

July 20, 2007

Pamela Mazurek, Guarantor
7N295 Whispering Trail Road
St. Charles, Illinois 60175

Re:   **Amada America, Inc.  Agreements in Default:**
      **Payment Necessary to Avoid Proceedings**

Dear Mrs. Mazurek:

Please be advised that I represent Amada America, Inc. with regard to several agreements upon which Precision Metals owes Amada and has yet to make a payment. As Guarantor of these agreements, you are responsible for their repayment.  The agreements are as follows:

a. Agreement Number 14744, to purchase a ToguIII Tool Grinder from Amada for the purchase price of $21,600.00.  There is a present outstanding amount of $18,919.06 on this Agreement.

b. Agreement Number 14546, dated July 20, 2006, to purchase a Spot Welder from Amada for the purchase price of $32,000.00. There is a present outstanding amount of $28,028.22 on this Agreement.

c. Agreement Number 14738, to purchase an APS Software Package from Amada for the purchase price of $89,880.00. There is a present outstanding amount of $73,898.85 on this Agreement.

d. Agreement Number 14550, to purchase a Fabrivision Inspection Machine from Amada for the purchase price of $64,700.00.  There is a present outstanding amount of $55,087.03 on this Agreement.

e. Agreement Number 14742, to purchase a Manipulator System from Amada for the purchase price of $122,000.00. There is a present outstanding amount of $99,485.53 on this Agreement.

f. Agreement Number 14740, to purchase a Turret Punch Press, with Tooling Package and Scrap Conveyor, from Amada for the purchase price of $307,235.00. There is a present outstanding amount of $313,108.10 on this Agreement.

g. Agreement Number 14741, to purchase a Robotic Press Brake with Tooling Package from Amada for the total purchase price of $605,000.00. There is a present outstanding amount of $549,225.89 on this Agreement.

**EXHIBIT**

tabbies

M

Although Precision agreed to remit monthly payments beginning on October 1, 2006 for Agreements number 14744 and 14546, and on May 15, 2007 for Agreements number 14738, 14550, 14742, 14740 and 14741, no payment has yet been received on any of these Agreements. As such, Amada has exercised its right under Section B, Paragraph 7(b) of the Agreements and has accelerated all amounts owed by Precision, making the entire amount owed under each agreement due immediately.

Pursuant to the Unconditional Continuing Guaranty you signed, you individually and personally promised to pay Amada, on demand, any of Precision's indebtedness to Amada not paid when due. Amada hereby demands that you pay the full amount owed to it by Precision immediately.

Please note, pursuant to Section A, Paragraph 4 of the Terms and Conditions of each Agreement, a late fee has been and will continue to be assessed against each Agreement at a rate of 5% of the amount due. Furthermore, the interest on each agreement is still accruing at a rate of 9.75% per month. Accordingly, each month you put off repaying the total amount due to Amada, the amount you owe as Guarantor will continue to increase exponentially.

Precision's original, principle amount due was $1,104,240.00. As of the date of this correspondence, however, the total amount Precision owes Amada, including any and all late fees and accrued interest, is $1,137,752.68. If you refuse to remit payment of this entire amount currently owed to Amada America, Inc. within five days of receipt of this letter, we will have no choice but to bring legal action against you.

Please contact me as soon as possible to discuss payment of the total amount you owe.

Very truly yours,

Matthew P. Connelly

MAT:tre

c.c.:   Dave Kehrli
b.c.c.: Timothy Eavenson

CIVIL COVER SHEET

RECEIVED

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

JUL 24 2007

**(a) PLAINTIFFS**

AMADA AMERICA, INC.

**DEFENDANTS**

PRECISION AMERICAN METALS, LLC, an Illinois corporation, JOHN M. MAZUREK and DEBRA A. MAZUREK, individually

07 C 4177

**(b)** County of Residence of First Listed Plaintiff   Orange County, California
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

JUDGE MORAN

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Matthew Connelly, Connelly Roberts & McGivney, LLC
55 W. Monroe St., Suite 1700, Chicago, Illinois, 60603
312/251-9600

Attorneys (If Known)

MAGISTRATE JUDGE KEYS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☑ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☑ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☑ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 480 Consumer Credit |
| Student Loans (excl. vet.) | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 490 Cable/Satellite TV |
| ☐ 153 Recovery of Overpayment | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| of Veteran's Benefits | Liability | ☐ 371 Truth in Lending | | | ☐ 850 Security/Commodity/Exch. |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| ☑ 190 Other Contract | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | ☐ 360 Other Personal Inj. | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| | | | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Determination Under |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 ADA—Employment | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| | ☐ 446 ADA — Other | ☐ 550 Civil Rights | Security Act | | ☐ 890 Other Statutory Actions |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

Appeal to District Judge from Magistrate Judgment

| | |
|---|---|
| ☑ 1 Original Proceeding | ☐ 2 Removed from State Court |
| ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened |
| ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation |
| ☐ 7 Appeal to District Judge from Magistrate Judgment | |

## VI. CAUSE OF ACTION (Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

Breach of contract action based on Defendants' failure to pay for goods delivered and accepted.

**VII. PREVIOUS BANKRUPTCY MATTERS** (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary)

**VIII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**IX. This case** ☑ is not a refiling of a previously dismissed action.

☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD

JUDGE NORGLE

MAGISTRATE JUDGE SCHENKIER

### Settlement Agreement and Release

This Settlement Agreement and Release (the "Settlement Agreement") is made and entered into as of the 5th day of December, 2007 (the "Effective Date"), by and between Amada America, Inc., a California Corporation ("Amada"), Precision American Metals, LLC, an Illinois limited liability Corporation ("Precision") and John M. Mazurek and Pamela F. Mazurek, individually (the "Mazurek's"). Collectively, Precision and the Mazurek's are referred to as the "Defendants". Amada, Precision and the Mazurek's are jointly referred to as the "Parties".

### Parties and Recitals:

1.     Amada is a corporation specializing in the manufacture and sale of machine tools to the fabrication industry, with its headquarters and principle place of business at 7025 Firestone Blvd. in the city of Buena Park, California.

2.     Precision is an Illinois limited liability corporation, with its headquarters and principle place of business at 1050 Kingsland Dr., in the village of Batavia, Kane County, Illinois.

3.     The Mazurek's are residents of the village of St. Charles, Kane County, Illinois and are principals of Precision.

4.     In July of 2006, Precision executed seven separate Equipment Purchase and Security Agreements (the "Purchase Agreements"), for the purpose of procuring a number of specialized machines from Amada.  The Purchase Agreements were numbered as follows:

> a.   Agreement Number 14744, to purchase a Tool Grinder from Amada for the total cash purchase price of $21,600.00;
>
> b.   Agreement Number 14546, to purchase a Spot Welder from Amada for the total cash purchase price of $32,000.00;
>
> c.   Agreement Number 14738, to purchase a Software Package from Amada for the total cash purchase price of $89,880.00;
>
> d.   Agreement Number 14550, to purchase an Inspection Machine from Amada for the total cash purchase price of $66,500.00;
>
> e.   Agreement Number 14742, to purchase a Manipulator System from Amada for the total cash purchase price of $121,000.00;
>
> f.   Agreement Number 14740, to purchase a Turret Punch Press, with Tooling Package and Scrap Conveyor, from Amada for the total cash purchase price of $380,820.00;

1


EXHIBIT
B

g.  Agreement Number 14741, to purchase a Robotic Press Brake with Tooling Package from Amada for the total cash purchase price of $668,000.00.

5.  The total value of the Purchase Agreements, less cash down payments and plus interest accrued thereon, is $1,399,955.20.

6.  The Mazurek's individually executed a document entitled "Unconditional Continuing Guaranty". That Guaranty provides, in pertinent part, that the Mazurek's individually guaranty and promise to pay to Amada, on demand, any indebtedness of Precision.

7.  None of the Purchase Agreements have been paid by Precision, or the Mazurek's. Amada has performed its obligations, in their entirety, under the terms of the Purchase Agreements.

8.  As a result of Precision and the Mazurek's failure to tender payment under the Purchase Agreements, a dispute has arisen between Amada, Precision and the Mazurek's. Amada initiated a suit in the United States District Court for the Northern District of Illinois, Eastern Division, captioned *Amada America, Inc., v. Precision American Metals, LLC and John M. Mazurek and Pamela F. Mazurek*, Case no. 07 C 4177 (the "Lawsuit"). The Lawsuit seeks damages for the Defendants' failure to tender payment under the Purchase Agreements, as well prejudgment interest, costs and attorneys' fees. The claims of Amada in the Lawsuit are more fully detailed and defined within its Complaint, which is attached as Exhibit A. The Purchase Agreements and the Mazureks' executed "Unconditional Continuing Guaranty" documents are also attached as exhibits to the Complaint.

**Settlement Agreement:**

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

9.  Amada agrees to accept the sum of $1,469,952.96 (the "Settlement Payment") in full satisfaction of all amounts which Amada claims to be owed to it by Defendants for the goods sold to them as alleged in the Lawsuit. This amount includes the current value of the Purchase Agreements plus prejudgment interest at the rate of 5%. Defendants shall be jointly and severally liable for the full satisfaction of the Settlement Payment.

10. The Settlement Payment shall be payable as follows:

a.  On November 28, 2007 Defendants tendered to Amada payment in the amount of $39,820.34 (the "First Installment"). Amada acknowledges receipt of the First Installment;

2

    b.    The remaining amount due under this Settlement Agreement, or $1,430,132.62 shall be paid in monthly installments of $23,835.54 (the "Monthly Installments"), due on the 15th of each month and beginning on December 15, 2007. The Monthly Installments shall continue until the Settlement Payment is satisfied in full.

11.    Upon receipt of the first Monthly Installment, Amada shall dismiss Defendants, with prejudice and without costs, from the Lawsuit.

**Remedies:**

12.    If, for any reason, Defendants fail to make any payment enumerated in this Settlement Agreement within 7 (Seven) days of when such payment(s) become due (the "Event of Default"), Amada may initiate a proceeding against Defendants under this Settlement Agreement, under its common law or statutory rights, or both, Or, in the alternative, and at the sole discretion of Amada, in the Event of Default, Defendants consent to the entry of a Confession of Judgment Order, without notice, the form and content of such Confession of Judgment Order shall be consistent with the Confession of Judgment Order that is attached as Exhibit B. Such Confession of Judgment Order shall be filed in the United States District Court for the Northern District of Illinois, Eastern Division and shall be enforceable against Defendants jointly and severally. The Parties consent to the jurisdiction of the United States District Court for the Northern District of Illinois, Eastern Division, for the purposes of the enforcement of this Settlement Agreement and for the entry of the Confession of Judgment Order.

13.    For purposes of the Confession of Judgment Order, Defendants appoint the law firm of Connelly Roberts & McGivney LLC, or its designee, as attorneys in fact for Defendants to enter the Confession of Judgment Order and for the preparation of any motion required for the entry of such Order. For purposes of this Agreement, Defendants waive any conflict which may arise with Connelly Roberts & McGivney LLC with respect to the entry of the Confession of Judgment Order, in addition to waiving any appeal rights which may arise resulting from the entry of the Confession of Judgment Order. Defendants also waive and forego any affirmative defenses, bars to enforcement, claims of estoppel, or any other matter which could act as a defense to the proceeding relating to the entry of the Confession of Judgment Order and/or any matters relating to the enforcement of any such Confession of Judgment Order, or supplemental proceedings thereon.

14.    Upon an Event of Default, Defendants shall be liable to Amada for the Settlement Payment, in full, plus attorneys' fees and costs, less any amounts paid by Defendants pursuant to this Settlement Agreement. At the time of the entry of the Confession of Judgment Order, Connelly Roberts & McGivney LLC shall provide the Court with an affidavit stating the amounts previously paid by Defendants pursuant to this Agreement and the attorneys' fees incurred by Amada.

**Release:**

15.    In consideration of the Settlement Payment, the Parties hereby absolutely, irrevocably and unconditionally forever release and discharge each other and, where applicable, their parents, subsidiaries, affiliates and partners from and against any and all claims, liabilities, actions, causes of action, demands, judgments or damages of any and all kind or nature, whatsoever, that the Parties have or may have in the future, whether known or unknown, suspected or unsuspected, at law, in equity, or otherwise, against each other that have, or may, arise out of the Purchase Agreements, or are currently detailed in the Lawsuit. Notwithstanding anything contained in this Settlement Agreement to the contrary, this Settlement Agreement shall in no way affect the rights of Amada stated herein, nor shall it affect the rights of Amada to enforce the terms of this Settlement Agreement, also stated herein.

16.    The Parties make the following representations and warranties to the other Parties hereto:

    a.    *Authority to execute Settlement Agreement*:  It is duly and validly organized and existing and in good standing under the laws of the state of its Organization and has full power and authority to execute, deliver and perform this Settlement Agreement and the documents and instruments to be executed and delivered by it pursuant to this Settlement Agreement. The execution, delivery and performance of this Settlement Agreement by it and each document and instrument to be executed and delivered by it pursuant to this Settlement Agreement have been duly authorized by all required action of the partners, shareholders and directors thereof and other persons whose consent may be required;

    b.    *No Duress*:    The Parties have executed and delivered, or shall execute and deliver, this Settlement Agreement and the other documents and instruments to be executed pursuant hereto, freely and voluntarily, with full knowledge and with the advice of independent legal counsel and without duress;

    c.    *Signatory*:    The person(s) executing this Settlement Agreement, whether individually, or on behalf of any Party enumerated herein, including each documents and instrument to be executed and delivered by such person, has the authority to do so on behalf of such party;

    d.    *Independent Investigation*:    The Parties have made such investigation of the facts pertaining to this Settlement Agreement, and to all of the matters pertaining thereto, as they deem necessary;

    e.    *No Transfers*:  The Parties have not conveyed, pledged, assigned or

4

otherwise transferred any claim which they might have against any other Party hereto.

17.     There are no other agreements or representations, either oral or written, express or implied, relating to the subject matter hereof, that are not embodied in this Settlement Agreement. This Settlement Agreement represents a complete integration of all prior and contemporaneous agreements and understandings of the Parties relating to such subject matter, and that any such agreements, to the extent that they may exist, are hereby superseded by this Settlement Agreement. This Settlement Agreement and any other document referenced herein shall be interpreted in accordance with their fair meanings and shall not be more or less favorably construed with respect to any of the Parties.

18.     This Settlement Agreement shall be binding upon the Parties and their respective successors and assigns and shall inure to the benefit of the Parties, and their respective successors and assigns. No other person or entity shall be, or is intended to be, a beneficiary under this Settlement Agreement.

19.     This Settlement Agreement may be executed in counterparts and all of said counterparts, taken together, will be deemed to constitute one and the same instrument.

20.     Any dispute which may arise under this Settlement Agreement shall be governed by the laws of the State of Illinois.

Executed as of the Effective Date.

By:     Amada America, Inc.

Name:     _W Kehrli, C.C.O._
         D. Kehrli

Title:     _Chief Compliance Officer_


By:     Precision American Metals, LLC

Name:     _____

Title:     _PRESIDENT_


By:     John M. Mazurek, individually

Name:     _____

5

By:  Pamela F. Mazurek, individually

Name: _Pamela F. Mazurek_____

08CV1706    JH
JUDGE NORGLE
MAGISTRATE JUDGE SCHENKIER

*122000166*
02/06/2008
6426086397

This is a LEGAL COPY of
your check. You can use it
the same way you would
use the original check.

RETURN REASON–A
NOT SUFFICIENT
FUNDS

[071002861    02/04/2008
0000000172593B

Suspense

PA

RETURN REASON–A
NOT SUFFICIENT FUNDS

1581

DATE 1 28-08          2-2566-710

PAY TO THE ORDER OF _____ _____ America          $ 23,835.54

Twenty three thousand eight hundred thirty five 54/100 DOLLARS

HARRIS          Harris N.A

FOR Installment

⑈"001581"⑈  ⑆:071025661:⑆  4801364764"  "0002383554"

⑈"001581"⑈    ⑆:071025661:⑆    4801364764"    "0002383554"



EXHIBIT
C

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AMADA AMERICA, INC., a California corporation, | ) ) ) | 08cv1706    JH |
| | ) | JUDGE NORGLE |
| Plaintiff, | ) ) | MAGISTRATE JUDGE SCHENKIER |
| v. | ) ) ) | |
| PRECISION AMERICAN METALS, LLC., An Illinois Limited Liability Corporation, and JOHN M. MAZUREK and PAMELA F. MAZUREK, individually, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MOTION TO ENTER CONFESSION OF JUDGMENT ORDER

Plaintiff, Amada America, Inc. ("Amada"), by its attorneys, Connelly Roberts & McGivney LLC, for its Motion to Enter Confession of Judgment Order, states as follows:

1.  In July of 2006, John M. Mazurek, as President of Precision American Metals, LLC ("Precision"), executed seven separate Equipment Purchase and Security Agreements on behalf of Precision ("the Agreements"), for the purpose of procuring a number of specialized machines from Amada.

2.  The Agreements were individually and personally guaranteed by John M. Mazurek and Pamela F. Mazurek.

3.  Defendants subsequently breached the terms of the Agreements by failing to tender payment for the purchased items.

4.  On July 24, 2007, Amada filed a Complaint alleging breach of contract against Precision and the Mazureks, individually, for their failure to tender payment



under the terms of the Agreements. (A copy of Amada's Complaint is attached as Exhibit "A").

5.      On December 5, 2007, Defendants and Amada entered into a Settlement and Release Agreement. (A copy of the Settlement and Release Agreement is attached hereto as Exhibit "B"). This Settlement and Release Agreement was signed by Precision and the Mazureks individually.

6.      In the Settlement and Release Agreement, Amada agreed to accept the payment of $1,469,952.96 to satisfy the debt owed by Precision and the Mazureks. Precision and the Mazureks agreed that they were jointly and severally liable for the full satisfaction of the Settlement and Release Agreement. (see ¶ 9, Ex. B).

7.      Precision and the Mazureks issued a check for the January 2008 installment payment which was returned for insufficient funds, and Precision and the Mazureks failed to tender payment for the February 2008 installment. (A copy of the insufficient check is attached hereto as Exhibit "C").

8.      Precision and the Mazureks breached their obligations under the Settlement and Release Agreement, and are in default of the same, by:

        a)      Issuing an insufficient check for the January 2008 installment payment, and;

        b)      Failing to tender payment for the February 2008 installment.

9.      In paragraph 12 of the Settlement and Release Agreement, Defendants consented to the entry of a Confession of Judgment Order similar to the Order attached to the Settlement and Release Agreement as Exhibit B. (see ¶ 12, Ex. B).

2

10.    Precision and the Mazureks are liable to Amada for the full Settlement Payment as well as attorney's fees and costs pursuant to paragraph 14 of the Settlement Agreement, which states:

> "Upon an Event of Default, Defendants shall be liable to Amada for the Settlement Payment, in full, plus attorneys' fees and costs, less any amounts paid by Defendants pursuant to this Settlement Agreement. At the time of the entry of the Confession of Judgment Order, Connelly Roberts & McGivney LLC shall provide the Court with an affidavit stating the amounts previously paid by Defendants pursuant to this Agreement and the attorneys' fees incurred by Amada."
> (¶ 14, Ex. B).

11.    Simultaneously with this Motion, Amada filed a Complaint alleging breach of contract based on Precision and the Mazurek's failure to tender payment as required by the terms of the Settlement Agreement. (A copy of the Complaint is attached hereto as Exhibit "D").

12.    Attached is the Affidavit of Cory D. Anderson (the "Affidavit"), an attorney with Connelly Roberts & McGivney LLC, which states the amounts paid to Amada by Defendants, Defendants' outstanding Settlement balance and the attorney's fees and costs incurred by Amada to enforce the Settlement Agreement. (Exhibit "E").

13.    Defendants owe Amada $1,406,296.08 under the terms of the Settlement and Release Agreement. (see Ex. E). Moreover, Amada, per the terms of the Settlement and Release Agreement, is entitled to be reimbursed by Defendants for their fees and costs associated with the enforcement of the Settlement and Release Agreement, totaling $7,150.00. (see Ex. E).

14.    Amada hereby requests this Court enforce the Settlement and Release Agreement by entering the Confession of Judgment Order against Precision American Metals, LLC, John M. Mazurek and Pamela F. Mazurek, jointly and severally.

WHEREFORE, Plaintiff, Amada America, Inc., respectfully requests that this Court:

1) Enter the Confession of Judgment Order against Precision American Metals, LLC, John M. Mazurek and Pamela F. Mazurek, jointly and severally;

2) Enter judgment for Amada America, Inc. and against Precision American Metals, LLC, John M. Mazurek and Pamela F. Mazurek, jointly and severally, in the amount of $1,413,446.08;

3) Or, in the alternative, for any other relief that this Court deems just.

Respectfully Submitted,

Amada America, Inc.,


By:/s/Cory D. Anderson
One of its Attorneys

Matthew P. Connelly
Cory D. Anderson
Connelly Roberts & McGivney LLC
55 W. Monroe St., Suite 1700
Chicago, Illinois 60603
(312)251-9600

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AMADA AMERICA, INC., a California corporation, | ) ) ) | 08cv1706    JH<br>JUDGE NORGLE<br>MAGISTRATE JUDGE SCHENKIER |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| PRECISION AMERICAN METALS, LLC., An Illinois Limited Liability Corporation, and JOHN M. MAZUREK and PAMELA F. MAZUREK, individually, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## AFFIDAVIT OF CORY D. ANDERSON

I, Cory D. Anderson, state:

1) I am an attorney with the law firm of Connelly Roberts & McGivney LLC ("CRM"). I have personal knowledge of the matters recited in this Affidavit and, if called as a witness, I could competently testify thereto.

2) I, along with CRM law clerks, paralegals and Matthew P. Connelly ("Connelly"), also an attorney with CRM, have represented Amada America, Inc. ("Amada") throughout the course of this litigation.

3) I am personally familiar with the billing methods and practices of CRM. My hourly billing rate for this matter is $240.00. Connelly's hourly billing rate for this matter is $350.00. CRM's hourly billing rate for other CRM personnel working on this matter is $140.00.

4) CRM began billing Amada for the research, preparation and presentation of Amada's Complaint for Defendants' breach of the Settlement


EXHIBIT
E

Agreement, Amada's Motion to Enter the Confession of Judgment Order, and the exhibits necessary for the same on February 12, 2008 (collectively the "Confession of Judgment Documents"). CRM concluded billing on the Confession of Judgment Documents on March 12, 2008.

5) Between February 12, 2008 and March 12, 2008, CRM attorneys and law clerks billed a combined total of 31.3 hours towards the completion of the Confession of Judgment Documents. Invoices reflecting the specific dates and time allotments billed for such tasks can be tendered to the Court upon request.

6) The total fees billed to Amada as a result of the 31.3 hours dedicated to the Confession of Judgment Documents by CRM, were $7,150.00. The fees generated by CRM personnel are reasonable and customary and were necessary for the preparation and presentation of the Confession of Judgment Documents. Amada is currently responsible for the $7,150.00.

7) Amada agreed, by way of the Settlement Agreement with Defendants', to accept the payment of $1,469,952.96 (the "Settlement Payment") in satisfaction of the debt owed by Defendants. Defendants agreed to be jointly and severally liable for the Settlement Payment.

8) Amada has received total payments of $63,656.88 from Defendants.

9) The remaining Settlement Payment owed to Amada by Defendants, jointly and severally, is $1,406,296.08.

10) The total amount owed to Amada by Defendants, jointly and severally, under the terms of the Settlement Agreement, is $1,413,446.08. This

amount constitutes the remaining amount owed to Amada by Defendants,

jointly and severally, under the terms of the Settlement Agreement, as well

as the fees generated by CRM for the preparation of the Confession of

Judgment Documents, for which Amada is now responsible.

11)    All of the statements made in the Confession of Judgment Documents, as

well as the exhibits thereto, are true and correct and this Affidavit is

submitted in support of the same.

By: _____

Cory D. Anderson

Attorney for Amada America, Inc.

Sworn to and subscribed before me this

24 th day of March, 2008

_____

Notary Public

NOTARY PUBLIC
OFFICIAL
SEAL
STATE OF ILLINOIS

CRAIG E. DONNELLY
MY COMMISSION EXPIRES
JANUARY 12, 2012

3